1  ADAMS LAW GROUP, LTD.
   JAMES R. ADAMS, ESQ.
2  Nevada Bar No. 6874
   ASSLY SAYYAR, ESQ.
3  Nevada Bar No. 9178
   8681 W. Sahara Ave, Suite 280
4  Las Vegas, Nevada 89117
   Tel: 702-838-7200
5  Fax: 702-838-3636
   james@adamslawnevada.com
6  *Attorneys for Plaintiffs*

7  PUOY K. PREMSRIRUT, ESQ., INC.
   Puoy K. Premsrirut, Esq.
8  Nevada Bar No. 7141
   520 S. Fourth Street, 2nd Floor
9  Las Vegas, NV 89101
   (702) 384-5563
10 (702)-385-1752 Fax
   ppremsrirut@brownlawlv.com
11 *Attorneys for Plaintiffs*

12                    **UNITED STATES DISTRICT COURT**

13                       **DISTRICT OF NEVADA**

14

15 NICOLAS OTOMO, an individual;          | Case No.: 2:10-cv-2199
   TIMOTHY MCCRIGHT, and individual, on
16 behalf of themselves and all those similarly
   situated,
17
              Plaintiffs,                  | **CLASS ACTION COMPLAINT**
18
       vs.                                 | **Demand for Jury Trial**
19
   NEVADA ASSOCIATION SERVICES, INC.,
20 a Nevada corporation; and DAVID STONE,
   an individual,
21
              Defendants.
22

23         Plaintiff Nicolas Otomo, an individual ("Plaintiff Otomo") and Plaintiff Timothy McCright,

24 an individual ("Plaintiff McCright") (collectively, "Plaintiffs"), on behalf of themselves and all others

25 similarly situated, allege as follows:

26 / / /

27 / / /

   / / /
28

*Sidebar (left margin):* ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

## JURISDICTION & VENUE

1.      As this is an action pursuant to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 et seq., this Court has subject matter jurisdiction over this action pursuant 15 U.S.C. §1692k(d) and 28 U.S.C. §1331.

2.      This Court has personal jurisdiction over Nevada Association Services, Inc., ("Defendant NAS") because Nevada Association Services, Inc., is a corporation registered to do business in the State of Nevada, conducts substantial business in the State of Nevada, has sufficient minimum contacts in Nevada, or otherwise intentionally avails itself of the markets within Nevada through the promotion, sales, marketing, and distribution of its services. This Court has personal jurisdiction over David Stone ("Defendant Stone") because Defendant Stone is a resident of the State of Nevada, owns and operates a collection agency in the State of Nevada, and is the principal of Defendant NAS.

3.      Venue is proper in this District under 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in Nevada, or a substantial part of property that is the subject of the action is situated in Nevada.  Further, venue is proper in this District under 28 U.S.C. §1391 (a) and ( c) because Defendant NAS and Defendant Stone reside in this District.  Pursuant to 28 U.S.C. §1391 ( c), a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. Thus, because Defendant NAS and Defendant Stone reside in this District, they transact business in this District, and a substantial part of the events giving rise to the claims arose in this District, venue is proper.

## NATURE OF THE CASE

4.      This is a proposed class action litigation.

5.      The proposed Plaintiff classes consist of thousands of individuals who have obtained title to and have lived in residential real properties located within Nevada common interest communities ("HOAS").

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ADAMS LAW GROUP, LTD.**
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

6.      Defendant NAS is a licensed Nevada collection agency which represents HOAS in the collection of various past due obligations allegedly owned to HOAS by Plaintiffs and the Proposed Class Members (defined *infra*). Defendant Stone owns and operates Defendant NAS.

7.      Although no law nor contract creating any debt described herein expressly authorized Defendant NAS or Defendant Stone to charge directly to Plaintiffs and the Proposed Class Members any specific collection cost or fee, nor have the HOAS ever actually authorized or expressly approved any specific collection cost or fee for Defendants to charge to Plaintiffs and the Proposed Class Members, for years it has been the practice of Defendant NAS and Defendant Stone to add thousands of dollars of collection fees and costs on top of the principal amount of the debt allegedly owed by Plaintiffs and the Proposed Class Members to the HOAS, and then directly bill to and collect from Plaintiffs and the Proposed Class Members (and not from the HOAS), those fees and costs.

8.      Unlike lawful debt collection practices of charging the creditor a percentage of the debt collected, or charging the creditor an agreed flat collection fee, or charging a specific and expressly authorized collection fee amount to the debtor which is contractually agreed to between the creditor and debtor, or charging fees and costs expressly approved and authorized by the creditors, the Defendants add unlimited collection fees and costs on top of the principal amount of the debt and demand those fees and costs from Plaintiffs and the Proposed Class Members.

9.      In doing so, Defendants have been free to invent and charge whatever egregious collection fees and costs for whatever services and items Defendants' unilaterally decide they want to charge to debtor Plaintiffs and Proposed Class Members.

10.      As a result of Defendants' practice of billing directly to the Plaintiffs and the Proposed Class Members unlimited debt collection fees and costs which were not specifically enumerated or expressly authorized between the debtor Plaintiffs and the creditor HOAS, the amount of collection fees and costs have skyrocketed, often dwarfing the principal amount of the original debts.

11.    This collection practice, which has no authorization either in law or in the contract which created the debt, is particularly outrageous because Defendants act to cloud title to the real properties of Plaintiffs and the Proposed Class Members by maintaining alleged liens against the properties for the unlawful collection fees, and refuse to release those alleged liens and halt further collection charges until the collection fees are paid directly to the Defendants.

12.    Thus, Defendants have made, and continue to make improper, unlawful and unauthorized collection demands upon Plaintiffs and the Proposed Class Members.

13.    Defendants have wrongfully maintained liens and/or wrongfully filed default and foreclosure notices with county recorders' offices against Plaintiffs and the Proposed Class Members in violation of the FDCPA and state law.

14.    As a result of Defendants' practices as herein described, Defendants have received and retained the monies of Plaintiffs and the Proposed Class Members to which Defendants have no legal entitlement.

**THE PARTIES**

15.    Plaintiff Otomo is a resident of Las Vegas, Nevada, located in the County of Clark, and owns and lives in a home located within the Lynbrook Master Association ("Lynbrook HOA") Plaintiff Otomo is a "consumer" as defined by the FDCPA, 15 U.S.C. §1692a(3). Plaintiff Otomo has received debt collection notices from Defendants, has had publicly recorded against him a notice of delinquent assessment lien and Notice of Default by Defendants, and has had maintained by Defendants against his property alleged liens based upon Defendants' unlawful collection fees, and has paid collection fees to Defendants.

16.    Plaintiff McCright is a resident of Las Vegas, Nevada, located in the County of Clark, and owns and lives in a home located within the Willow Tree Homeowners Association ("Willow Tree HOA"). Plaintiff McCright is a "consumer" as defined by the FDCPA, 15 U.S.C. §1692a(3). Based upon Defendants' unlawful collection fees, Plaintiff McCright has received debt collection notices from Defendants, and has had publicly recorded against him and his property by Defendants a notice of delinquent assessment lien, a Notice of Default, a Notice of Trustee's Sale,

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

1   and has had maintained by Defendants against his property alleged liens based upon Defendants'
2   unlawful collection fees, and has paid collection fees to Defendants.

3       17.     Defendant NAS is a corporation organized under the laws of the State of Nevada
4   and conducts significant amounts of collection agency business in Nevada. Defendant is engaged in
5   the business of collecting consumer debts and regularly collects consumer debts. Defendant NAS
6   is, accordingly, a "debt collector" as defined in the FDCPA, 15 U.S.C. §1692a(6).

7       18.     Defendant Stone is the President, Secretary, Treasurer and Director of Defendant
8   NAS. Upon information and belief, Defendant Stone has a high level of involvement in the
9   improper and unlawful activities as described herein, and is an employee and owner of Defendant
10  NAS. Defendant Stone is engaged in the business of collecting consumer debts and regularly
11  collects consumer debts. Defendant Stone is, accordingly, a "debt collector" as defined in the
12  FDCPA, 15 U.S.C. §1692a(6).

13                          **INDIVIDUAL FACTUAL ALLEGATIONS**

14      19.     Plaintiff Otomo owns and lives in home located within Lynbrook HOA and Plaintiff
15  McCright owns and lives in a home located within the Willow Tree HOA. Thus, both Plaintiffs
16  own "units" as defined by NRS §116.093 (the "Otomo Home" and the "McCright Home"
17  respectively).

18      20.     The Lynbrook HOA and the Willow Tree HOA have recorded and published with
19  the county recorder's office, covenants, conditions and restrictions (the "Lynbrook CC&RS"
20  attached as Exhibit 1 and the "Willow Tree CC&RS" attached as Exhibit 2) (collectively, the
21  "CC&RS").

22      21.     The provisions of the Lynbrook CC&RS bind both Lynbrook HOA and Plaintiff
23  Otomo.

24      22.     The provisions of the Willow Tree CC&RS bind both Willow Tree HOA and
25  Plaintiff McCright.

26      23.     Pursuant to the Lynbrook CC&RS, Lynbrook HOA may impose upon Plaintiff
27  Otomo charges for late payment of common area assessments.

28

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

24.    There is no provision in the Lynbrook CC&RS which allows a third party debt collector to impose directly upon Plaintiff Otomo any amount of collection fees or other such charges at the sole discretion of the debt collector.

25.    Pursuant to the Willow Tree CC&RS, Willow Tree HOA may impose upon Plaintiff McCright charges for late payment of common area assessments.

26.    There is no provision in the Willow Tree CC&RS which allows a third party debt collector to impose directly upon Plaintiff McCright any amount of collection fees or other such charges at the sole discretion of the debt collector.

27.    Nevada Revised Statutes §116.3116 governs liens against properties located within homeowners' associations, such as the Otomo Home and the McCright Home, and generally states as follows: homeowners' associations have a statutory lien on any unit of real property located with their associations for any assessment imposed against a unit or fine imposed against the unit's owner from the time the assessment or fine became due (the "HOA Lien").

28.    Nevada Revised Statutes §116.3102(k) permits only Lynbrook HOA to impose charges for late payment of assessments against Plaintiff Otomo and permits only Willow Tree HOA to impose charges for late payment of assessments against Plaintiff McCright.

29.    Further, Nevada Revised Statutes §116.310313(1) permits only Lynbrook HOA to charge Plaintiff Otomo reasonable fees to cover the costs of collecting any past due obligation and permits only Willow Tree HOA to charge Plaintiff McCright reasonable fees to cover the costs of collecting any past due obligation.

30.    Nevada Revised Statutes §116.310313(3)(a) defines "costs of collecting" as any fee, charge or cost, by whatever name, including, without limitation, any collection fee, filing fee, recording fee, fee related to the preparation, recording or delivery of a lien or lien rescission, title search lien fee, bankruptcy search fee, referral fee, fee for postage or delivery and any other fee or cost that an association charges a unit's owner for the enforcement or collection of a past due obligation.

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

1
2
3
4

31.    There is no provision at law which authorizes third party debt collectors, like Defendant NAS and Defendant Stone, to unilaterally assess and charge to Plaintiffs any and all fees and costs that Defendants wish to charge in the collection of past due obligation allegedly owed by Plaintiff Otomo to Lynbrook HOA or owed by Plaintiff McCright to Willow Tree HOA.

5
6
7

32.    Upon information and belief, Defendant Stone caused Defendant NAS to enter into an agreement with Lynbrook HOA and Willow Tree HOA to provide collection services (Willow Tree HOA Collection Agreement attached hereto as Exhibit 3) (the "Collection Agreements").

8
9
10
11

33.    Upon information and belief, through the Collection Agreements, Lynbrook HOA and Willow Tree HOA did not expressly approve or authorize any particular fee that could be charged by Defendants to Plaintiffs, nor did the Collection Agreements enumerate or authorize any particular items or collection activities for which charges could be incurred.

12
13
14
15
16

34.    It has been the practice between the Lynbrook HOA and Defendants and the Willow Tree HOA and Defendants, that Defendants would not charge, bill, or collect from the Lynbrook HOA or the Willow Tree HOA any such collection fees, but would instead bill to and collect from Plaintiff Otomo and Plaintiff McCright all such collection fees as Defendants determined, in their discretion, to charge.

17
18
19
20

35.    Upon information and belief, at no time relevant hereto did Lynbrook HOA or Willow Tree HOA ever actually incur any collection fees for Defendants' collection services as such fees were not the obligation of the HOAS pursuant to the Collection Agreements and pursuant to past practices between Defendants and the Lynbrook HOA and Willow Tree HOA.

21
22
23
24

36.    Further, upon information and belief, because the Collection Agreements failed to specify any particular items or activities for which said collection fees could be charged, no particular amount of collection fees were expressly charged, authorized or approved by Lynbrook HOA or Willow Tree HOA.

25
26
27

37.    Although (a) the Lynbrook CC&RS and Willow Tree CC&RS never expressly authorized specific collection fees to be charged by Defendants to Plaintiffs Otomo and McCright; and (b) although the Lynbrook HOA and Willow Tree HOA never actually incurred said fees; and

28

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

1

2   (c) although the Collection Agreements never specified what collection fees and costs that could be

3   charged; and (d) although there is no law which permits Defendants to charge directly to Plaintiffs

    Otomo and McCright any collection fees Plaintiffs Otomo and McCright received the following

4   debt collection letter from Defendants.  Plaintiff Otomo's June 24th, 2010, letter stated:

5           "As of today's date, records show a balance due on your account of
            $1,447.98. Any statements or invoices you receive from your
6           association or its managing agent will not reflect the total amount
            due.  If you want to resolve this matter before a Notice of Delinquent
7           Assessment Lien is recorded and sent to you pursuant to Nevada
            Revised Statutes, you must, within 10 days from the date of this
8           letter, pay the balance due.... Should you decide not to pay within the
            10 day period, this office will be entitled to proceed with the
9           preparation and recordation of the Notice of Delinquent Assessment
            Lien. Should the Notice of Delinquent Assessment Lien be prepared
10          and recorded, the additional cost to you will be $325.00 plus
            recording and mailing costs. There will also be a $30.00 charge to
11          your account to release the Notice of Delinquent Assessment Lien,
            plus recording costs. These charges may not be all inclusive.

12          Federal Law gives you 30 Days from the date you receive this letter
            (the 30 Day Period) to dispute the validity of the debt or any part
13          thereof. If you do not dispute the validity of the debt or any portion
            thereof as outlined above, NAS will assume the debt is valid. If you
14          do contest the validity of the debt or any portion thereof as outlined
            above, NAS will assume the debt is valid. If you do contest the
15          validity of this debt or any portion thereof, by notifying NAS in
            writing to that effect, NAS will, as required by law, obtain and mail
16          to you verification of the original creditor, if the original creditor is
            different from the current creditor, the Association, NAS will also
17          furnish you with that information. Federal Law does not require NAS
            to wait until the end of the 30 Day Period to record the Notice of
18          Delinquent Assessment Lien. If, however, you notify NAS, in
            writing, withing the 30 Day Period, that begins with the receipt of
19          this letter, that you dispute the debt or any portion thereof, or that
            you request the name and address of the original creditor, if the
20          original creditor is difference from the current creditor, the
            Association, NAS will, as required by law, cease collection of the
21          debt or any disputed portion thereof until NAS obtain verification of
            the debt or the name and address of the original creditor and a copy
22          of such verification or name of the original creditor is mailed to you
            by NAS. (Exhibit 4).
23

24          38.     On February 13th, 2009, Plaintiff McCright received from Defendants an identical

25  letter (Exhibit 5) to Plaintiff Otomo's June 24th, 2010, letter with the exception that the amount

26  demanded in the Plaintiff McCright's February 13th, 2009, letter was $1,510.50 (collectively, the

27  "Initial Demand Letters").

28

39.     The Initial Demand Letters communicated false, misleading or contradictory information to Plaintiffs Otomo and McCright because:

a.      they stated that the Notice of Delinquent Assessment Lien ("Delinquent Lien Notice") could be recorded pursuant to Nevada Revised Statutes when there is no Nevada Revised Statute that permits the recording of such a document;

b.      they stated that the alleged debt must be paid with 10 days or else Defendants would be "entitled" to record the Delinquent Lien Notice when Defendants were not so entitled because the recording of such a document was not authorized by Nevada Revised Statutes and was not permitted pursuant to the Fair Debt Collection Practices Act;

c.      they stated that should Defendants record the Delinquent Lien Notice, the cost to Plaintiffs would be $325.00 plus recording costs when no such costs were permitted because the recording of the document was not authorized by Nevada Revised Statutes and was not permitted pursuant to the Fair Debt Collection Practices Act;

d.      they suggested that the Delinquent Lien Notice was a lien, when, in fact, the document was not a lien, but merely a notice. The document was not a lien because pursuant to NRS 116.3116(4), the recording of the CC&RS constitutes record notice and perfection of a homeowners' association lien. No further recording of any claim of lien for assessment under NRS 116 is required;

e.      they stated that a fee would be charged to "release" the Delinquent Lien Notice, when, in fact, the document was not a "lien" that needed to be or could be "released" and no such fee was, therefore, required or permitted for such a "release";

f.      they stated that "Federal Law does not require NAS to wait until the end of the 30 Day Period to record the Notice of Delinquent Assessment Lien" which suggests that "Federal Law" authorized the recording of such a document when, in fact, there is no federal law which authorizes the recording of the Delinquent Lien Notice;

g.      they stated that the current creditor was the "Association" when, in fact, no collection fees or costs were ever expressly charged, approved or authorized by the Lynbrook HOA

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

1  or the Willow Tree HOA, were never incurred by said HOAS, were never expressly agreed to by

2  the Plaintiffs in the CC&RS and, thus, the HOAS were not the "creditor" of the collection fees, but

3  only of the past due assessments;

4     h.  they stated a particular "balance due" or "debt" was owed to the Lynbrook HOA

5  and Willow Tree HOA when, in fact, the "balance due" or "debt" claimed in the Initial Demand

6  Letters included collection fees and costs which were never expressly charged, approved or

7  authorized by the Lynbrook HOA or the Willow Tree HOA, were never incurred by said HOAS,

8  were never expressly agreed to by Plaintiffs in the CC&RS, and, thus, did not constitute a "debt"

9  owed to the Lynbrook HOA and Willow Tree HOA by the Plaintiffs;

10     i.  they stated that the alleged debt must be paid within 10 days or else the Delinquent

11  Lien Notice would be filed and Plaintiffs would be required to pay additional fees and costs.  Such

12  statements plainly undercut and overshadow the message of the 30 day debt validation notice so as

13  to mislead Plaintiffs into believing they must ignore their right to take 30 days to verify their debts,

14  and act within 10 days so as to avoid suffering the unpermitted publication of their debt to the

15  general public and the unlawful incurrence of additional fees and costs.

16     40.  On the 29th day of July, 2010, Defendants mailed to Plaintiff Otomo a follow-up

17  debt collection letter.  The follow-up debt collection letter stated in pertinent part:

18      As you were previously advised, Nevada Association Services, Inc.,
("NAS") has been retained by Lynbrook Master Association (the

19      Association) to collect from you the overdue homeowner's
assessments you owe the Association. As of the date the lien was

20      prepared, the total amount due, including collection fees and costs is
$1,848,98 (also called the balance due or debt). Since you have

21      decided not to reinstate your account, a Notice of Delinquent
Assessment Lien was recorded on your property. A copy of the lien

22      is enclosed. The amount stated above does NOT include
assessments, late fees, interest, fines, collection fees and costs, and

23      other applicable charges, that have become due since the date the lien
was recorded. Those additional amounts must be included when you

24      submit your payment. Therefore, you may wish to contact this office
to verify the amount due prior to sending your payment.

25      Nevada Law permits NAS to proceed with the recordation of a

26      Notice of Default and Election to Sell (also called an "NOD") which
is the next step in the lien foreclosure process. If you want to resolve

27      this matter before the recordation of the NOD, you must, within 30
days from the date of this letter, pay the balance due by cashier's

28

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

1

2

3

4

5

check or money order payable to NAS. Recording of the NOD will result in additional charges fro which you will be responsible. The 30 Day Period referenced in our prior "Initial Letter" still applies. Federal Law grant you 30 Days from the date of receipt of the Initial Letter to dispute the validity of the debt or any portion thereof. Should you fail to dispute, in writing, the validity of the debt or any portion thereof within the 30 Day Period, NAS will assume the debt is valid. If you dispute the debt or any portion thereof in writing, NAS will, to the extent required by law, cease collection efforts until validation of the debt is sent to you. (Exhibit 6)

6

7

8

9

41.     On March 3rd, 2009, Plaintiff McCright received from Defendants an identical letter (Exhibit 7) to Plaintiff Otomo's July 29th, 2010, letter with the exception that the amount demanded in the Plaintiff McCright March 3rd, 2009, letter was $1,901.50 (collectively, the "Secondary Demand Letters").

10

11

42.     The Secondary Demand Letters communicated false, misleading or contradictory information to Plaintiffs Otomo and McCright because:

12

13

14

15

16

a.     they stated in several places that the Delinquent Lien Notice was a "lien" when, in fact, it was merely a notice.  For example, they stated "A copy of the lien is enclosed" and "the lien was recorded."  However, said document was, in fact, not a "lien" because the actual lien was created and perfected by the recording of the CC&RS pursuant to NRS 116.3116(4) and no subsequent document is required to be recorded;

17

18

19

20

21

22

b.     they stated a particular "balance due" or "debt" was owed to the Lynbrook HOA and Willow Tree HOA when, in fact, the "balance due" or "debt" claimed in the Secondary Demand Letters included collection fees and costs which were never expressly charged, approved or authorized by the Lynbrook HOA or the Willow Tree HOA, were never incurred by said HOAS, were never expressly agreed to by Plaintiffs in the CC&RS, and, thus, did not constitute a "debt" owed to the Lynbrook HOA and Willow Tree HOA by the Plaintiffs;

23

24

25

26

27

c.     they stated that the alleged debt must be paid within 30 days of the date of the Secondary Demand Letters or else a Notice of Default would be filed and Plaintiffs would be required to pay additional fees and costs.  Such statements plainly undercut and overshadowed the message of the 30 day debt validation notice so as to mislead Plaintiffs into believing they must ignore their right to take 30 days to verify their debts, and act within 30 days so as to avoid

28

suffering the recording of a Notice of Default and the unlawful incurrence of additional fees and costs.

43.    On or about the 29th day of July, 2010, Defendants mailed to Plaintiff Otomo, and on or about the 3rd day of March, 2009, mailed to Plaintiff McCright the Delinquent Lien Notices. Pursuant to NRS §116.31162(1)(a), the mailing of the Delinquent Lien Notices is the first step in the foreclosure process of an HOA Lien.

44.    There is no provision at law which permits the public recording or publishing of the Delinquent Lien Notices nor did Plaintiff Otomo or Plaintiff McCright expressly authorize such recording.

45.    Without the prior consent of Plaintiff Otomo, on the 26th day of July, 2010, Defendants published the Delinquent Lien Notice against Plaintiff Otomo by recording it with the Clark County, Nevada, Recorder's Office (Exhibit 8) thereby communicating to the general public information related to the alleged debt of Plaintiff Otomo, including Plaintiff Otomo's identity.

46.    Without the prior consent of Plaintiff McCright, on the 2nd day of March, 2009, Defendants published the Delinquent Lien Notice against Plaintiff McCright by recording it with the Clark County, Nevada, Recorder's Office (Exhibit 9) thereby communicating to the general public information related to the alleged debt of Plaintiff McCright, including Plaintiff McCright's identity.

47.    The amount due noted in the both Delinquent Lien Notices were false as they included collection fees and costs which were not expressly charged, authorized or approved by the Lynbrook HOA or Willow Tree HOA, not actually incurred by the Lynbrook HOA or Willow Tree HOA, not permitted by the Lynbrook CC&RS or Willow Tree CC&RS, nor authorized by law for Defendants to charge directly to Plaintiff Otomo and Plaintiff McCright.

48.    On the 5th day of October, 2010, Defendants mailed to Plaintiff Otomo a letter stating, "As you know, your failure to pay your homeowners' association assessments has resulted in a Notice of Delinquent Assessment Lien being recorded against your property. The Association will soon proceed with a non-judicial foreclosure auction, which could result in you losing your

property. You will be responsible to pay the additional foreclosure fees and costs, which could total approximately $700 in additional charges." (Exhibit 10). On the 25th day of March, 2009, Defendants mailed to Plaintiff McCright a substantially similar letter (Exhibit 11) (collectively, the "Foreclosure Letters").

49.     Upon information and belief, the Foreclosure Letters were false, misleading or contradictory for the following reasons:

a.     they stated that the Lynbrook HOA and Willow Tree HOA would "soon proceed with a non-judicial foreclosure" when, in fact, Defendants and the HOAS had no intention of soon proceeding with non-judicial foreclosure auctions. This is so because Defendants and the HOAS knew that HOAS in recent years, rarely, if ever, foreclosed their HOA Liens due to the fact that residential first mortgages exceeded the value of the real properties they encumbered;

b.     they stated that Plaintiffs would be responsible for paying addition foreclosure fees, when, in fact, no such fees would be chargeable to Plaintiffs because such fees were not expressly charged, authorized or approved by the Lynbrook HOA or Willow Tree HOA, not actually incurred by the Lynbrook HOA or Willow Tree HOA, not permitted by the Lynbrook CC&RS or Willow Tree CC&RS, or authorized by law for Defendants to charge directly to Plaintiff Otomo and Plaintiff McCright.

c.     they stated that unless full payment is received by Defendants with 10 days of the date of the Foreclosure Letter, "foreclosure proceedings will commence," when, in fact, "foreclosure proceedings" had already commenced by the mailing of the Delinquent Lien Notice.

d.     they stated that due to the Plaintiffs' failure to pay their debts, a "lien" was recorded against their properties when the Delinquent Lien Notice was, in fact, not a "lien," but merely a notice.

50.     On the 21st day of October, 2010, Defendants caused to record against Plaintiff Otomo in the Clark County, Nevada, Recorder's Office a Notice of Default and Election to Sell Under Homeowners Association Lien (Exhibit 12).

51.     On the 17th day of November, 2009, Defendants caused to record against Plaintiff McCright in the Clark County, Nevada, Recorder's Office a Notice of Default and Election to Sell Under Homeowners Association Lien (Exhibit 13) (collectively the "NODS").

52.     The NODS stated, "WARNING. IF YOU FAIL TO PAY THE AMOUNT SPECIFIED IN THIS NOTICE, YOU COULD LOSE YOUR HOME."

53.     The aforementioned statement in the NODS was false because Defendants had no intention of ever foreclosing on the Otomo Home and the McCright Home as they remained subject to the first secured lender.  Therefore, Plaintiff Otomo and Plaintiff McCright could not lose their home.

54.     The aforementioned statement in the NODS were false because Defendants had no legal or contractual right to cause the foreclosure of the Otomo Home and the McCright Home for the amount Defendants stated in the NODS.  Therefore Plaintiff Otomo and Plaintiff McCright could not lose their homes.

55.     The NODS were false because they stated an incorrect amount of money as being due by Plaintiff Otomo and Plaintiff McCright to satisfy their delinquency.  The amounts were false because they included collection fees which were not expressly charged, authorized or approved by the Lynbrook HOA or the Willow Tree HOA, not actually incurred by the Lynbrook HOA or Willow Tree HOA, not permitted by the Lynbrook CC&RS or Willow Tree CC&RS, or authorized by law for Defendants to charge directly to Plaintiff Otomo and Plaintiff McCright.

56.     The NODS were also false because they stated that the Delinquent Lien Notice was a "lien," when in fact, it was merely a notice.

57.     The NODS were merely a clever rouse to trick and coerce Plaintiff Otomo and Plaintiff McCright into paying Defendants' unilaterally imposed collection fees and costs which were neither authorized by statute, nor by the contract creating the debt (the CC&RS), nor expressly charged, authorized or approved by the Lynbrook HOA or Willow Tree HOA.

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

58.     On or about November 23, 2010, Defendants cause to record against Plaintiff McCright in the Office of the Clark County Recorder a Notice of Foreclosure Sale ("NFS") (Exhibit 14).

59.     The NFS stated, "WARNING! A SALE OF YOUR PROPERTY IS IMMINENT!"

60.     The aforementioned statement in the NFS was false because, upon information and belief, Defendants had no intention of ever foreclosing on the McCright Home.  Therefore, the sale of the McCright Home was not "imminent."

61.     Further, the "unpaid balance" stated in the NFS was false because it included collection fees which were not expressly charged, authorized or approved by the Willow Tree HOA, not actually incurred by the Willow Tree HOA, not permitted by the Willow Tree CC&RS, or authorized by law for Defendants to charge directly to Plaintiff McCright.

## CLASS ACTION ALLEGATIONS

62.     Claimants bring this action on behalf of themselves and a class of persons initially defined as follows:

Proposed Sub-Class A - "The Initial Demand Letter Recipients"

> all natural persons who own and reside in, or owned and resided in homes located in HOAS and who received the Initial Demand Letter from Defendants ("Proposed Sub-Class A Members")

Proposed Sub-Class B - "The Secondary Demand Letter Recipients"

> all natural persons who own and reside in, or owned and resided in homes located in HOAS and who received the Secondary Demand Letters from Defendants ("Proposed Sub-Class B Members")

Proposed Sub-Class C - "The Shame List"

> all natural persons who own and reside in, or owned and resided in homes located in HOAS and against whom Defendants have published or recorded Delinquent Lien Notices for non-payment of HOA assessments and other such fees wherein such natural persons did not give prior consent for the publication or recordation of such notices ("Proposed Sub-Class C Members")

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

Proposed Sub-Class D - "The Delinquent Lien Notice Recipients"

> all natural persons who own and reside in, or owned and resided in homes located in HOAS and who received from Defendants or had recorded against them by Defendants the Delinquent Lien Notices ("Proposed Sub-Class D Members")

Proposed Sub-Class E - "The Foreclosure Letter Recipients"

> all natural persons who own and reside in, or owned and resided in homes located in HOAS and who received the Foreclosure Letters from Defendants ("Proposed Sub-Class E Members")

Proposed Sub-Class F - "The NODS Recipients"

> all natural persons who own and reside in, or owned and resided in homes located in HOAS and who received from Defendants or had recorded against them by Defendants the NODS ("Proposed Sub-Class F Members")

Proposed Sub-Class G - "The NFS Recipients"

> all natural persons who own and reside in, or owned and resided in homes located in HOAS and who received from Defendants or had recorded against them by Defendants the NFS ("Proposed Sub-Class G Members")

Collectively, the "Proposed Class Members".

63.    The Proposed Class Members are consumers who own and live in, or owned and lived in homes located within the HOAS and, thus, own or owned a "unit" as defined by NRS §116.093 ("Members' Homes").

64.    The HOAS have recorded and published with the county recorder's offices, covenants, conditions and restrictions, the provisions of which bind the HOAS and the Proposed Class Members (the "CC&RS").

65.    Pursuant to the CC&RS, HOAS may impose upon the Proposed Class Members charges for late payment of common area assessments.

66.    There are no provisions in the CC&RS which allow a third party debt collector, such as Defendant Stone and Defendant NAS, to impose directly upon the Proposed Class Members any amount of collection fees or other such charges at the sole discretion of Defendants.

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

67.     Nevada Revised Statutes §116.3116 governs liens against properties located within HOAS and generally states as follows: HOAS have a statutory lien on any unit of real property located with their associations for any assessment imposed against a unit or fine imposed against the unit's owner from the time the assessment or fine became due (the "HOA Lien").

68.     Nevada Revised Statutes §116.3102(k) permits only HOAS to impose charges for late payment of assessments against the Proposed Class Members.

69.     Further, Nevada Revised Statutes §116.310313(1) permits only HOAS to charge to the Proposed Class Members reasonable fees to cover the costs of collecting any past due obligation.

70.     Nevada Revised Statutes §116.310313(3)(a) defines "costs of collecting" as any fee, charge or cost, by whatever name, including, without limitation, any collection fee, filing fee, recording fee, fee related to the preparation, recording or delivery of a lien or lien rescission, title search lien fee, bankruptcy search fee, referral fee, fee for postage or delivery and any other fee or cost that HOAS charge a unit's owner for the enforcement or collection of a past due obligation.

71.     There is no provision at law which authorizes third party debt collectors, like Defendant NAS and Defendant Stone, to unilaterally assess and charge to the Proposed Class Members any and all fees and costs that Defendants wish to charge in the collection of past due obligations allegedly owed by the Proposed Class Members to the HOAS.

72.     Upon information and belief, Defendant Stone caused Defendant NAS to enter into Collection Agreements with the HOAS.

73.     Upon information and belief, through the Collection Agreements, the HOAS did not expressly approve or authorize any particular fee that could be charged by Defendants, nor did the Collection Agreements enumerate or authorize any particular items or collection activities for which charges could be incurred.

74.     It has been the practice between the HOAS and Defendants that Defendants would not charge, bill, or collect from the HOAS any such collection fees, but would instead bill to and

1
2
collect from the Proposed Class Members all such collection fees as Defendants determined, in their discretion, to charge.

3
4
5
6
75.     Upon information and belief, at no time relevant hereto did the HOAS ever actually incur any collection fees for Defendants' collection services as such fees were not the obligation of the HOAS pursuant to the Collection Agreements and pursuant to past practices between Defendants and the HOAS.

7
8
9
76.     Further, upon information and belief, because the Collection Agreements failed to specify any particular items or activities for which said collection fees could be charged, no particular amount of collection fees were expressly authorized or approved by the HOAS.

10
11
12
13
14
15
77.     Although (a) the HOAS never expressly charged, approved or authorized specific collection fees; and (b) although the HOAS never actually incurred said fees; and (c) although the Collection Agreements never specified what collection fees and costs that could be charged; and (d) although there is no law which permits Defendants to charge directly to the Proposed Class Members any collection fees, the Proposed Sub-Class A Members received from Defendants the Initial Demand Letters.

16
17
78.     The Initial Demand Letters communicated false, misleading or contradictory information to the Proposed Sub-Class A Members because:

18
19
20
a.     they stated that the Delinquent Lien Notice could be recorded pursuant to Nevada Revised Statutes when there is no Nevada Revised Statute that permits the recording of such a document;

21
22
23
24
b.     they stated that the alleged debt must be paid with 10 days or else Defendants would be "entitled" to record the Delinquent Lien Notice when Defendants were not so entitled because the recording of such a document was not authorized by Nevada Revised Statutes and was not permitted pursuant to the Fair Debt Collection Practices Act;

25
26
c.     they stated that should Defendants record the Delinquent Lien Notice, the cost to the Proposed Sub-Class A Members would be $325.00 plus recording costs when no such costs were

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

permitted because the recording of the document was not authorized by Nevada Revised Statutes and was not permitted pursuant to the Fair Debt Collection Practices Act;

d.     they suggested that the Delinquent Lien Notice was a lien, when, in fact, the document was not a lien, but merely a notice.  The document was not a lien because pursuant to NRS 116.3116(4), the recording of the CC&RS constitutes record notice and perfection of a homeowners' association lien. No further recording of any claim of lien for assessment under NRS 116 is required;

e.     they stated that a fee would be charged to "release" the Delinquent Lien Notice, when, in fact, the document was not a "lien" that needed to be or could be "released" and no such fee was, therefore, required or permitted for such a "release";

f.     they stated that "Federal Law does not require NAS to wait until the end of the 30 Day Period to record the Notice of Delinquent Assessment Lien" which suggests that "Federal Law" authorized the recording of such a document when, in fact, there is no federal law which authorizes the recording of the Delinquent Lien Notice;

g.     they stated that the current creditor was the "Association" when, in fact, no collection fees or costs were ever expressly charged, approved or authorized by the HOAS, were never incurred by the HOAS, were never expressly agreed to by the Proposed Sub-Class A Members in the CC&RS and, thus, the HOAS were not the "creditor" of the collection fees, but only of the past due assessments;

h.     they stated a particular "balance due" or "debt" was owed to the HOAS when, in fact, the "balance due" or "debt" claimed in the Initial Demand Letters included collection fees and costs which were never expressly charged, approved or authorized by the HOAS, were never incurred by said HOAS, were never expressly agreed to by Proposed Sub-Class A Members in the CC&RS, and, thus, did not constitute a "debt" owed to the HOAS by Proposed Sub-Class A Members;

i.     they stated that the alleged debt must be paid within 10 days or else the Delinquent Lien Notice would be filed and the Proposed Sub-Class A Members would be required to pay

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

additional fees and costs. Such statements plainly undercut and overshadow the message of the 30

day debt validation notice so as to mislead Proposed Sub-Class A Members into believing they

must ignore their right to take 30 days to verify their debts, and act within 10 days so as to avoid

suffering the unpermitted publication of their debt to the general public and the unlawful

incurrence of additional fees and costs.

79.     Defendants mailed to the Proposed Sub-Class B Members the Secondary Demand

Letters.

80.     The Secondary Demand Letters communicated false, misleading or contradictory

information to the Proposed Sub-Class B Members because:

a.      they stated in several places that the Delinquent Lien Notice was a "lien" when, in

fact, it was merely a notice. For example, they stated "A copy of the lien is enclosed" and "the lien

was recorded." However, said document was, in fact, not a "lien" because the actual lien was

created and perfected by the recording of the CC&RS pursuant to NRS 116.3116(4) and no

subsequent document is required to be recorded;

b.      they stated a particular "balance due" or "debt" was owed to the HOAS when, in

fact, the "balance due" or "debt" claimed in the Secondary Demand Letters included collection fees

and costs which were never expressly charged, approved or authorized by the HOAS, were never

incurred by the HOAS, were never expressly agreed to by Proposed Sub-Class B Members in the

CC&RS, and, thus, did not constitute a "debt" owed to the HOAS;

c.      they stated that the alleged debt must be paid within 30 days of the date of the

Secondary Demand Letters or else a Notice of Default would be filed and the Proposed Sub-Class

B Members would be required to pay additional fees and costs. Such statements plainly undercut

and overshadowed the message of the 30 day debt validation notice so as to mislead the Proposed

Sub-Class B Members into believing they must ignore their right to take 30 days to verify their

debts, and act within 30 days so as to avoid suffering the recording of a Notice of Default and the

unlawful incurrence of additional fees and costs.

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

81.     Defendants mailed to the Proposed Sub-Class C and D Members the Delinquent Lien Notices.  Pursuant to NRS §116.31162(1)(a), the mailing of the Delinquent Lien Notices is the first step in the foreclosure process of an HOA Lien.

82.     There is no provision at law which permits the public recording or publishing of the Delinquent Lien Notices nor did the Proposed Sub-Class C Members authorize such recording.

83.     Without the prior consent of the Proposed Sub-Class C Members, Defendants published the Delinquent Lien Notices by recording them with the county recorder's offices thereby communicating to the general public information related to the alleged debt of Proposed Sub-Class C Members, including the Proposed Sub-Class C Members' identities.

84.     The amounts due noted in the Delinquent Lien Notices were false as they included collection fees and costs which were not expressly charged, authorized or approved by the HOAS, not actually incurred by the HOAS, not permitted by the CC&RS, or authorized by law for Defendants to charge directly to the Proposed Sub-Class C Members and Proposed Sub-Class D Members.

85.     Defendants mailed to the Proposed Sub-Class E Members the Foreclosure Letters.

86.     Upon information and belief, the Foreclosure Letters were false, misleading or contradictory for the following reasons:

a.     they stated that the HOAS would "soon proceed with a non-judicial foreclosure" when, in fact, Defendants and the HOAS had no intention of soon proceeding with non-judicial foreclosure auctions.  This is so because Defendants and the HOAS knew that HOAS in recent years, rarely, if ever, foreclosed their HOA Liens due to the fact that residential first mortgages exceeded the value of the real properties they encumbered;

b.     they stated that the Proposed Sub-Class E Members would be responsible for paying addition foreclosure fees, when, in fact, no such fees would be chargeable to the Proposed Sub-Class E Members because such fees were not expressly charged, authorized or approved by the HOAS, not actually incurred by the HOAS, not permitted by the CC&RS, or authorized by law for Defendants to charge directly to the Proposed Sub-Class E Members.

c.      they stated that unless full payment is received by Defendants with 10 days of the date of the Foreclosure Letter, "foreclosure proceedings will commence," when, in fact, "foreclosure proceedings" had already commenced by the mailing of the Delinquent Lien Notice.

d.      they stated that due to the Proposed Sub-Class E Members' failure to pay their debts, a "lien" was recorded against their properties when the Delinquent Lien Notice was, in fact, not a "lien," but merely a notice.

87.     Defendants caused to record against the Proposed Sub-Class F Members in county recorder's offices a Notice of Default and Election to Sell Under Homeowners Association Lien ("NODS").

88.     The NODS stated, "WARNING. IF YOU FAIL TO PAY THE AMOUNT SPECIFIED IN THIS NOTICE, YOU COULD LOSE YOUR HOME."

89.     The aforementioned statement in the NODS was false because Defendants had no intention of ever foreclosing on the Proposed Sub-Class F Members' Homes as they remained subject to the first secured lender.  Therefore, the Proposed Sub-Class F Members could not lose their home.

90.     The aforementioned statement in the NODS were false because Defendants had no legal or contractual right to cause the foreclosure of the Proposed Sub-Class F Members' Homes for the amount Defendants stated in the NODS.  Therefore the Proposed Sub-Class F Class Members could not lose their homes.

91.     The NODS were false because they stated an incorrect amount of money as being due by the Proposed Sub-Class F Members to satisfy their delinquency.  The amounts were false because they included collection fees which were not expressly charged, authorized or approved by the HOAS, not actually incurred by the HOAS, not permitted by the CC&RS, or authorized by law for Defendants to charge directly to the Proposed Sub-Class F Members.

92.     The NODS were also false because they stated that the Delinquent Lien Notice was a "lien," when in fact, it was merely a notice.

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

93. The NODS were merely a clever rouse to trick and coerce the Proposed Sub-Class F Members into paying Defendants' unilaterally imposed collection fees and costs which were neither authorized by statute, nor by the contract creating the debt (the CC&RS), nor expressly charged, authorized or approved by the HOAS.

94. Defendants caused to record against the Proposed Sub-Class G Members a Notice of Foreclosure Sale ("NFS").

95. The NFS stated, "WARNING! A SALE OF YOUR PROPERTY IS IMMINENT!"

96. The aforementioned statement in the NFS was false because, upon information and belief, Defendants had no intention of ever foreclosing on Proposed Sub-Class G Members' Homes. Therefore, the sale of the Proposed Sub-Class G Members' Homes was not "imminent."

97. Further, the "unpaid balance" stated in the NFS was false because it included collection fees which were not expressly charged, authorized or approved by the HOAS, not actually incurred by the HOAS, not permitted by the CC&RS, or authorized by law for Defendants to charge directly to the Proposed Sub-Class G Members.

98. Excluded from the Proposed Class Members are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel for Plaintiffs in this action; any judge to whom this case is assigned as well as his or her immediate family and staff.

99. This action has been brought and may properly be maintained on behalf of the Proposed Class Members above under the criteria of Nevada Rule of Civil Procedure Rule 23.

100. <u>Numerosity</u>. The Proposed Class Members are so numerous that their individual joinder herein is impracticable. Thousands of members each comprising the Proposed Sub-Classes A through G have received the subject letters or have had maintained against them in public records inaccurate or improper collection demands, notices, defaults, liens or other communications from Defendants. The Proposed Class Members may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

published notice.

101.   Existence and predominance of common questions.  Common questions of law and fact exist as to all Proposed Sub-Class A through G Members, respectively, and predominate over questions affecting only individual members of the Classes.

102.   Regarding Sub-Class A Members, these common questions include the following:

a.   Whether Sub-Class A Members own and reside in, or owned and resided in HOAS;

b.   Whether Sub-Class A Members received and Defendants sent the Initial Demand Letters;

c.   Whether the Initial Demand Letters communicated false, misleading or contradictory information more particularly described at Paragraph 78 of this Complaint;

d.   Whether such false, misleading or contradictory information violated the Fair Debt Collection Practices Act, Nevada's consumer fraud act and deceptive trade practices act, and the common laws of the State of Nevada.

103.   Regarding Sub-Class B Members, these common questions include the following:

a.   Whether Sub-Class B Members own and reside in, or owned and resided in HOAS;

b.   Whether Sub-Class B Members received and Defendants sent the Secondary Demand Letters;

c.   Whether the Secondary Demand Letters communicated false, misleading or contradictory information more particularly described at Paragraph 80 of this Complaint;

d.   Whether such false, misleading or contradictory information violated the Fair Debt Collection Practices Act, Nevada's consumer fraud act and deceptive trade practices act and the common laws of the State of Nevada.

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

104.     Regarding Sub-Class C Members, these common questions include the following:

a.       Whether Sub-Class C Members own and reside in, or owned and resided in HOAS;

b.       Whether Sub-Class C Members have had published or recorded against them by Defendants the Delinquent Lien Notices for non-payment of HOA assessments wherein the Sub-Class C Members did not give prior consent for the publication or recording of such notices;

c.       Whether there is any provision at law which permits the public recording or publishing of such Delinquent Lien Notices;

d.       Whether, without the prior consent of Proposed Sub-Class C Members, on thousands of separate occasions, Defendants published such Delinquent Lien Notices by recording them with county recorder's offices thereby communicating to the general public information related to the alleged debts of Proposed Sub-Class C Members.

105.     Regarding Sub-Class D Members, these common questions include the following:

a.       Whether Sub-Class D Members own and reside in, or owned and resided in HOAS;

b.       Whether Sub-Class D Members received and Defendants sent the Delinquent Lien Notices;

c.       Whether the Delinquent Lien Notices communicated false, misleading or contradictory information more particularly described at Paragraph 84 of this Complaint;

d.       Whether such false, misleading or contradictory information violated the Fair Debt Collection Practices Act, Nevada's consumer fraud act and deceptive trade practices act and the common laws of the State of Nevada.

106.     Regarding Sub-Class E Members, these common questions include the following:

a.       Whether Sub-Class E Members own and reside in, or owned and resided in HOAS;

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

b.   Whether Sub-Class E Members received and Defendants sent the Foreclosure Letters;

c.   Whether the Foreclosure Letters communicated false, misleading or contradictory information more particularly described at Paragraph 86 of this Complaint;

d.   Whether such false, misleading or contradictory information violated the Fair Debt Collection Practices Act, Nevada's consumer fraud act and deceptive trade practices act and the common laws of the State of Nevada.

107.   Regarding Sub-Class F Members, these common questions include the following:

a.   Whether Sub-Class F Members own and reside in, or owned and resided in HOAS;

b.   Whether Sub-Class F Members received and Defendants sent the NODS;

c.   Whether the NODS communicated false, misleading or contradictory information more particularly described at Paragraphs 89, 90, 91 and 92 of this Complaint;

d.   Whether such false, misleading or contradictory information violated the Fair Debt Collection Practices Act, Nevada's consumer fraud act and deceptive trade practices act and the common laws of the State of Nevada.

108.   Regarding Sub-Class G Members, these common questions include the following:

a.   Whether Sub-Class G Members own and reside in, or owned and resided in HOAS;

b.   Whether Sub-Class G Members received and Defendants sent the NFS;

c.   Whether the NFS communicated false, misleading or contradictory information more particularly described at Paragraph 96 and 97 of this Complaint;

d.   Whether such false, misleading or contradictory information violated the Fair Debt Collection Practices Act, Nevada's consumer fraud act and

deceptive trade practices act and the common laws of the State of Nevada.

109.   Typicality.  Plaintiffs' claims are typical of the claims of the Proposed Sub-Class A, B, D, E, F and G Members because, among other things, Plaintiffs received or had recorded against them in county recorder's offices the Initial Demand Letter, the Secondary Demand Letter, the Foreclosure Letter, the Delinquent Lien Notice, the NODS and the NFS.  Plaintiffs' claims are typical of the claims of the Proposed Sub-Class C Members because, among other things, Defendants published Delinquent Lien Notices against Plaintiffs by recording them with a county recorder's office thereby communicating to the general public information related to the alleged debts of Plaintiffs without Plaintiffs' prior consents.

110.   Adequacy. Plaintiffs are adequate representatives of the Proposed Class Members because Plaintiffs' interests do not conflict with the interests of the members of the Classes they seek to represent and Plaintiffs intend on prosecuting this action vigorously. The interests of the Proposed Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

111.   Superiority. The class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each of the Proposed Class Members, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if the Proposed Class Members, themselves, could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing myriad actions arising from the harm herein alleged, individualized litigation presents a potential for inconsistent or contradictory judgments, individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

112.   In the alternative, the Classes may be certified because:

a.   the prosecution of separate actions by the individual Proposed Class Members would create a risk of inconsistent or varying adjudication with respect to the Proposed

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

Class Members which would establish incompatible standards of conduct for Defendants;

b.     the prosecution of separate actions by individual Proposed Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Proposed Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.     Defendants have acted or refused to act on grounds generally applicable to the Proposed Class Members, thereby making appropriate final and injunctive relief with respect to the Proposed Class Members as a whole.

## FIRST CAUSE OF ACTION

### Violation of Fair Debt Collection Practices Act

113.    The allegations of paragraphs 1 through 112 above are hereby re-alleged and incorporated herein by this reference.

### Sub-Class A - The Initial Demand Letter Recipients

114     Defendants violated the Fair Debt Collection Practices Act by sending the form of communications represented by the Initial Demand Letters.

115.    By stating in the Initial Demand Letters that the Delinquent Lien Notice could be recorded pursuant to Nevada Revised Statutes when there is no Nevada Revised Statute that permits the recording of such a document, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692e(13), 15 U.S.C. § 1692f.

116.    By stating in the Initial Demand Letters that the alleged debt must be paid with 10 days or else Defendants would be "entitled" to record the Delinquent Lien Notice when Defendants were not so entitled because the recording of such a document was not authorized by Nevada Revised Statutes and was not permitted pursuant to the Fair Debt Collection Practices Act, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692e(13), 15 U.S.C. § 1692f.

117.    By stating in the Initial Demand Letters that should Defendants record the Delinquent Lien Notice, the cost to the Proposed Sub-Class A Members would be $325.00 plus

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

recording costs when no such costs were permitted because the recording of the document was not authorized by Nevada Revised Statutes and was not permitted pursuant to the Fair Debt Collection Practices Act, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692e(13), 15 U.S.C. § 1692f.

118.    By suggesting in the Initial Demand Letters that the Delinquent Lien Notice was a lien, when, in fact, the document was not a lien, but merely a notice, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692f.

119.    By stating in the Initial Demand Letters that a fee would be charged to "release" the Delinquent Lien Notice, when, in fact, the document was not a "lien" that needed to be or could be "released" and no such fee was, therefore, required or permitted for such a "release" Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692e(13), 15 U.S.C. § 1692f.

120.    By stating in the Initial Demand Letters that "Federal Law does not require NAS to wait until the end of the 30 Day Period to record the Notice of Delinquent Assessment Lien" which suggests that "Federal Law" authorized the recording of such a document when, in fact, there is no federal law which authorizes the recording of the Delinquent Lien Notice, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692e(13), 15 U.S.C. § 1692f.

121.    By stating in the Initial Demand Letters that the current creditor was the "Association" when, in fact, no collection fees or costs were ever expressly charged, approved or authorized by the HOAS, were never incurred by the HOAS, were never expressly agreed to by the Proposed Sub-Class A Members in the CC&RS and, thus, the HOAS were not the "creditor" of the collection fees, but only of the past due assessments, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692f, 15 U.S.C. § 1692f(1).

122.    By stating in the Initial Demand Letters that a particular "balance due" or "debt" was owed to the HOAS when, in fact, the "balance due" or "debt" claimed in the Initial Demand Letters included collection fees and costs which were never expressly charged, approved or authorized by the HOAS, were never incurred by said HOAS, were never expressly agreed to by Proposed Sub-Class A Members in the CC&RS, and, thus, did not constitute a "debt" owed to the

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

1   HOAS by Proposed Sub-Class A Members, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. §

2   1692e(2), 15 U.S.C. § 1692f, and 15 U.S.C. § 1692f(1).

3          123.    By stating in the Initial Demand Letters that the alleged debt must be paid within 10

4   days or else the Delinquent Lien Notice would be filed and the Proposed Sub-Class A Members

5   would be required to pay additional fees and costs, Defendants made statements which plainly

6   undercut and overshadowed the message of the 30 day debt validation notice so as to mislead

7   Proposed Sub-Class A Members into believing they must ignore their right to take 30 days to

8   verify their debts, and act within 10 days so as to avoid suffering the unpermitted publication of

9   their debt to the general public and the unlawful incurrence of additional fees and costs. This action

10  violated 15 U.S.C. § 1692g.

11                  Sub-Class B - The Secondary Demand Letter Recipients

12         124.    Defendants violated the Fair Debt Collection Practices Act by sending the form of

13  communications represented by the Secondary Demand Letters.

14         125.    By stating in the Secondary Demand Letters that the Delinquent Lien Notice was a

15  "lien" when, in fact, it was merely a notice (for example, "A copy of the lien is enclosed" and "the

16  lien was recorded.") because the actual lien was created and perfected by the recording of the

17  CC&RS pursuant to NRS 116.3116(4) and no subsequent document is required to be recorded,

18  Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(5), 15 U.S.C. §

19  1692e(13), 15 U.S.C. § 1692f.

20         126.    By stating in the Secondary Demand Letters that a particular "balance due" or

21  "debt" was owed to the HOAS when, in fact, the "balance due" or "debt" claimed in the Secondary

22  Demand Letters included collection fees and costs which were never expressly charged, approved

23  or authorized by the HOAS, were never incurred by the HOAS, were never expressly agreed to by

24  Proposed Sub-Class B Members in the CC&RS, and, thus, did not constitute a "debt" owed to the

25  HOAS, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692f, and 15

26  U.S.C. § 1692f(1).

27

28

127.   By stating in the Secondary Demand Letters that the alleged debt must be paid within 30 days of the date of the Secondary Demand Letters or else a Notice of Default would be filed and the Proposed Sub-Class B Members would be required to pay additional fees and costs, when Defendants had no such right to file a Notice of Default for the amount claimed, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(4), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692f, 15 U.S.C. § 1692f(1), 15 U.S.C. § 1692f(6).

128.   By stating in the Secondary Demand Letter that the alleged debt must be paid within 30 days of the date of the Secondary Demand Letters or else a Notice of Default would be filed plainly undercut and overshadowed the message of the 30 day debt validation notice so as to mislead the Proposed Sub-Class B Members into believing they must ignore their right to take 30 days to verify their debts, and act within 30 days so as to avoid suffering the recording of a Notice of Default and the unlawful incurrence of additional fees and costs.  This action violated 15 U.S.C. § 1692g.

### Sub-Class C - The Shame List

129.   Defendants violated the Fair Debt Collection Practices Act by recording with county recorder's offices the Delinquent Lien Notice thereby communicating to the general public information related to the alleged debts of the Proposed Sub-Class C Members and, thus, publishing a "shame list" of debtors.

130.   Because there is no provision at law which permits the public recording or publishing of the Delinquent Lien Notices, and because the Proposed Sub-Class C Members did not authorize such recording, Defendants violated 15 U.S.C. § 1692d(3), 15 U.S.C. § 1692c(2), and 15 U.S.C. § 1692c(2).

### Sub-Class D - The Delinquent Lien Notice Recipients

131.   Defendants violated the Fair Debt Collection Practices Act by sending the form of communications represented by the Delinquent Lien Notice.

132.   By stating in the Delinquent Lien Notices that a particular "balance due" or "debt" was owed to the HOAS when, in fact, the "balance due" or "debt" claimed in the Delinquent Lien

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

Notices included collection fees and costs which were never expressly charged, approved or authorized by the HOAS, were never incurred by the HOAS, were never expressly agreed to by Proposed Sub-Class B Members in the CC&RS, and, thus, did not constitute a "debt" owed to the HOAS, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692f, and 15 U.S.C. § 1692f(1).

<u>Sub-Class E - The Foreclosure Letter Recipients</u>

133.   Defendants violated the Fair Debt Collection Practices Act by sending the form of communications represented by the Foreclosure Letters.

134.   By stating in the Foreclosure Letters that the HOAS would "soon proceed with a non-judicial foreclosure" when, in fact, Defendants and the HOAS had no intention of soon proceeding with non-judicial foreclosure auctions, nor did they have a legal right to foreclosure because the amount demanded included collection fees and costs which were never expressly charged, approved or authorized by the HOAS, were never incurred by the HOAS, were never expressly agreed to by Proposed Sub-Class E Members in the CC&RS, and, thus, did not constitute a "debt" owed to the HOAS, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(4), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692f, 15 U.S.C. § 1692f(1), and 15 U.S.C. § 1692f(6).

135.   By stating in the Foreclosure Letters that the Proposed Sub-Class E Members would be responsible for paying addition foreclosure fees, when, in fact, no such fees would be chargeable to the Proposed Sub-Class E Members because such fees were not expressly charged, authorized or approved by the HOAS, not actually incurred by the HOAS, not permitted by the CC&RS, or authorized by law for Defendants to charge directly to the Proposed Sub-Class E Members, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692f, and 15 U.S.C. § 1692f(1).

136.   By stating in the Foreclosure Letters that unless full payment is received by Defendants with 10 days of the date of the Foreclosure Letter, "foreclosure proceedings will commence," when, in fact, "foreclosure proceedings" had already commenced by the mailing of

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

the Delinquent Lien Notice, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), and 15 U.S.C. § 1692f.

137.    By stating in the Foreclosure Letters that due to the Proposed Sub-Class E Members' failure to pay their debts, a "lien" was recorded against their properties when the Delinquent Lien Notice was, in fact, not a "lien," but merely a notice, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), and 15 U.S.C. § 1692f.

<div align="center">Sub-Class F - The NODS Recipients</div>

138.    Defendants violated the Fair Debt Collection Practices Act by sending and recording the form of communications represented by the NODS.

139.    By stating in the NODS, "WARNING. IF YOU FAIL TO PAY THE AMOUNT SPECIFIED IN THIS NOTICE, YOU COULD LOSE YOUR HOME" and by filing the NODS with the county recorder's offices, when in fact, the aforementioned statement in the NODS was false because Defendants had no intention of ever foreclosing on the Proposed Sub-Class F Members' Homes, nor did they have a legal right to foreclosure because the amount demanded included collection fees and costs which were never expressly charged, approved or authorized by the HOAS, were never incurred by the HOAS, were never expressly agreed to by Proposed Sub-Class F Members in the CC&RS, and, thus, did not constitute a "debt" owed to the HOAS, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(4), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692f, 15 U.S.C. § 1692f(1), and 15 U.S.C. § 1692f(6).

140.    By stating in the NODS that a particular "balance due" or "debt" was owed to the HOAS when, in fact, the "balance due" or "debt" claimed in the NODS included collection fees and costs which were never expressly charged, approved or authorized by the HOAS, were never incurred by the HOAS, were never expressly agreed to by Proposed Sub-Class F Members in the CC&RS, and, thus, did not constitute a "debt" owed to the HOAS, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692f, and 15 U.S.C. § 1692f(1).

141.    By stating in the NODS that the Delinquent Lien Notice was a "lien," when in fact, it was not a "lien" but merely a "notice", Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. §

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

1692e(2), and 15 U.S.C. § 1692f.

<div align="center">Sub-Class G - The NFS Recipients</div>

142.    Defendants violated the Fair Debt Collection Practices Act by sending and recording the form of communications represented by the NFS.

143.    By stating in the NFS, "WARNING! A SALE OF YOUR PROPERTY IS IMMINENT!" and by filing the NFS with the county recorder's offices, when in fact, the aforementioned statement in the NFS was false because Defendants had no intention of ever foreclosing on the Proposed Sub-Class G Members' Homes, nor did they have a legal right to foreclosure because the amount demanded included collection fees and costs which were never expressly charged, approved or authorized by the HOAS, were never incurred by the HOAS, were never expressly agreed to by Proposed Sub-Class F Members in the CC&RS, and, thus, did not constitute a "debt" owed to the HOAS, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(4), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692f, 15 U.S.C. § 1692f(1), and 15 U.S.C. § 1692f(6).

144.    By stating in the NFS that a particular "balance due" or "debt" was owed to the HOAS when, in fact, the "balance due" or "debt" claimed in the NFS included collection fees and costs which were never expressly charged, approved or authorized by the HOAS, were never incurred by the HOAS, were never expressly agreed to by Proposed Sub-Class G Members in the CC&RS, and, thus, did not constitute a "debt" owed to the HOAS, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692f, and 15 U.S.C. § 1692f(1).

145.    As a result of Defendants' actions as herein described, the Proposed Class Members have suffered damages in excess of $10,000.00.

146.    As a result of Defendants' actions as herein described, Plaintiffs and Proposed Class Members have been forced to incur costs and fees in the prosecution of this action and have been required to hire an attorney and incur attorney fees and costs to which Plaintiff and the Proposed - Class Members hereby make claim.

## SECOND CAUSE OF ACTION

**Violation of NRS 598 and 41.600 - Deceptive Trade Practices Act/Consumer Fraud**

All Sub-Classes

147.    The allegations of paragraphs 1 through 146 above are hereby re-alleged and incorporated herein by this reference.

148.    By all their acts as above described, Defendants have violated NRS 598, the Nevada Deceptive Trade Practices Act, including NRS §598.0915, §598.092 and §598.0923.

149    As described herein, Defendants violated NRS 598.0915(15) by knowingly making false representations in a transaction.

150.    As described herein, Defendants violated NRS 598.092(8) by misrepresenting the legal rights, obligations or remedies of a party to a transaction.

151.    As described herein, Defendants violated NRS 598.0923(2) through (4) by failing to disclose a material fact in connection with the sale or lease of goods or services, violating a state or federal statute or regulation relating to the sale or lease of goods or services, and using coercion, duress or intimidation in a transaction.

152.    Pursuant to NRS §41.600, "consumer fraud" means, a deceptive trade practice as defined in NRS 598.0915 to 598.0925.

153.    Therefore, by their actions as herein described, Defendants have violated Nevada Revised Statutes §41.600 and have committed consumer fraud.

154.    As a result of Defendants' actions as herein described, the Proposed Class Members have suffered damages in excess of $10,000.00.

155.    As a result of Defendants' actions as herein described, Plaintiffs and Proposed Class Members have been forced to incur costs and fees in the prosecution of this action and have been required to hire an attorney and incur attorney fees and costs to which Plaintiff and the Proposed Class Members hereby make claim.

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

### THIRD CAUSE OF ACTION

**Declaratory Relief**

<u>All Sub-Classes</u>

156.    The allegations of paragraphs 1 through 155 above are hereby re-alleged and incorporated herein by this reference.

157.    Nevada has adopted the Uniform Declaratory Judgments Act (the "State Act").

158.    The United States adopted 28 U.S.C.A. § 2201 (the "Federal Act")

159.    The State Act permits persons interested under a deed, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

160.    The Federal Act permits any court of the United States, upon the filing of an appropriate pleading, to declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

161.    Plaintiffs', the Proposed Class Members' and Defendants' rights, status and legal relations are affected by the CC&RS, the FDCPA and Nevada Revised Statutes §598, §116 and §649.

162.    Therefore, Plaintiffs and the Proposed Class Members seek a declaration of rights from this Honorable Court which declares that:

a.    In construing the CC&RS, only HOAS may impose upon the Proposed Class Members charges for past due obligations;

b.    In construing the CC&RS, third party debt collectors such as Defendant Stone and Defendant NAS do not have the right to independently impose directly upon the Proposed Class Members collection fees that are not expressly approved by the CC&RS, charged by the HOAS, or expressly authorized by the HOAS in the Collection Contracts;

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

c.      In construing Nevada Revised Statutes §116.3102(k), only HOAS are permitted to impose charges against Plaintiffs and the Proposed Class Members for late payment of assessments and third party debt collectors such as Defendant Stone and Defendant NAS do not have the right to independently impose directly upon the Proposed Class Members collection fees that are not expressly approved by the HOAS, not charged by the HOAS, or not expressly authorized by the HOAS in the Collection Contracts;

d.      In construing Nevada Revised Statutes §116.310313 only HOAS are permitted to charge the Proposed Class Members reasonable fees to cover the costs of collecting any past due obligation and third party debt collectors such as Defendant Stone and Defendant NAS do not have the right to independently impose directly upon the Proposed Class Members collection fees that are not expressly approved by the HOAS, not charged by the HOAS, or not expressly authorized by the HOAS in the Collection Contracts;

e.      In construing the CC&RS and NRS §116.3102(k) and §116.310313, a third party debt collector like Defendant Stone and Defendant NAS do not have the independent right to create and impose collection fees where the CC&RS and statutes have delegated that authority to the HOAS;

f.      In construing Nevada Revised Statutes §116.310313, "costs of collecting" is defined as any fee, charge or cost that an association charges a unit's owner for the enforcement or collection of a past due obligation, not as any fee that a third party debt collector such as Defendants Stone and Defendant NAS wish to charge in their discretion;

g.      In construing the CC&RS and NRS §116.3102(k) and §116.310313, a third party debt collectors, such as Defendant NAS and Defendant Stone, do not have the right to charge directly to the Proposed Class Members, at Defendants' discretion, any fee related to the collection of any amounts allegedly owed by the Proposed Class Members to the HOAS unless the HOAS actually incurred such collection fee or cost;

h.      In construing NRS §649.375 which states that a collection agency, or its manager, agents or employees, shall not use any device, subterfuge, pretense or deceptive means or

representations to collect any debt, by their actions as herein described, Defendants have violated NRS §649.375's prohibition against using any device, subterfuge, pretense or deceptive means or representations to collect any debt;

i.       In construing NRS §649.375(2) which states that a collection agency, or its manager, agents or employees shall not collect or attempt to collect any interest, charge, fee or expense incidental to the principal obligation unless any such interest, charge, fee or expense was authorized by law or agreed to by the parties to the debt, Defendants had no right to impose upon Plaintiffs and the Proposed Class Members collection fees because they were not authorized by any law and not agreed to by the parties in the contract creating the debt. Therefore, by demanding and collecting collection fees that were not expressly authorized by the agreement creating the debt or permitted by law, Defendants have violated NRS §649.375(2);

j.       In construing 15 U.S.C.A. § 1692f(1) which states that it is a violation of the Fair Debt Collection Practices Act if a debt collector collects any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law, Defendants had no right to demand and collect fees and costs from Plaintiffs and the Proposed Class Members because such fees and costs were not expressly authorized by the agreement creating the debt or permitted by law.  Therefore, Defendants have violated 15 U.S.C.A. § 1692f(1).

k.       In construing 15 U.S.C. § 1692e which prohibits false, deceptive or misleading representations, 15 U.S.C. § 1692e(2) which prohibits communicating a false impression of the character, amount, or legal status of the debt, 15 U.S.C. § 1692e(5) which prohibits threatening to take any action that cannot be legally taken or that is not intended to be taken, 15 U.S.C. § 1692e(13) which prohibits communicating the false impression that a document is legal process, and 15 U.S.C. § 1692f which prohibits the use of unfair or unconscionable means to collect a debt, Defendants had no right to state in their communications with Plaintiffs and the Proposed Class Members that the Delinquent Lien Notice was a "lien" when, in fact, it was merely a notice.  The Delinquent Lien Notice, in fact, not a "lien" because the actual lien was created and perfected by the recording of the CC&RS pursuant

to NRS 116.3116(4) and no subsequent document is required to be recorded, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692e(13), 15 U.S.C. § 1692f;

l.      In construing 15 U.S.C. § 1692e which prohibits false, deceptive or misleading representations, 15 U.S.C. § 1692e(2) which prohibits communicating a false impression of the character, amount, or legal status of the debt, 15 U.S.C. § 1692e(5) which prohibits threatening to take any action that cannot be legally taken or that is not intended to be taken, 15 U.S.C. § 1692e(13) which prohibits communicating the false impression that a document is legal process, and 15 U.S.C. § 1692f which prohibits the use of unfair or unconscionable means to collect a debt, Defendants had no right to state in their communications with Plaintiffs and the Proposed Class Members that they had the right to record the Delinquent Lien Notice pursuant to Nevada Revised Statutes in fact, there is no Nevada Revised Statute that permits the recording of such a document. Therefore, Defendants violated 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692e(13), 15 U.S.C. § 1692f.

163.    As a result of Defendants' actions as herein described, the Proposed Class Members have suffered damages in excess of $10,000.00.

164.    As a result of Defendants' actions as herein described, Plaintiffs and Proposed Class Members have been forced to incur costs and fees in the prosecution of this action and have been required to hire an attorney and incur attorney fees and costs to which Plaintiff and the Proposed Class Members hereby make claim.

## FOURTH CAUSE OF ACTION

### Injunctive Relief

#### Sub-Classes D, F and G

165.    The allegations of paragraphs 1 through 164 above are hereby re-alleged and incorporated herein by this reference.

166.    Currently, and on thousands of occasions over the last several years, Defendants have mailed to the Proposed Sub-Class D Members Delinquent Lien Notices.

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

167.    Pursuant to NRS §116.31162(1)(a), the mailing of the Delinquent Lien Notice is the first step in the foreclosure process of an HOA Lien.

168.    Further, currently, and on thousands of occasions over the past several years, Defendants caused to mail to Proposed Sub-Class F Members, and record in county recorders' offices the NODS against the Proposed Sub-Class F Members.

169.    Pursuant to NRS §116.31162(1)(b), the recording and mailing of the NODS is the second step in the foreclosure process of an HOA Lien.

170.    Further, currently, and on thousands of occasions over the past several years, Defendants caused to mail to Proposed Sub-Class G Members, and record in county recorders' offices the NFS against the Proposed Sub-Class G Members.

171.    Pursuant to NRS §116.311635, the recording and mailing of the NFS is the third and final step prior to the foreclosure auction in the foreclosure process of an HOA Lien.

172.    Thus, Defendants are currently and continually engaged in commencement of foreclosure proceedings of HOA Liens against Proposed Sub-Class D, F and G Members' Homes.

173.    Plaintiff and the Proposed Sub-Class D, F and G Members are in danger of losing their homes to foreclosure of HOA Liens which are comprised of the improper and unauthorized collection fees, i.e., fees that were never expressly charged, approved or authorized by the HOAS, were never incurred by the HOAS, were never expressly agreed to by Proposed Sub-Class D,F and G Members in the CC&RS, and, thus, did not constitute a "debt" owed to the HOAS.

174.    Defendants are violating state and federal law by imposing and collecting such improper and unauthorized collection fees.

175.    Plaintiff and the Proposed Sub-Class D, F and G Members seek injunctive relief against Defendants to enjoin Defendants from the following:

a.    instituting, maintaining, causing or assisting in the instituting of any process in furtherance of the foreclosure of HOA Liens against Plaintiffs and the Proposed Sub-Class D, F and G Members' Homes which are based in whole or in part on improper or unauthorized collection fees; and

1

       b.      violating state and federal law in the demanding and collecting of the improper

2

or unauthorized collection fees.

3

    176.   As a result of Defendants' actions as herein described, the Proposed Class Members

4

have suffered damages in excess of $10,000.00.

5

    177.   As a result of Defendants' actions as herein described, Plaintiffs and Proposed Class

6

Members have been forced to incur costs and fees in the prosecution of this action and have been

7

required to hire an attorney and incur attorney fees and costs to which Plaintiff and the Proposed Class

8

Members hereby make claim.

9

<div align="center">

## **FIFTH CAUSE OF ACTION**

**Negligence (Per Se)**

</div>

10

<div align="center">

All Sub-Classes

</div>

11

12

    178.   The allegations of paragraphs 1 through 177 above are hereby re-alleged and

13

incorporated herein by this reference.

14

    179.   Plaintiffs and the Proposed Class Members, as consumers, as debtors, as owners and

15

former owners of homes located within HOAS, and as recipients of Defendants' collection letters and

16

notices as herein described, belong to a class of persons that 15 U.S.C. §§1692e, 1692f, and 1692g,

17

and NRS §41.600 §598.0915, §598.092 §598.0923, §116.3102(k), §116.310313 and §649.375 were

18

intended to protect.

19

    180.   Defendants and each of them have violated the FDCPA and Nevada Revised Statutes

20

by their actions as above described.

21

    181.   As a result of Defendants' actions as herein described, the Proposed Sub-Class

22

Members have suffered damages in excess of $10,000.00.

23

    182.   As a result of Defendants' actions as herein described, Plaintiffs and Proposed Class

24

Members have been forced to incur costs and fees in the prosecution of this action and have been

25

required to hire an attorney and incur attorney fees and costs to which Plaintiff and the Proposed Class

26

Members hereby make claim.

27

28

<div align="left">

**ADAMS LAW GROUP, LTD.**
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

</div>

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Proposed Class Members, expressly reserving their right to amend this pleading at the time of, or prior to trial, pray for judgment against Defendants as follows:

A.    For an order certifying this case is a class action pursuant to Federal Rule of Civil Procedure 23;

B.    For an order appointing Plaintiffs as class representative and James R. Adams., Esq., of Adams Law Group, Ltd., and Puoy K. Premsrirut, Esq., of Puoy K. Premsrirut, Esq., Inc., as class counsel;

C.    For general damages in excess of $10,000.00;

D.    For declaratory relief and injunctive relief as set forth herein;

E.    For reasonable attorneys' fees and costs of suit of litigation thereof as damages and under applicable statutes and/or as special damages in excess of $10,000.00;

F.    For pre and post judgement interest at the statutory rate as may be applicable;

G.    For punitive and trebled damages;

H.    The maximum amount of statutory damages provided under 15 U.S.C. §1692k;

I.    For any further legal and equitable relief that this Honorable Court may deem just and equitable.

Dated this 17 day of December, 2010.

ADAMS LAW GROUP, LTD.

JAMES R. ADAMS, ESQ.
Nevada Bar No. 6874
ASSLY SAYYAR, ESQ.
Nevada Bar No. 9178
8681 W. Sahara Ave., Suite 280
Las Vegas, Nevada 89117
Tel: 702-838-7200
Fax: 702-838-3636
james@adamslawnevada.com
assly@adamslawnevada.com
Attorney for Plaintiffs

ADAMS LAW GROUP, LTD.
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

PUOY K. PREMSRIRUT, ESQ., INC.
Puoy K. Premsrirut, Esq.
Nevada Bar No. 7141
520 S. Fourth Street, 2nd Floor
Las Vegas, NV 89101
(702) 384-5563
(702)-385-1752 Fax
ppremsrirut@brownlawlv.com
Attorneys for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ADAMS LAW GROUP, LTD.**
8681 W. SAHARA AVENUE, SUITE 280
LAS VEGAS, NEVADA 89117
TELEPHONE (702) 838-7200
FACSIMILE (702) 838-3636

1

**VERIFICATION**

2   STATE OF NEVADA        )
3   COUNTY OF CLARK        )   ss.
                           )

4        NICOLAS OTOMO, being duly sworn, states; that I am the Affiant and am a Plaintiff in the

5   above titled action; that I have read the forgoing Verified Complaint and know the contents thereof;

6   that the same is true and correct to the best of my own knowledge as to all allegations and claims

7   pertaining to me, except as to those matters therein stated on information and belief, and as to those

8   matters I believe them to be true.

9        DATED this 17th day of December, 2010.

10

11        NICOLAS OTOMO

12

13   SUBSCRIBED and SWORN to before me
     this 17 day of December, 2010.

14

15
     NOTARY PUBLIC in and for said
16   County and State.

17

18

19

20

21

22

23

24

25

26

27

28

Toni P. Hansen
Notary Public
State of Nevada
Date Appointment Exp: 02-09-11
Certificate No: 98-49523-1

1

## VERIFICATION

2   STATE OF NEVADA          )
                             )   ss.
3   COUNTY OF CLARK          )

4         TIMOTHY MCCRIGHT, being duly sworn, states; that I am the Affiant and am a Plaintiff in

5   the above titled action; that I have read the forgoing Verified Complaint and know the contents

6   thereof; that the same is true and correct to the best of my own knowledge as to all allegations and

7   claims pertaining to me, except as to those matters therein stated on information and belief, and as to

8   those matters I believe them to be true.

9         DATED this _____ day of _____ 2010.

10

11                                                              TIMOTHY MCCRIGHT

12
    SUBSCRIBED and SWORN to before me
13  this _____ day of December, 2010.

14

15
    NOTARY PUBLIC in and for said
16  County and State.

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

590805.02111



46

RECORDING REQUESTED BY:

NEVADA TITLE COMPANY

WHEN RECORDED PLEASE
RETURN TO:

JONES VARGAS
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, NV 89109
Attn: Michael F. Buckley, Esq.

_____

*(Space Above for Recorders Use)*

## MASTER
## DECLARATION OF COVENANTS, CONDITIONS
## AND RESTRICTIONS AND GRANT OF EASEMENTS
## FOR
## LYNBROOK

99000.00111

# TABLE OF CONTENTS
## FOR
## MASTER DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND GRANT OF EASEMENTS
## FOR
## LYNBROOK

__DESCRIPTION__            __PAGE__

1.  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    1.1  Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    1.2  Additional Property . . . . . . . . . . . . . . . . . . . . -2-
    1.3  Allocated Interests . . . . . . . . . . . . . . . . . . . . -2-
    1.4  Articles . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    1.5  Assessments . . . . . . . . . . . . . . . . . . . . . . . . -2-
    1.6  Assessment Year . . . . . . . . . . . . . . . . . . . . . . -2-
    1.7  Bylaws . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    1.8  Capital Improvement Assessment . . . . . . . . . . . . . . -2-
    1.9  Close of Escrow . . . . . . . . . . . . . . . . . . . . . . -2-
    1.10 Common Assessment . . . . . . . . . . . . . . . . . . . . . -2-
    1.11 Common Elements . . . . . . . . . . . . . . . . . . . . . . -2-
    1.12 Common Expenses . . . . . . . . . . . . . . . . . . . . . . -3-
    1.13 Community . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    1.14 Cost Center . . . . . . . . . . . . . . . . . . . . . . . . -3-
    1.15 Declarant . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    1.16 Declarant Control Period . . . . . . . . . . . . . . . . . -3-
    1.17 Declaration . . . . . . . . . . . . . . . . . . . . . . . . -3-
    1.18 Declarant's Rights . . . . . . . . . . . . . . . . . . . . -4-
    1.19 Development Rights . . . . . . . . . . . . . . . . . . . . -4-
    1.20 Director . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    1.21 Dwelling Unit . . . . . . . . . . . . . . . . . . . . . . . -4-
    1.22 Executive Board . . . . . . . . . . . . . . . . . . . . . . -4-
    1.23 FHA . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    1.24 FHLMC . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    1.25 Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . -4-
    1.26 FNMA . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    1.27 GNMA . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    1.28 Improvements . . . . . . . . . . . . . . . . . . . . . . . -4-
    1.29 Initial Property . . . . . . . . . . . . . . . . . . . . . -4-
    1.30 Limited Common Elements . . . . . . . . . . . . . . . . . . -5-
    1.31 Lot . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
    1.32 Master Association . . . . . . . . . . . . . . . . . . . . -5-
    1.33 Master Association Maintenance Funds . . . . . . . . . . . -5-
    1.34 Mortgagee . . . . . . . . . . . . . . . . . . . . . . . . . -5-
    1.35 Notice of Annexation . . . . . . . . . . . . . . . . . . . -5-
    -1.36 Owner . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

58786.0.111

## DESCRIPTION

PAGE

1.37    Participating Builder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
1.38    Perimeter Walls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
1.39    Person . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
1.40    Phase of Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
1.41    Planned Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
1.42    Plats and Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
1.43    Record, Recorded and Recordat on . . . . . . . . . . . . . . . . . . . . . . . -6-
1.44    Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
1.45    Security Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
1.46    Special Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
1.47    Special Declarant Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
1.48    Sub-Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
1.49    Supplemental Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
1.50    VA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

2.      Name and Type of Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
2.1     Name and Type of Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
2.2     Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

3.      Development of the Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
3.1     Master Planned Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
3.2     Expansion by Declarant and Participating Builder . . . . . . . . . . . . . . . . . . -7-
3.3     Expansion by the Master Association . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
3.4     Notice of Annexation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
3.5     Expansion of Additional Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
3.6     Supplemental Declarations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
3.7     Common Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

4.      Community Easements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
4.1     Owners' Easements of Enjoyment . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
4.2     Easements for Public Service Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
4.3     Waiver of Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
4.4     Easements for Water and Utility Purposes . . . . . . . . . . . . . . . . . . . . . . -10-
4.5     Delegation of Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
4.6     Other Easements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

5.      Allocated Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
5.1     Allocation of Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
5.2     Formulas for Allocation of Interests . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
5.3     Allocated Interests Upon Exercise of Development Rights . . . . . . . . . . . . -11-

6.      Larkbrook Master Association. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
6.1     Membership in the Master Association . . . . . . . . . . . . . . . . . . . . . . . . -12-
6.2     Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
6.3     Suspension of Membership Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

| DESCRIPTION | PAGE |
|---|---|

|   | 6.4 | Transfer of Membership | -12- |
|   | 6.5 | Powers of the Master Association | -12- |
|   | 6.6 | Officers and Directors | -14- |
|   | 6.7 | Maintenance Responsibilities | -15- |
|   | 6.8 | Tort and Contract Liability | -15- |
|   | 6.9 | Master Association Records | -15- |
| 7. | | Assessments | -15- |
|   | 7.1 | Assessments for Common Expenses | -15- |
|   | 7.2 | Common Expenses Attributable to Fewer than all Lots | -15- |
|   | 7.3 | Date of Commencement of Common Assessments | -16- |
|   | 7.4 | Maintenance Funds of Master Association | -17- |
|   | 7.5 | Limitation on Use of Assessments | -17- |
|   | 7.6 | Capital Improvement Assessments | -17- |
|   | 7.7 | Ratification of Budgets | -17- |
|   | 7.8 | Surplus Funds | -18- |
|   | 7.9 | Remedies of Master Association | -18- |
|   | 7.10 | Lien for Assessments | -18- |
|   | 7.11 | Capitalization of Association | -19- |
| 8 | | Design Review | -19- |
|   | 8.1 | Members of Design Review Committee | -19- |
|   | 8.2 | Review of Plans and Specifications | -20- |
|   | 8.3 | Meetings of the Design Review Committee | -21- |
|   | 8.4 | No Waiver of Future Approvals | -21- |
|   | 8.5 | Compensation of Members | -21- |
|   | 8.6 | Correction of Defects | -21- |
|   | 8.7 | Scope of Review | -22- |
|   | 8.8 | Variances | -22- |
|   | 8.9 | Non-Liability for Approval of Plans | -23- |
|   | 8.10 | Declarant/Participating Builder Exemption | -23- |
| 9 | | Use Restrictions | -23- |
|   | 9.1 | Residential Use | -23- |
|   | 9.2 | Nuisances | -24- |
|   | 9.3 | Common Elements | -24- |
|   | 9.4 | Garbage | -24- |
|   | 9.5 | Party Walls | -24- |
|   | 9.6 | Parking and Vehicular Restrictions | -25- |
|   | 9.7 | Interpretation | -25- |
|   | 9.8 | Violations | -25- |
|   | 9.9 | No Liability | -26- |

99885.02111

| DESCRIPTION | | PAGE |
|---|---|---|
| 10 | Insurance | -26- |
| | 10.1 Required Insurance | -26- |
| | 10.2 Policies and Use of Proceeds | -27- |
| | 10.3 Repair or Replacement of Damaged or Destroyed Common Elements | -28- |
| 11 | Condemnation | -28- |
| 12 | Termination of Contracts and Leases of Declarant | -28- |
| 13. | Enforcement of Restrictions | -29- |
| | 13.1 Parties Entitled to Enforce | -29- |
| | 13.2 Remedies Cumulative | -29- |
| | 13.3. No Waiver | -29- |
| | 13.4 Legal Proceedings | -29- |
| | 13.5. Additional Remedies | -29- |
| 14 | Declarant's Rights | -29- |
| | 14.1 Reservation of Development Rights | -29- |
| | 14.2 Limitations on Development Rights | -30- |
| | 14.3 Phasing of Development Rights | -31- |
| | 14.4 Special Declarant Rights | -31- |
| | 14.5 Models, Sales Offices and Management Offices | -31- |
| | 14.6 Construction: Declarant's Easement | -31- |
| | 14.7 Signs and Marketing | -32- |
| | 14.8 Declarant's Personal Property | -32- |
| | 14.9 Declarant Control of the Association | -32- |
| | 14.10 Limitations on Special Declarant Rights | -32- |
| | 14.11 Interference with Special Declarant Rights | -33- |
| | 14.12 Rights of Lenders to Declarant | -33- |
| | 14.13 Priority of Declarant's Rights and Reservations | -33- |
| | 14.14 Interest of Declarant | -33- |
| | 14.15 Exemptions for Declarant and Participating Builders | -33- |
| | 14.17 Liabilities and Obligations of Person Who Succeeds to Declarant's Rights | -36- |
| | 14.18 Successor Declarant's Liabilities and Obligations | -36- |
| | 14.19 General | -37- |
| | 14.20 Termination | -37- |
| 15 | General Provisions | -37- |
| | 15.1 Severability | -37- |
| | 15.2 Violation of Law | -37- |
| | 15.3 Delivery of Notices and Documents | -37- |
| | 15.4 Acceptance, Binding Effect | -37- |
| | 15.5 Headings: Construction | -38- |
| | 15.6 Litigation: Attorney Fees | -38- |
| | 15.7 Enforcement | -38- |

| DESCRIPTION | | | PAGE |
|---|---|---|---|
| | 15.8 | Construction of Declaration and Bylaws ............ .. .... ....... | -38- |
| | 15.9 | FHA/VA Approval ..... ...................... . .. ...... ... | -38- |
| 16. | | Dispute Notification and Resolution Procedure ..... .......... | -39- |
| | 16.1 | Claim Notice ....... ...... ..... .. ...... .. | -39- |
| | 16.2 | Right to Inspect ... ... . ......... ......... .. | -39- |
| | 16.3 | Right to Corrective Action ......... ........... . ........ .. | -39- |
| | 16.4 | Non-Binding Mediation ...... ... . .. ...... ... . .. | -40- |
| | 16.5 | Litigation .. ............. .. ...... ... ... . ... ... | -41- |
| | 16.6 | Miscellaneous ..... .... . ....... .. ...... ..... . | -41- |
| 17 | | Arbitration, Legal Expenses, Limitations on Damages .... .... . .. | -41- |
| | 17.1 | Binding Arbitration ................. . ...... .... | -41- |
| | 17.2 | Limitation on Expenditures for Legal Proceedings ........ . ...... ... | -42- |
| | 17.3 | Limitation on Damages . ... . ...... . ............. | -42- |
| 18 | | Rights of Mortgagees . .    .    ...... ...... ... | -43- |
| 19 | | Duration and Amendment ...   ... | -45- |
| | 19.1 | Duration . ......  . ... . | -45- |
| | 19.2 | Termination  .... .  .    .. ......... .. ...... | -46- |
| | 19.3 | Amendments In General  .. .   ... ... ... | -46- |
| | 19.4 | Limitation of Challenges   .. .        ...... ..... | -46- |
| | 19.5 | Recordation of Amendments .. .    .    .    . ...... ... | -46- |
| | 19.6 | Unanimous Consent .. .   ...  .   .     ...... | -46- |
| | 19.7 | Execution of Amendments .        .   ...... ...... | -46- |
| | 19.8 | Special Declarant Rights  .    ... ...... .  . .... | -47- |
| | 19.9 | Consent of Holders of Security Interests .  .. ... ... .  .... ... | -47- |

EXHIBIT A   DESCRIPTION OF INITIAL PROPERTY

EXHIBIT B   DESCRIPTION OF ADDITIONAL PROPERTY

EXHIBIT C   DESCRIPTION OF COMMON ELEMENTS

# MASTER
# DECLARATION OF COVENANTS, CONDITIONS
# AND RESTRICTIONS AND GRANT OF EASEMENTS
# FOR
# LYNBROOK

THIS MASTER DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND GRANT OF EASEMENTS FOR LYNBROOK ("Declaration") is dated as of Jan. 27, 1999 and is made by THE GATES, LLC, a Nevada limited liability company ("Declarant"), with reference to the following facts:

A.      Declarant is the owner of certain real property located in the City of Las Vegas ("City"), Clark County, Nevada (the "County"), more particularly described on Exhibit A attached hereto ("Initial Property") Declarant intends that the Initial Property be developed and improved as a master Planned Community for residential purposes, which will be known as "Lynbrook."

B.      Declarant has deemed it desirable, for the efficient preservation of the values and amenities in the Community to create a corporation under the laws of the State of Nevada which shall be known as the "Lynbrook Master Association" and which shall be delegated and assigned the powers of, among other things, owning, maintaining and administering the Common Elements for the private use and benefit of its members and authorized guests and invitees and performing such other acts as shall generally benefit the Community.

C.      Declarant will cause or has caused such corporation, the members of which shall be the Owners of Lots to be formed for the purpose of exercising such functions.

D.      Declarant desires to subject the Initial Property to certain covenants, conditions and restrictions for the benefit of Declarant and any and all future owners of Lots in accordance with a common plan and scheme of improvement and development.

NOW, THEREFORE, Declarant hereby declares and establishes the following general plan for the protection and benefit of the Community, and has fixed and does hereby fix the following protective covenants, conditions and restrictions as covenants and equitable servitudes running with the Community upon each and every ownership interest in the Community under and pursuant to which each such ownership interest shall hereafter be held, used, occupied, leased, sold, encumbered, conveyed or transferred. Each and all of the covenants, conditions and restrictions set forth herein are for the purpose of protecting the value and desirability of the Community, and each and every Lot, and inure to the benefit of, run with, and shall be binding upon and pass with each and every ownership interest herein and shall inure to the benefit of and apply to and bind Declarant and any Participating Builders and their respective successors in interest and each Owner and his or her respective successors in interest.

-1-

# ARTICLE 1

1    Definitions.  Unless otherwise expressly provided, when used in this Declaration, the following words and phrases shall have the meanings hereinafter specified.

1.1    Act.  Act means Chapter 116 of the Nevada Revised Statutes (the Nevada Common - Interest Ownership Act), as now or hereafter in effect.

1.2    Additional Property.  Additional Property means the real property described in Exhibit B attached hereto, all or any portion of which may be made subject to this Declaration from time to time.

1.3    Allocated Interests.  Allocated interests means the liability for Common Expenses and votes in the Master Association allocated to each Lot.

1.4    Articles.  Articles means the Articles of Incorporation of the Master Association as filed or to be filed in the Office of the Nevada Secretary of State.

1.5    Assessments.   Assessments collectively means Capital Improvement Assessments, Common Assessments and Special Assessments.

1.6    Assessment Year.  Assessment Year means the calendar year or such other twelve (12) consecutive calendar month period selected by the Executive Board for the levying, determining and assessing of Common Assessments under this Declaration

1.7    Bylaws.  Bylaws means the Bylaws of the Master Association which have or will be adopted by the Executive Board, as such Bylaws may be amended from time to time.

1.8    Capital Improvement Assessment.  Capital Improvement Assessment means a charge against each Owner and its Lot, representing a portion of the costs to the Master Association for installation, construction, or reconstruction of any Improvements on any portion of the Common Elements which the Master Association may from time to time authorize, pursuant to the provisions of this Declaration.

1.9    Close of Escrow.  Close of Escrow means the date on which a deed is Recorded conveying a Lot to a member of the home buying public.

1.10    Common Assessment.  Common Assessment means an annual charge against each Owner and its Lot representing a portion of the total, ordinary costs of maintaining, improving, repairing, replacing, managing and operating the Common Elements, including reserves, and any other costs incurred by the Master Association for the common benefit of the Owners and the Community, as authorized by the Restrictions

1.11    Common Elements.  Common Elements means any real property and Improvements within the Community owned by the Master Association for or which the Master Association has the obligation to maintain, repair and replace for the common benefit of all Owners or, in the case of Limited Common Elements, one or more but fewer than all of the Owners.

-2-

Common Elements may include but not be limited to, Perimeter Walls, multi-purpose recreational trails, parks and related improvements, entry monuments, private streets, sidewalks and arterial setback landscaping along the private streets.

1.12   Common Expenses. Common Expenses means the expenditures made by, or financial liabilities of, the Master Association, together with any allocations to reserves, including actual and estimated costs of  (a) maintaining, managing, operating, repairing and replacing the Common Elements, (b) any unpaid Special Assessments and Capital Improvement Assessments, including these costs not paid by the Owner responsible for payment, (c) managing and administering the Master Association including, but not limited to, compensation paid by the Master Association to managers, accountants, attorneys and other employees, (d) utilities, gardening, trash pickup and disposal and other services benefitting the Common Elements and the Master Association, (e) fire, casualty and liability insurance, workers' compensation insurance and other insurance covering the Common Elements or for the benefit of the Master Association, (f) bonding the members of the management body, any professional managing agent or any other Person handling the funds of the Master Association, (g) taxes paid by the Master Association, (h) amounts paid by the Master Association for the discharge of any lien or encumbrance levied against the Common Elements or the Community, or portions thereof, (i) maintaining areas within the public right-of-way of public streets in the vicinity of the Community as provided in this Declaration, (j) cost of repairing or replacing Common Elements in excess of insurance proceeds and reserves, and (k) any other costs incurred by the Master Association for the common benefit of the Owners.

1.13   Community. Community means the Initial Property (including the Lots and Common Elements), together with all or a portion of the Additional Property or any other real property that may be added to the property subject to this Declaration and the jurisdiction of the Master Association.

1.14   Cost Center. Cost Center means an area within the Community with Limited Common Elements, the maintenance and use of which are limited to the Owners within that area. A Cost Center may be designated in a Notice of Annexation or Supplemental Declaration, and the expenses of maintaining, replacing and operating the Limited Common Elements within the Cost Center are borne solely or disproportionately by the Owners within the Cost Center. There are no Cost Centers designated in the Initial Property. Cost Centers may be designated in connection with future Phases of Development.

1.15   Declarant. Declarant means The Gates LLC, a Nevada limited liability company, its successors and any Participating Builder or other Person to which Declarant expressly assigns any Development Rights hereunder by a Recorded instrument. Any such assignment may include all or only specific rights of the Declarant hereunder and may be subject to such conditions and limitations as Declarant may impose in its sole and absolute discretion.

1.16   Declarant Control Period. Declarant Control Period has the meaning given that term in Section 34.9.

1.17   Declaration. Declaration means this Master Declaration of Covenants, Conditions and Restrictions and Grant of Easements for Lynbrook, as it may be amended from time to time.

990905.02111

1.18   Declarant's Rights.  Declarant's Rights means those Development Rights, Special Declarant's Rights and other rights reserved for the benefit of Declarant pursuant to Article XIV.

1.19   Development Rights.  Development Rights means the "developmental rights" described in NRS 116.11034 and those rights reserved by the Declarant under Section 14.1, including the right to create Lots, Common Elements and Limited Common Elements within the Community as well as other rights provided for herein.

1.20   Director.  Director means a member of the Executive Board.

1.21   Dwelling Unit.  Dwelling Unit means a building that is located on a Lot and designed and intended for use and occupancy as a residence by a single family.

1.22   Executive Board.  Executive Board means the Board of Directors of the Master Association.

1.23   FHA.  FHA means the Federal Housing Administration of the United States Department of Housing and Urban Development and any department or agency of the United States government which succeeds to FHA's function of insuring notes secured by Mortgages on residential real estate.

1.24   FHLMC.  FHLMC means the Federal Home Loan Mortgage Corporation created by Title II of the Emergency Home Finance Act of 1970, and its successors.

1.25   Fiscal Year.  Fiscal Year means the fiscal accounting and reporting period of the Master Association selected by the Board.

1.26   FNMA.  FNMA means the Federal National Mortgage Association, a government-sponsored private corporation established pursuant to Title VIII of the Housing and Urban Development Act of 1968, and its successors.

1.27   GNMA.  GNMA means the Government National Mortgage Association administered by the United States Department of Housing and Urban Development, and its successors.

1.28   Improvements.  Improvements means all structures and appurtenances thereto of every type and kind placed in the Community, including buildings, outbuildings, walkways, entry monuments, basketball courts, portable basketball standards, playground equipment, hiking trails, barbecue pits, waterways, sprinkler pipes, garages, swimming pools, Jacuzzi spas and other recreational facilities, paint on all surfaces, carports, roads, driveways, parking areas, fences, screening walls, retaining walls, stairs, decks, landscaping, hedges, windbreaks, plantings, planted trees and shrubs, poles or signs, exterior air conditioning and water softener fixtures or equipment.

1.29   Initial Property.  Initial Property means the real property described in Exhibit A attached hereto, and which is subject to this Declaration.

-4-

AP0609.02111

1.30    Limited Common Elements  Limited Common Elements means a portion of the Common Elements designated in this Declaration, a Notice of Annexation or a Supplemental Declaration or by operation of the Act for the exclusive use of one or more but fewer than all of the Lots. There are no Limited Common Elements in the Initial Property.

1.31    Lot. Lot means a residential lot within the Community designed for separate ownership or occupancy, as shown on a Recorded subdivision map identified in this Declaration or any Notice of Annexation or Supplemental Declaration, together with the Improvements thereon, but excepting any Common Elements or Limited Common Elements  The identifying number of each Lot is shown on the Recorded subdivision map of which the Lot is a part.

1.32    Master Association   Master Association means the Lynbrook Master Association, a Nevada nonprofit corporation

1.33    Master Association Maintenance Funds.  Master Association Maintenance Funds means the accounts created for Master Association receipts and disbursements pursuant to Article VII hereof

1.34    Mortgagee  Mortgagee means the holder of a Security Interest, including a mortgagee of a mortgage and a beneficiary of a deed of trust.

1.35    Notice of Annexation.  Notice of Annexation means an amendment to the Declaration Recorded pursuant to Section 3.4 hereof to annex all or a portion of the Additional Property, submitting the real estate described therein to the Declaration and the jurisdiction of the Master Association.

1.36    Owner.  Owner means the Person or Persons, including Declarant and any Participating Builder, who owns (a) a fee simple interest to a Lot, or (b) a leasehold interest of a Lot with an initial term of more than twenty (20) years, including options to renew, excluding those Persons holding title solely as security for the performance of an obligation other than sellers under executory contracts of sale. Declarant or a Participating Builder is the owner of any Lot created by this Declaration until that Lot is conveyed to another Person.

1.37    Participating Builder. Participating Builder means a Person who acquires a portion of the Community for the purpose of constructing Dwelling Units and related Improvements on Lots for purposes of sale or lease to the general public; provided, however, that the term "Participating Builder" shall not mean or refer to Declarant or its successors.

1.38    Perimeter Walls.  Perimeter Walls means certain walls around the perimeter of the Community which the Master Association is responsible for maintaining (structure, cap and exterior surface of wall facing Common Elements only). The Perimeter Walls in the Initial Property are shown on Exhibit C attached hereto.

1.39.    Person.  Person means a natural individual, a partnership, a limited liability company, a corporation, a government and governmental subdivision or agency or other legal entity which may legally hold title to real property.

-5-

970305.02111

1.40    Phase of Development.  Phase of Development means each portion of real property designated as such in this Declaration, in a Notice of Annexation or a Supplemental Declaration.

1.41    Planned Community.  Planned Community means a common-interest community of the type defined in NRS 116.110365.

1.42    Plats and Plans.  Plats and Plans means the plats and the plan of development for the Community, as further provided in NRS 116.2109.

1.43    Record, Recorded and Recordation.  Record, Recorded and Recordation means, with respect to any document and unless the context otherwise requires, the recordation or filing of such document in the Office of the County Recorder.

1.44    Restrictions.  Restrictions means this Declaration, the Articles, the Bylaws, any rules and regulations of the Master Association and any Notice of Annexation or Supplemental Declaration.

1.45    Security Interest.  Security Interest means an interest in real estate or personal property, created by contract or conveyance, which secures payment or performance of an obligation. The term includes a lien created by a mortgage, deed of trust, trust deed, security deed, contract for deed, land sales contract, lease intended as security, assignment of leases or rents intended as security, pledge of an ownership interest in the Master Association and any other consensual lien or contract for retention of title intended as security for an obligation.

1.46    Special Assessment  Special Assessment means a charge against a particular Owner and its Lot directly attributable to or reimbursable by the Owner, to reimburse the Master Association for costs incurred in bringing the Owner and its Lot into compliance with the provisions of this Declaration, or a charge levied by the Executive Board as a reasonable fine or penalty for non-compliance with the Restrictions, plus interest and other charges on such Special Assessment as provided for in this Declaration. Special Assessments shall not include any late payment penalties, interest charges, attorneys' fees or other costs incurred by the Master Association in its efforts to collect Common Assessments or Capital Improvement Assessments.

1.47    Special Declarant Rights.  Special Declarant Rights means the "special declarant's rights" described in NRS 116.110385 and reserved for the benefit of the Declarant to: (i) complete improvements indicated on the Plats and Plans or in the Declaration; (ii) exercise any Development Right; (iii) maintain sales offices, management offices, signs advertising the Community and models; (iv) use easements through the Common Elements for the purpose of making improvements within the Community, the Additional Property or any other real estate which may be added to the Community; (v) make the Community subject to a master association; (vi) merge or consolidate the Community with another common-interest community of the same form of ownership; (vii) appoint or remove any officer of the Master Association or any Director during the Declarant Control Period; or (viii) exercise any other "special declarant's rights" existing from time to time under the Act or reserved for the benefit of Declarant pursuant to Article XIV.

1.48 Sub-Association. Sub-Association means any Nevada non-profit corporation, or unincorporated association, or its successor in interest, the membership of which is composed of Owners of Lots within one or more Phases of Development or other portion of the Community, which is organized and established or authorized pursuant to or in connection with a Supplemental Declaration.

1.49 Supplemental Declaration. Supplemental Declaration means any declaration of covenants, conditions and restrictions, or similar such document, which affects one or more Phases of Development.

1.50 VA. VA means the Department of Veterans Affairs of the United States of America and any department or agency of the United States government which succeeds to VA's function of issuing guarantees of notes secured by Security Interests on residential real estate.

## ARTICLE II

2. Name and Type of Community.

2.1 Name and Type of Community: The name of the Community is Lynbrook. Lynbrook is a Planned Community.

2.2 Association: The name of the Master Association is Lynbrook Master Association. The Master Association is charged with the duties and vested with the powers prescribed by law and set forth in the Restrictions. Neither the Articles nor Bylaws shall, for any reason, be amended or otherwise changed so as to be inconsistent with this Declaration.

## ARTICLE III

3. Development of the Community.

3.1 Master Planned Community. Declarant intends, but is not obligated, to develop the Community, and all portions thereof, as a master Planned Community used primarily for residential purposes consistent with this Declaration.

3.2 Expansion by Declarant and Participating Builder.

(a) Declarant has reserved as a Development Right the right to annex all or any portion of the Additional Property to the provisions of this Declaration and the jurisdiction of the Master Association, without the consent of any Owner or Mortgagee. A Participating Builder may annex all or a portion of the Additional Property which it has acquired from Declarant, with the consent of Declarant (such consent shall not be unreasonably withheld), or without the consent of Declarant if Declarant has assigned to the Participating Builder its right to annex property to the Community.

(b) Declarant may annex Additional Property in accordance with the procedures set forth in Section 3.4. No assurances are made regarding the boundaries of any particular portion of the Additional Property added to the Community, or the sequence in which

portions of the Additional Property may be added to the Community. Declarant is neither obligated to exercise its right to annex Additional Property to the Community nor, if Declarant exercises its option with respect to any portion of the Additional Property, to exercise this option with respect to the remainder of the Additional Property.

(c)     Declarant's (or Participating Builder's) right to annex the Additional Property under this provision shall terminate on the date provided in Section 14.10.

3.3     Expansion by the Master Association.  The Master Association may submit any real estate located immediately adjacent to the Community or across a public road from the Community to the provisions of this Declaration and the jurisdiction of the Master Association, in accordance with the procedures set forth in Section 3.4 as long as the Master Association obtains the written consent of all of the following: (i) the fee simple owner (if not the Master Association); (ii) any Mortgagee on such real estate, (iii) sixty-seven percent (67%) of the total number of votes of the Owners and (iv) the Declarant during the period of time during which the Declarant has the right to annex Additional Property under Section 3.2.

3.4     Notice of Annexation.  A Notice of Annexation shall contain at least the following provisions: (i) a reference to this Declaration, which reference shall state the date of Recordation hereof and other relevant recording data of the County Recorder's office; (ii) a statement that the provisions of this Declaration including provisions regarding allocation of votes and liability for Assessments, shall apply to the real estate added; (iii) a sufficient description of the real estate added and a designation of such real estate with the term "Phase of Development" followed by a unique identifier so as to differentiate between each Phase of Development of the Community; (iv) a description of any Common Elements and any Limited Common Elements created in the real property annexed and a designation of the Lots(s) to which each Limited Common Element is allocated to the extent required by NRS 116.2108(i); (v) an identifying number for each new Lot created; and (vi) an allocation of the Allocated Interests.  A Notice of Annexation may cover one or more Phases of Development, as designated in such Notice of Annexation.  Each Notice of Annexation shall be signed by Declarant, by Declarant and the fee owner if the real estate added is not owned in fee by Declarant or by the Master Association pursuant to Section 3.3.  Upon Recording, the provisions of this Declaration shall apply to the Additional Property or other real property thereby annexed as if it were originally part of the Initial Property, and the definitions used in this Declaration shall be expanded automatically to encompass and refer to the Community as expanded.

3.5     Expansion of Additional Property.  To the fullest extent permitted by the Act and subject to Section 14.2, the Additional Property may, from time to time be expanded to include additional real property, not as yet identified.  Such property may be added to the Additional Property upon the Recordation of a written instrument describing such real property, executed by Declarant and all other owners of such property; provided, however, to the extent required by the Act, such expansion of the Additional Property must also be approved a majority of the total voting power of the Master Association

97860.0111

### 3.6    Supplemental Declarations.

(a)    As each Phase of Development is developed, Declarant, or a Participating Builder with Declarant's sole discretionary written approval, may Record one or more Supplemental Declarations which will incorporate this Declaration therein by reference. Such Supplemental Declaration may supplement the provisions of this Declaration with such further or more restrictive covenants, conditions, restrictions, land uses and other matters as Declarant or a Participating Builder may deem appropriate for such area, taking into account the particular requirements of each Phase of Development.

(b)    This Declaration shall control in the event of any conflict between any Supplemental Declaration and the provisions of this Declaration, although such documents shall be construed to be consistent with one another to the extent possible. The inclusion in any Supplemental Declaration of conditions, restrictions, covenants, land uses and other matters which are more restrictive or more inclusive than the restrictions contained in this Declaration shall not be deemed to constitute a conflict with the provisions of this Declaration.

### 3.7    Common Elements. As each Phase of Development is added to the Community, title to and control over the Common Elements in that Phase of Development (if any) shall be transferred to the Master Association in accordance with the provisions of this Declaration unless a Supplemental Declaration establishes a Sub-Association to take title to and control over the Common Elements therein. A Supplemental Declaration for such Phase of Development of the Community may, but need not, provide for the establishment of a Sub-Association, to be comprised of Owners of Lots within that Phase of Development.

## ARTICLE IV

### 4.    Community Easements.

### 4.1    Owners' Easements of Enjoyment. Declarant reserves for the benefit of every Owner nonexclusive easements of ingress and egress and of enjoyment in, to and over the Common Elements, and such easements are appurtenant to and shall pass with title to every Lot, subject to the following:

(a)    The Master Association's right to reasonably limit the number of guests and tenants of the Owners using the Common Elements;

(b)    The Master Association's right to establish rules and regulations for the use of the Common Elements;

(c)    The Master Association's right in accordance with the Restrictions, with the vote or written assent of two-thirds (2/3rds) of the Master Association's voting power, to borrow money for the purpose of improving, repairing, or adding to the Common Elements.

(d)    Subject to the rights of Mortgagees set forth in Article XVIII, the Master Association's right to transfer the Common Elements for such purposes and subject to such conditions as may be agreed to by the Owners. Except for grants of easements, licenses, minor lot

line adjustments or rights-of-way in or over the Common Elements for purposes consistent with the use of the Community as a residential development, no such dedication, release, alienation or transfer shall be effective, without the vote or written consent of Owners entitled to cast at least two-thirds (2/3rds) of the voting power of the Master Association, agreeing to such dedication, release, alienation or transfer;

   (e) The right of Declarant, Participating Builders and their respective sales agents, representatives and prospective purchasers to the nonexclusive use of the Common Elements, without cost, for access, ingress, egress, use and enjoyment, in order to dev elop, show and dispose of the Community as provided herein, until the last Close of Escrow in the Community; provided, however, that such use shall not unreasonably interfere with the rights of enjoyment of the other Owners as provided herein;

   (f) Declarant's and Participating Builders' rights and reservations as set forth in Articles VIII and XIV of this Declaration;

   (g) The Master Association's right to reconstruct, replace or relinish any Improvement or portion thereof on the Common Elements;

   (h) The Master Association's right to maintain and repair the Common Elements;

   (i) The Master Association's right to reasonably restrict access to portions of the Common Elements;

   (j) Dedications, easements, rights, interests and reservations set forth on any Recorded subdivision map by which any Lot or Common Element was created; and

   (k) Any other easements, rights and interests reserved in this Declaration.

  4.2 Easements for Public Service Use. In addition to the foregoing easements over the Common Elements, Declarant hereby reserves easements over the Community for public services of the City and County, including but not limited to, the right of law enforcement and fire protection personnel to enter upon any part of the Community for the purpose of carrying out their official duties.

  4.3 Waiver of Use. No Owner may exempt himself from personal liability for assessments duly levied by the Master Association, nor release its Lot from the liens and charges hereof, by waiving the use and enjoyment of the Common Elements or any facilities thereon or by abandonment of such Owner's Lot.

  4.4 Easements for Water and Utility Purposes. In addition to the foregoing easements over the Common Elements, Declarant hereby reserves easements over the Community for public and private utility purposes, including but not limited to, the right of any public utility or water district of ingress or egress over the Common Elements for purposes of reading and maintaining meters, and using and maintaining fire hydrants located in the Community

-16-

PP0609.00111

4.5    Delegation of Use. Any Owner entitled to the right and easement of use and enjoyment of the Common Elements may delegate those rights and easements to such Owner's tenants, contract purchasers or subtenants who reside in such Owner's Dwelling Unit, subject to reasonable regulation by the Executive Board.

4.6    Other Easements. Declarant hereby reserves for the benefit of each Owner and such Owner's Lot reciprocal, nonexclusive easements over the adjoining Lots for the control, maintenance and repair of the utilities serving such Owner's Lot. Declarant expressly reserves for the benefit of all of the real property in the Community, and for the benefit of the Owners and all of the Lots, reciprocal, nonexclusive easements over all Lots and the Common Elements, for maintenance and repair of utility services and for maintenance and repair of any Dwelling Unit. If any Dwelling Unit encroaches in a minor way upon the Common Elements as a result of construction by Declarant or a Participating Builder, or as a result of reconstruction, repair, shifting, settlement or movement of any portion of the Community, a valid easement for minor encroachment and for its maintenance shall exist so long as the minor encroachment exists. Declarant and the Owners shall have an easement appurtenant to their respectively owned Lots over the property line to and over the adjacent Lot for the purposes of accommodating any natural movement or settling of any Dwelling Unit located on such Lot, any encroachment of any Dwelling Unit due to minor engineering or construction variances, and any encroachment of eaves, roof overhangs and architectural features comprising parts of the original construction of any Dwelling Unit located on such Lot.

## ARTICLE V

5    Allocated Interests.

5.1    Allocation of Interests. The Allocated Interests shall be allocated and calculated in accordance with the formulas set forth in this Article. The same formulas are to be used in reallocating interests if Lots are added to the Community pursuant to Article III.

5.2    Formulas for Allocation of Interests. The interests allocated to each Lot have been calculated by the following formulas:

(a)    Liability for Common Expenses. The percentage of Liability for Common Expenses allocated to each Lot shall be one equal share for each Lot. The formula for calculating the Common Expense liability for each Lot is based on each Lot having an equal share in the Common Expenses. Nothing contained in this subsection shall prohibit certain Common Expenses from being apportioned to particular Lots under Section 7.2.

(b)    Votes. Each Lot shall have one equal vote. Any specified percentage, portion or fraction of Owners, unless otherwise stated in the Restrictions, means the specified percentage, portion or fraction of all of the votes.

5.3    Allocated Interests Upon Exercise of Development Rights. The effective date for assigning Allocated Interests to Lots created pursuant to Section 3.2 or 3.3 shall be the date on which the Notice of Annexation, Supplemental Declaration or other amendment creating the Lots is Recorded.

970805-02111

## ARTICLE VI

### 6. Lynbrook Master Association.

6.1. Membership in the Master Association. The membership of the Master Association at all times consists exclusively of all Owners or, following termination of the Community, of all Owners of former Lots entitled to distributions of proceeds or their heirs, successors or assigns.

#### 6.2 Voting Rights:

(a) When more than one Person holds such interest or interests in any Lot ("Co-Owner"), all such Co-Owners shall be members and may attend any meetings of the Master Association, but only one (1) such Co-Owner shall be entitled to exercise the votes to which the Lot is entitled. Such Co-Owners may from time to time designate in writing one of their number to vote. Where no voting Co-Owner is designated, or if such designation has been revoked, the vote for such Lot shall be exercised as mutually agreed upon by the majority of the Co-Owners of the Lot. Unless the Executive Board receives a written objection from a Co-Owner, it shall be presumed that the voting Co-Owner is acting with the consent of its Co-Owners. No vote shall be cast for any Lot where the majority of the Co-Owners, present in person or by proxy, owning the majority interest in the Lot cannot agree to the vote or other action.

(b) The right to vote may not be severed or separated from the ownership of the Lot to which it is appurtenant, except that, subject to the requirements of the Act, an Owner may give a proxy in the manner described in the Bylaws, may assign its right to vote to a contract purchaser, a lessee or tenant actually occupying the Lot or to a Mortgagee of the Lot, for the term of the lease or Security Interest, and any sale, transfer or conveyance of the Lot to a new Owner or Owners shall operate automatically to transfer the appurtenant vote to the new Owner, subject to any assignment of the right to vote to a contract purchaser, lessee or Mortgagee as provided herein.

6.3 Suspension of Membership Rights. The Executive Board shall have the authority, after notice and opportunity to be heard, to suspend the membership rights of any Owner, including the right to vote at any meeting of the members, for any period during which the payment of any Assessment owed by such Owner remains delinquent, it being understood that any suspension for nonpayment of any Assessment shall not constitute a waiver or discharge of the Owner's obligation to pay Assessments. The Executive Board may suspend the right of an Owner to use the Common Elements (to the extent that access and utility services to a Lot are not impaired) for a period not to exceed sixty (60) days, unless such rights are suspended for failure to pay Assessments, in which case such rights may be suspended until the Assessments are fully paid.

6.4 Transfer of Membership. Except as permitted by the Restrictions, membership in the Master Association shall not be transferred, pledged or assigned. Any attempted transfer, other than as permitted in the Restrictions, shall be deemed a prohibited transfer, shall be void, and shall not be reflected as a transfer upon the Master Association's books and records.

6.5 Powers of the Master Association. Subject to the provisions of the Restrictions, the Master Association may:

99[803.02111

(a)     Adopt and amend bylaws, rules and regulations;

(b)     Adopt and amend budgets for revenues, expenditures and reserves and collect Assessments from Owners;

(c)     Hire and discharge managing agents and other employees, agents and independent contractors. Specifically, the Master Association may contract with a manager, whether an employee or independent contractor, and delegate to the manager the authority to implement the duties, powers or functions of the Master Association as the same may be limited by the Restrictions;

(d)     Subject to the provisions of Article XVII, institute, defend or intervene in litigation or administrative proceedings in its own name on behalf of itself or two or more Owners on matters affecting the Community;

(e)     Make contracts and incur liabilities;

(f)     Regulate the use, maintenance, repair, replacement and modification of Common Elements;

(g)     Cause additional Improvements to be made as part of the Common Elements;

(h)     Acquire, hold, encumber and convey in its own name any right, title or interest to real estate or personal property, but Common Elements may be conveyed or subjected to a Security Interest only if persons entitled to cast at least two-thirds (2/3rds) of the votes in the Master Association, including two-thirds (2/3rds) of the votes allocated to Lots not owned by Declarant, agree to that action; furthermore, all owners of Lots to which any Limited Common Element is allocated must agree in order to convey that Limited Common Element or subject it to a Security Interest;

(i)     Grant easements, leases, licenses and concessions through or over the Common Elements;

(j)     Impose and receive any payments, fees or charges for the use, rental or operation of the Common Elements and for services provided to Owners;

(k)     Impose charges for late payment of Assessments and, after notice and an opportunity to be heard, levy reasonable fines for violations of the Restrictions;

(l)     Impose reasonable charges for the preparation and Recordation of amendments to this Declaration, information regarding the Master Association requested by an Owner in connection with the preparation of that Owner's required disclosures to a purchaser of that Lot or statements of unpaid assessments;

(m)     Provide for the indemnification of its officers and Executive Board and maintain directors' and officers' liability insurance;

-13-

990805.02111

(n)     Assign its right to future income, including the right to receive Assessments for Common Expenses;

(o)     Direct the removal, in accordance with applicable law, of vehicles improperly parked on property owned or leased by the Master Association; and

(p)     Exercise any other power conferred by the Act or these Restrictions or otherwise necessary and proper for the governance and operation of the Master Association.

6.6     Officers and Directors.

(a)  .. Not later than 60 days after conveyance of 25% of the Lots that may be created to Owners other than a Declarant, at least one Director and not less than 25% of the Directors must be elected by Owners other than the Declarant. Not later than 60 days after conveyance of 50% of the Lots that may be created to Owners other than a Declarant, not less than 33 1/3% of the Directors must be elected by Owners other than the Declarant. Not later than the termination of the Declarant Control Period, the Owners shall elect an Executive Board of five (5) Directors, at least a majority of whom must be Owners. The Executive Board shall elect the officers. The Directors and officers of the Master Association shall take office upon election.

(b)     An officer, employee, agent or director of a corporate Owner, a trustee or designated beneficiary of a trust that owns a Lot, a partner of a partnership that owns a Lot, a manager or member of a limited liability company that owns a Lot and a fiduciary of an estate that owns a Lot may be an officer or Director. In all events where the person serving or offering to serve as an officer or Director is not the record owner, such person shall file proof of authority in the records of the Master Association.

(c)     Except as otherwise provided in the Restrictions or the Act, the Executive Board may act in all instances on behalf of the Master Association. In the performance of their duties, the Directors and officers of the Master Association are insulated from liability as provided by the laws of the State of Nevada for officers and directors of corporations.

(d)     The Executive Board may not act on behalf of the Master Association to amend this Declaration, to terminate the Community as a Planned Community, or to elect Directors or determine their qualifications, powers and duties or terms of office, but the Executive Board may fill vacancies in its membership for the unexpired portion of any term.

(e)     Owners, by a two-thirds (2/3) vote of all persons present and entitled to vote at any meeting of the Owners at which a quorum is present, may remove any Director with or without cause, other than a Director appointed by Declarant.

(f)     If a Director is sued for liability for actions undertaken in his or her role as a Director, the Master Association shall indemnify such Director for losses or claims, and undertake all costs of defense, until and unless it is proven that such Director acted with willful or wanton misfeasance or with gross negligence. After such proof, the Master Association is no longer liable for the cost of defense, and may recover costs already expended from the Director who so acted.  Officer of the Master Association and Directors are not personally liable to the victims of

950803.0911

crimes occurring in the Community. Punitive damages may not be recovered against the Master Association.

6.7 <u>Maintenance Responsibilities</u>. Each Owner is responsible for maintaining, repairing and replacing all Improvements constructed on such Owner's Lot (including the Dwelling Unit). Subject to Section 9.5, Owners shall only be responsible for maintaining the exterior surface of a Perimeter Wall facing such Owner's Lot. The Master Association is responsible for maintaining, repairing and replacing the Common Elements. Each Owner shall afford to the Master Association and the other Owners, and to their agents or employees, access through the Owner's Lot reasonably necessary for those purposes. The Master Association or any other Owner shall be liable for any damage caused by entry onto an Owner's Lot.

6.8 <u>Tort and Contract Liability</u>. Neither the Master Association nor any Owner (excluding Declarant and Participating Builders) is liable for Declarant's or any Participating Builder's torts in connection with any part of the Community which Declarant or a Participating Builders is responsible for maintaining. Any claim alleging tortious conduct on the part of the Master Association must be brought against the Master Association and not against any Owner.

6.9 <u>Master Association Records</u>. The Master Association shall keep financial records sufficiently detailed to enable the Master Association to comply with NRS 116.4109. All financial and other records of the Master Association must be made reasonably available for each Owner and his or her authorized agent to inspect, examine, photocopy and audit.

## ARTICLE VII

7. <u>Assessments</u>

7.1 <u>Assessments for Common Expenses</u>.

(a) Except as provided in Section 7.2, all Common Expenses shall be assessed at a uniform rate for all Lots in accordance with the percentage of Liability for Common Expenses as set forth in Article V.

(b) Until the Master Association makes an Assessment for Common Expenses, Declarant shall pay all Common Expenses. After an Assessment has been made by the Master Association, Assessments for Common Expenses must be made at least annually, based on a budget adopted at least annually by the Master Association and ratified by Owners as provided in Section 7.7.

(c) Assessments shall be due and payable in twelve (12) equal monthly installments. Payments of Assessments shall be collected in advance on a regular basis on such due dates as the Executive Board shall determine from time to time in its discretion.

7.2 <u>Common Expenses Attributable to Fewer than all Lots</u>.

(a) Any Common Expense or portion thereof benefitting fewer than all of the Lots shall be assessed exclusively against the Lots benefitted.

-15-

990806.02111

(b)      An assessment to pay a judgment against the Master Association may be made only against the Lots in the Community at the time the judgment was entered, in proportion to their respective liabilities for Common Expense.

(c)      If a Common Expense is caused by the misconduct of a Owner, the Master Association may assess that expense exclusively against that Owner's Lot.

(d)      If the liabilities for Common Expenses are reallocated, Common Assessments and any installment thereof not yet due shall be recalculated in accordance with the reallocated liabilities.

(e)      Fees, charges, late charges, fines, collection costs and interest charged against a Owner pursuant to the Declaration and the Act are enforceable as Common Assessments against that Owner's Lot.

(f)      The following portions of the Community shall be exempt from the assessments, charges and liens created herein:

(i)      All properties dedicated and accepted by the City, County or State of Nevada and devoted to public uses, whether the City's, County's and or State's interest is represented by a fee ownership, by an easement, or in any other form of property ownership;

(ii)      All utility lines and easements (but not any Lot subject thereto), and

(iii)      The Common Elements.

7.3      Date of Commencement of Common Assessments.

(a)      Lots in each Phase of Development shall not be subject to Assessment for Common Expenses until the first day of the first month following the month in which the first Close of Escrow occurs for the sale of a Lot to an Owner (other than Declarant or a Participating Builder) in each respective Phase of Development.

(b)      The first Common Assessment shall be adjusted according to the number of months remaining in the Fiscal Year. The Executive Board shall fix the amount of the Common Assessment at least thirty (30) days in advance of each Assessment period. Written notice of any change in the amount of any Common Assessment or Capital Improvement Assessment shall be sent via first-class mail to every Owner subject thereto not less than thirty (30) nor more than sixty (60) days prior to the increased assessment becoming due. The due dates shall be established by the Executive Board.

(c)      The Master Association shall, upon demand and for a reasonable charge, furnish a certificate signed by a Master Association officer or agent setting forth whether the Assessments for a specified Lot have been paid. A properly executed certificate as to the status of

-16-

540305.02111

Assessments is binding upon the Master Association, the Executive Board and every Owner as of the date of its issuance.

(d)     Upon dissolution of the Master Association incident to the abandonment or termination of the Community as a Planned Development, any Common Assessment funds remaining shall be distributed to or for the benefit of the Owners in the same proportions as such monies were collected from the Owners.

7.4     Maintenance Funds of Master Association.  The Board shall establish no fewer than two (2) separate Master Association Maintenance Fund accounts into which shall be deposited all monies paid to the Master Association and from which disbursements shall be made, as provided herein, in the Master Association's performance of functions under this Declaration.  The Master Association Maintenance Funds may be established as trust accounts at a banking or savings institution and shall include: (a) an Operating Fund for current Common Expenses, (b) an adequate Reserve Fund for capital Improvements, replacements, painting and repairs of the Common Elements (which would not reasonably be expected to occur on an annual or more frequent basis), and for payment of deductible amounts for insurance policies which the Master Association obtains as provided in Article X hereof, and (c) any other funds which the Board may establish to the extent necessary under the Declaration's provisions, including a separate fund for Cost Centers.  The Master Association may establish additional Maintenance Funds, so long as the amounts assessed, deposited into, and disbursed from any such Fund are designated for purposes authorized by this Declaration.

7.5     Limitation on Use of Assessments.

(a)     The Master Association shall not use any Assessments or Master Association funds to abate any annoyance or nuisance emanating from outside the physical boundaries of the Community, or in support of Federal, State or local political activities intended to influence governmental action affecting areas outside the boundaries of the Community (e.g., endorsement or support of political candidates, initiatives, legislative actions or administrative actions by any governmental agency).

(b)     The Master Association shall not use reserve funds for any purpose other than capital Improvements, replacements, painting and repairs of the Common Elements (which would not reasonably be expected to occur on an annual or more frequent basis), and for payment of deductible amounts for insurance policies which the Master Association obtains as provided in Article X hereof.

7.6     Capital Improvement Assessments.  If the reserve funds of the Master Association are inadequate to make necessary capital improvements to the Community, the Master Association may levy a Capital Improvement Assessment applicable to that year only for the purpose of defraying, in whole or in part, the cost of any construction, reconstruction, maintenance, repair or replacement of a capital improvement upon the Common Elements.  The budget for any Capital Improvement Assessment shall be adopted by the Executive Board, subject to ratification by Owners as provided in Section 7.7.

7.7     Ratification of Budgets.  Within thirty (30) days after adoption of any proposed budget for the Master Association or a Capital Improvement Assessment, the Executive

Board shall provide a summary of the budget or the Capital Improvement Assessment to all the Owners, and shall set a date for a meeting of the Owners to consider ratification of the budget or Capital Improvement Assessment not less than fourteen (14) nor more than thirty (30) days after mailing of the summary, except in the case of a Capital Improvement Assessment, in which case notice of the meeting at which the Capital Improvement Assessment will be considered must be given at least 21 days in advance of the meeting of the Owners. Unless at that meeting eighty percent (80%) of all Owners reject the budget or the Capital Improvement Assessment, the budget or the Capital Improvement Assessment, as applicable, is ratified, whether or not a quorum is present. If the proposed budget is rejected, the periodic budget last ratified by the Owners or initially established by Declarant must be continued until such time as the Owners ratify a subsequent budget proposed by the Executive Board.

7.3     Surplus Funds. Any surplus funds of the Master Association remaining after payment of or provision for Common Expenses and any prepayment of reserves must be paid to the Owners in proportion to their liabilities for Common Expenses or credited to them to reduce their future assessments for Common Expenses.

7.3     Remedies of Master Association. Any installment of a Common Assessment, Capital Improvement Assessment or Special Assessment not paid within thirty (30) days after the due date shall bear interest from the due date of such installment at the rate established by the Executive Board not exceeding eighteen percent (18%) per year from the due date until paid. The Master Association may also impose a late charge for installments received ten (10) days after the due date of the installment in an amount established by the Executive Board to compensate the Master Association for increased bookkeeping, billing, administrative costs and other appropriate charges. No such late charge on any delinquent installment of an Assessment shall exceed the maximum amount permitted by law. All Assessments, together with interest, costs and reasonable attorneys' fees, shall also be the personal obligation of the Owner of such Lot at the time when the Assessment fell due. The personal obligation for delinquent Assessments shall not pass to a successor in title unless expressly assumed by such successor

7.10    Lien for Assessments

(a)     The Master Association has a lien on a Lot for any Assessment levied against that Lot or fines imposed against its Owner from the time the assessment or fine becomes due. Fees, charges, late charges, fines and interest charged pursuant to paragraphs (j), (k) and (l) of Section 6.5 are enforceable as Assessments under this Section. If an Assessment is payable in installments, the full amount of the Assessment is a lien from the time the first installment thereof becomes due.

(b)     A lien under this Section is prior to any lien imposed by a Sub-Association and to all other liens and encumbrances on a Lot, except:

(i)     Liens and encumbrances Recorded before the Recordation of this Declaration;

(ii)    A first Security Interest on a Lot Recorded before the date on which the assessment sought to be enforced became delinquent; and

-18-

(iii)    As otherwise required by law, including liens for real estate taxes and other governmental assessments or charges against a Lot to the extent required by law.

A lien under this Section 7.10(b) is also prior to all Security Interests described in Section 7.10(b)(ii) to the extent that the Common Assessments are based on the periodic budget adopted by the Master Association pursuant to Section 7.7 and would have become due in the absence of acceleration, during the six months immediately preceding institution of an action to enforce the Master Association's lien. This subsection does not affect the priority of mechanics' or materialmen's liens or the priority of a lien for other assessments made by the Master Association.

(c)    Recording of this Declaration constitutes record notice and perfection of the lien created hereunder. No further Recordation of any claim of lien for Assessments is required.

(d)    This Section does not prohibit actions to recover sums for which Section 7.10(a) creates a lien or prohibit the Master Association from taking a deed in lieu of foreclosure.

(e)    A judgment or decree in any action brought under this section must include costs and reasonable attorneys' fees for the prevailing party.

(f)    Upon written request, the Master Association shall furnish to an Owner a statement setting forth the amount of unpaid Assessments against the Owner's Lot. The statement must be in recordable form. The statement must be furnished within ten (10) business days after receipt of the request and is binding on the Master Association, the Executive Board and every Owner.

(g)    The Master Association may foreclose its lien as provided by NRS 116.3116 through 116.31168. Such lien may also be enforced in any manner permitted by law.

7.11    Capitalization of Association. A working capital fund is to be established in the amount of two (2) months' regularly budgeted initial Common Assessments, measured as of the date of the first Assessment on the first Phase of Development, for all Lots as they are created in proportion to their respective Allocated Interests in Common Expenses. Any amounts paid into this fund shall not be considered as advance payment of Assessments. Upon Close of Escrow each Owner shall pay its Lot's share of the working capital fund directly to the Master Association. While Declarant is in control of the Executive Board, Declarant cannot use any of the working capital funds to defray its expenses, reserve contribution or construction costs or to make up budget deficits.

## ARTICLE VIII

8.    Design Review.

8.1    Members of Design Review Committee. The Master Association shall have a Design Review Committee which shall consist of five (5) members; provided, however, such number may be increased or decreased by resolution of the Executive Board. The initial Design

Review Committee shall consist of three (3) members appointed by Declarant. After the first meeting of the Owners of the Master Association, the number shall be increased to five (5) members, three (3) of which shall be appointed by Declarant and two (2) of which shall be appointed by the Executive Board. Declarant shall appoint a majority of members to the Design Review Committee for the duration of the Declarant Control Period; thereafter, the Executive Board shall appoint all members. A member of the Design Review Committee may be removed at any time, without cause, by the Person who appointed such member. Unless changed by resolution of the Executive Board, the address of the Design Review Committee for all purposes, including the submission of plans for approval, shall be at the principal office of the Master Association as designated by the Executive Board pursuant to the Bylaws.

## 5.2    Review of Plans and Specifications.

(a)    The Design Review Committee shall consider and act upon any and all plans and specifications submitted for its approval pursuant to the terms of this Declaration and shall perform such other duties as are specified in this Declaration or are from time to time assigned to it by the Executive Board.   No construction, alteration, grading, addition, excavation, modification, decoration, redecoration or reconstruction of an Improvement or removal of any tree in any Phase of Development shall be commenced or maintained by any Owner, until the plans and specifications consistent with the Development Standards (as defined below) have been submitted to, and approved in writing by, the Design Review Committee. Every applicant for approval of the Design Review Committee must obtain a written receipt for each submission required under this Article   The Design Review Committee shall approve plans and specifications submitted for its approval only if it deems that (a) the construction, alterations, or additions contemplated thereby in the locations indicated will comply with the development standards of Declarant, as the same may be amended from time to time by the Declarant or the Executive Board  (the "Development Standards") and will not be detrimental to the appearance of the surrounding area or the Community as a whole, (b) the appearance of any structure affected thereby will be in harmony with other structures in the vicinity, (c) the construction will not detract from the beauty, wholesomeness and attractiveness of the Common Elements or the enjoyment thereof by the Owners, (d) the construction will not unreasonably interfere with existing views from other Lots, and (e) the upkeep and maintenance of any Common Elements will not become a burden on the Master Association

(b)    The Design Review Committee may condition its approval of proposals or plans and specifications for any Improvement upon compliance with applicable zoning ordinances and building, health and safety codes, compliance with the Development Standards and such other conditions as the Design Review Committee may reasonably determine to be prudent and in the best interests of the Master Association. The Design Review Committee may also issue rules or guidelines supplementing the Development Standards setting forth procedures for the submission of plans for approval.

(c)    The Design Review Committee may further require that all plans and specifications first be approved by any Sub-Association having jurisdiction.  Any application submitted shall be deemed approved, unless written disapproval or a request for further information or materials shall have been transmitted to the applicant within thirty (30) days after the date of receipt by the Design Review Committee of all required materials.

440805.02111

(d)     The Design Review Committee will condition any approval required in this Article, among other things, on compliance with the Development Standards, which are incorporated herein by reference.

(e)     Any Owner aggrieved by a decision of the Design Review Committee may appeal the decision to the Design Review Committee in accordance with procedures to be established by the Design Review Committee. Such procedures would include the requirement that the appellant has modified the requested action or has new information which would in the Design Review Committee's opinion warrant reconsideration. If the Design Review Committee fails to allow an appeal or if it, after appeal, again rules in a manner aggrieving the appellant, the decision of the Design Review Committee shall become final.

8.3     Meetings of the Design Review Committee. The Design Review Committee shall meet from time to time as necessary to perform its duties, and may from time to time, by resolution unanimously adopted in writing, designate a Design Review Committee Representative to take any action or perform, any duties for and on behalf of the Design Review Committee, except the granting of variances pursuant to Section 8.8  In the absence of such designation, the vote of a majority of the members of the Design Review Committee, or the written consent of a majority of the members of the Design Review Committee taken without a meeting, shall constitute an act of the Design Review Committee.

8.4     No Waiver of Future Approvals. The approval of the Design Review Committee of any proposals or plans and specifications or drawings for any work done or proposed or in connection with any other matter requiring the approval and consent of the Design Review Committee shall not be deemed to constitute a waiver of any right to withhold approval or consent as to any similar proposals, plans and specifications, drawings, or matters subsequently or additionally submitted for approval or consent.

8.5     Compensation of Members. At the discretion of the Executive Board, the members of the Design Review Committee may receive compensation from the Master Association for services rendered.

8.6     Correction of Defects. Inspection of work and correction of defects therein shall proceed as follows:

(a)     The Design Review Committee or its duly appointed representative shall have the right to inspect Improvements whether or not its approval was been requested or given ("Right of Inspection")  Such Right of Inspection shall, however, terminate sixty (60) days after receipt by the Design Review Committee of written notice from the Owner of the Lot that such Improvements have been completed. If, as a result of such inspection, the Design Review Committee finds that such Improvements were done without obtaining approval of the plans and specifications therefor or was not done in substantial compliance with plans and specifications approved by the Design Review Committee, it shall, within sixty (60) days of the inspection, notify the Owner in writing of its failure to comply with this Article, specifying the particulars of non-compliance. If work has been performed without approval of plans and specifications therefor, the Design Review Committee may require the Owner of the Lot to submit "as-built" record drawings certified by a licensed architect or engineer which describe the Improvement in detail as actually

constructed. The Design Review Committee shall have the authority to require the Owner to take such action as may be necessary to remedy the non-compliance.

(b) If, upon the expiration of sixty (60) days from the date of such notification, the Owner has failed to remedy such non-compliance, the Design Review Committee shall notify the Executive Board in writing of such failure. After notice and an opportunity for a hearing, the Executive Board shall determine whether there is a noncompliance and, if so, the nature thereof and the estimated cost of correcting or removing the same. If a non-compliance exists, the Owner shall remedy or remove the same within a period of not more than forty-five (45) days from the date that notice of the Executive Board ruling is given to the Owner. If the Owner does not comply with the Executive Board's ruling within that period, the Executive Board, at its option, may Record a notice of non-compliance and may peacefully remedy the non-compliance. The Owner shall reimburse the Master Association, upon demand, for all expenses incurred in correcting the noncompliance. If the Owner does not promptly repay such expenses to the Master Association, the Executive Board shall levy a Special Assessment against such Owner for reimbursement as provided in this Declaration. The right of the Master Association to remove non-complying Improvements or to otherwise remedy the non-compliance shall be in addition to all other rights and remedies which the Master Association may have at law, in equity, or in this Declaration.

(c) If for any reason the Design Review Committee fails to notify the Owner of any non-compliance with previously submitted and approved plans and specifications within sixty (60) days after receipt of written notice of completion from the Owner, the Improvements shall be deemed to be in accordance therewith

(d) All construction, alteration or other work shall be performed as promptly and as diligently as possible and shall be completed within one hundred eighty (180) days of the date on which the work commenced.

8.7 Scope of Review. The Design Review Committee shall review and approve or disapprove all proposals and plans and specifications submitted to it for any proposed Improvement, alteration or addition, on the basis of the considerations set forth in this Article. The Design Review Committee may balance light, air and view interests of Owners against privacy interests of other Owners in approving or disapproving any proposal. The Design Review Committee shall not be responsible for reviewing, nor shall its approval of any plan or design be deemed approval of, any proposal, plan or design from the standpoint of structural safety or conformance with zoning ordinances or building, health and safety or other codes.

8.8 Variances. When circumstances such as topography, natural obstructions, hardship, aesthetic or environmental considerations may require it, the Design Review Committee may authorize variances from compliance with any of the architectural provisions of this Declaration. Such variances must be evidenced in writing, must be signed by at least a majority of the members of the Design Review Committee, and shall become effective upon Recordation. If such variances are granted, no violation of the covenants, conditions and restrictions contained in this Declaration shall be deemed to have occurred with respect to the matter for which the variance was granted. The granting of such a variance shall not operate to waive any of the terms and provisions of this Declaration for any purpose except as to the particular property and particular provision hereof covered by the variance, nor shall it in any way affect the Owner's obligation to

-22-

comply with all governmental laws and regulations affecting the Owner's use of the premises, including zoning ordinances and lot set-back lines or requirements imposed by the City, the County or any municipal or other public authority. The granting of a variance shall not be deemed to be approval from the standpoint of compliance with such laws or regulations, nor from the standpoint of structural safety, and the Design Review Committee, provided it acts in good faith, shall not be liable for any damage to an Owner as a result of its granting or denying of a variance.

8.9     Non-Liability for Approval of Plans.  The Design Review Committee's approval of proposals or plans and specifications shall not constitute a representation, warranty or guarantee, whether express or implied, that such proposals or plans and specifications comply with good engineering design or with zoning ordinances or building, health and safety codes, or other governmental regulations or restrictions.  By approving such proposals or plans and specifications neither the Design Review Committee, the members thereof, the Master Association, the Executive Board nor Declarant assumes any liability or responsibility therefor, or for any defect in the structure constructed from such proposals or plans or specifications.  Neither the Design Review Committee, any member thereof, the Master Association, the Executive Board nor Declarant shall be liable to any Owner, occupant or other Person or entity for any damage, loss, or prejudice suffered or claimed on account of (a) the approval or disapproval or any proposals, plans and specifications and drawings, whether or not defective, or (b) the construction or performance of any work whether or not pursuant to the approved proposals, plans and specifications and drawings.

8.10    Declarant Participating Builder Exemption.  The provisions of this Article VIII are subject to Declarant's and Participating Builder's rights and exemptions in Article XIV. Without limiting the foregoing, the Design Review Committee shall have no authority, power or jurisdiction over Lots owned by Declarant or Participating Builders, and the provisions of this Article shall not apply to Lots owned by Declarant or a Participating Builder until such time as Declarant or the Participating Builder conveys title to the Lot to a purchaser other than a Declarant or Participating Builder.  Declarant and Participating Builders need not seek approval of the Design Review Committee with respect to their activities.  However, until the later to occur of (i) the expiration of Declarant's right to add Additional Property to the Community, (ii) the expiration of the Declarant Control Period, or (iii) the date on which Declarant no longer owns any Lots in the Community, Participating Builders must obtain Declarant's written approval of all construction and development activities as if such activities were subject to this Article and Declarant were the "Design Review Committee."  This Article shall not be amended without Declarant's written consent set forth on the amendment.

# ARTICLE IX

9.    Use Restrictions  The provisions of this Article IX are subject to Declarant's and Participating Builder's rights and exemptions in Article XIV

9.1    Residential Use.  Lots shall be used exclusively for residential purposes consistent with applicable zoning ordinances.  This Section shall not apply to any activity conducted by Declarant or any Participating Builder with respect to the development of the Community and the sale of the Lots and Dwelling Units or use of any property which they own within the Community nor to the property designated by Declarant or any Participating Builder as a sales office or model center location.  As to this latter area, Declarant or any Participating Builder shall have the

right, subject to applicable governmental ordinances, to utilize the same for office or professional business uses.

9.2    Nuisances.  No rubbish or debris of any kind shall be placed or permitted to accumulate anywhere within the Community which can be seen or smelled by Owners in the Community, and no odor shall be permitted to arise therefrom so as to render the Community or any portion thereof unsanitary, unsightly or offensive. No noise or other nuisance shall be permitted to exist or operate upon any portion of a Lot so as to be offensive or detrimental to any other Lot or to its occupants. Without limiting the generality of any of the foregoing provisions, no exterior speakers, horns, whistles, bells or other sound devices, noisy or smoky vehicles, large power equipment or large power tools, unlicensed off-road motor vehicles or other items which may disturb other Owners or their tenants shall be located, used or placed on any portion of the Community. Alarm devices used exclusively to protect the security of a Lot and its contents shall be permitted, provided that such devices do not produce annoying sounds or conditions as a result of frequently occurring false alarms. No clothing or household fabrics shall be hung, dried, or aired in a manner that is visible from any roadway. No other noxious or offensive activity shall be carried on upon the Lots nor shall anything be done thereon which may become an annoyance or nuisance to the Community. No Owner shall permit or suffer anything to be done or kept within the Community which will obstruct or interfere with the rights of other Owners or annoy them, nor commit or suffer any illegal act to be committed thereon. Owners shall comply with all requirements of the County Health District and of all other governmental authorities with respect to the Lots.

9.3    Common Elements.  No Owner may obstruct the Common Elements, nor shall any Owner keep or store personal property on the Common Elements, other than parking of vehicles on the private streets in accordance with the Restrictions. Following use of the Common Elements, each Owner shall leave the Common Elements in a neat and orderly condition and shall remove any garbage, refuse, equipment or the like brought upon the Common Elements. If any animals are brought on the Common Elements, the Owner of the animal shall be liable to the Master Association for any damages to the Common Elements caused by the animal. Each Owner shall promptly remove, and dispose in a sanitary manner, all of that Owner's animal waste and droppings on the Common Elements.

9.4    Garbage.  Owners shall keep trash, garbage and other waste materials in sanitary containers. All equipment for the storage or disposal of such materials shall be kept in a clean and sanitary condition and shall be enclosed so as not to be visible from any street in the Community or from any other Owner's Lot except when placed at the curbing on the days of regularly scheduled garbage collection.

9.5    Party Walls.  Each wall or fence which is placed on the boundary line between Lots is a "Party Wall" and the following provisions shall apply to the use and maintenance of Party Walls within the Community:

(a)    The cost of reasonable repair and maintenance of a Party Wall shall be shared equally by the Owners of the Lots connected by such Party Wall. However, each Owner shall be solely responsible for repainting the side of any Party Wall facing its Lot.

-24-

(b)      Unless covered by a blanket insurance policy maintained by the Master Association, if a Party Wall is destroyed or damaged by fire or other casualty, any Owner whose Lot is affected thereby may restore it, and the Owner of the other Lot which is affected shall contribute equally to the cost of restoration of the Party Wall; provided, however, that any Owner shall be responsible for any damage to a Party Wall caused by the negligent or willful act of such Owner or the guests, invitees, tenants, employees or contractors of such Owner.

(c)      The right of any Owner to contribution from any other Owner under this Section is appurtenant to the land and passes to such Owner's successors in title.

9.6      Parking and Vehicular Restrictions.

(a)      Authorized Vehicles. The following vehicles are Authorized Vehicles: standard passenger vehicles, including without limitation automobiles, passenger vans designed to accommodate ten (10) or fewer people, sport utility vehicles, motorcycles and pick-up trucks having a manufacturer's rating or payload capacity of one (1) ton or less. Authorized Vehicles may be parked in any portion of the Community intended for parking of motorized vehicles.

(b)      Prohibited Vehicles. The following vehicles are Prohibited Vehicles: (i) commercial-type vehicles (e.g., stake bed trucks, tank trucks, dump trucks, stop vans, concrete trucks, etc.), (ii) buses or vans designed to accommodate more than ten (10) people, (iii) vehicles having more than two (2) axles, (iv) trailers, inoperable vehicles or parts of vehicles, (v) aircraft, other similar vehicles or any vehicle or vehicular equipment deemed a nuisance by the Board. Prohibited Vehicles may not be parked, stored or kept on any private street within the Community except for brief periods for loading, unloading, making deliveries or emergency repairs. Prohibited Vehicles may only be parked within an Owner's fully enclosed garage with the door closed so long as their presence in the Community does not otherwise violate the provisions of this Declaration.

(c)      Maintenance and Restoration. No repair, maintenance or restoration of any vehicle may be conducted except within an enclosed garage when the garage door is closed, provided such activity is not undertaken as a business, and provided that such activity may be prohibited entirely by the Board if the Board determines that it constitutes a nuisance.

(d)      Parking Regulations. The Board may establish additional regulations regarding parking on streets in the Community, including without limitation, designating "parking," "guest parking," and "no parking" areas thereon; and may enforce all Parking and vehicle use regulations applicable to the Community, including removing violating vehicles from the Community pursuant to all applicable ordinances or statutes. If the Board fails to enforce any of the parking or vehicle use regulations, the City may enforce such regulations in accordance with applicable laws and ordinances.

9.7      Interpretation. All questions of interpretation or construction of any of the terms or conditions in this Article IX shall be resolved by the Executive Board, and its decision shall be final, binding and conclusive on all of the parties affected.

9.8      Violations. If any Owner violates the use restrictions in this Declaration, or if any Owner fails to comply with a written directive or order from the Executive Board or its

-25-

designated committee with respect to a violation of these use restrictions, the Executive Board shall have the right and authority to cure such violation, including, if necessary, the right to enter upon an Owner's Lot. The cost of curing such violation shall be charged to the Owner of the Lot in question, which cost shall be due within five (5) days after receipt of written demand therefor. The Executive Board shall also have the authority, after notice and an opportunity to be heard, to levy reasonable fines for violations of these use restrictions. If not paid to the Master Association, the Executive Board may levy Special Assessments for the amounts due under this Section.

9.9    No Liability.  Neither Declarant, any Participating Builder, the Master Association, any Director, or any of their respective authorized representatives shall be liable for any loss, damage or injury arising out of, or in any way connected with, the performance of its respective duties under this Article, unless due to fraud, intentional misconduct or a knowing violation of law.

## ARTICLE X

10.    Insurance

10.1    Required Insurance

(a)    Commencing not later than the time of the first conveyance of a Lot to a Person other than Declarant or a Participating Builder, the Master Association shall maintain, to the extent reasonably available, the following:

(i)    Fire and casualty insurance with extended coverage, without deduction for depreciation, in an amount as near as possible to the full replacement value of the Common Elements. Such insurance shall be maintained for the benefit of the Master Association, the Owners, and the Owners' Mortgagees, as their interests may appear as named insured, subject, however, to loss payment requirements as set forth herein.

(ii)    General liability insurance (including medical payments), with such limits as may be considered acceptable to FNMA (not less than $2 million covering all claims for personal injury and property damage arising out of a single occurrence), insuring against liability for bodily injury, death and property damage arising from the activities of the Master Association and its members, with respect to the Common Elements

(iii)    Fidelity bond coverage which names the Master Association as an obligee for any person or entity handling funds of the Master Association, including, but not limited to, officers, directors, trustees, employees or agents of the Master Association, whether or not such persons are compensated for their services, in an amount not less than the estimated maximum of funds, including reserve funds, in the custody of any such person at any given time during the term of each bond. However, the aggregate amount of such bonds may not be less than the sum equal to one-fourth (¼) of the annual Common Assessments on all Lots.

(b)    If the insurance described above is not reasonably available, this Master Association promptly shall cause notice of that fact to be delivered or sent prepaid by United States mail to all Owners. The Master Association may carry such other insurance as necessary

including, but not limited to, errors and omissions, directors, officers and agents liability insurance, plate glass insurance, medical payments, malicious mischief, liquor liability and vandalism insurance and workers compensation, and such other risks customarily covered with respect to Planned Community projects similar in construction, location and use. Notwithstanding any other provisions herein, the Master Association shall continuously maintain in effect such casualty, flood and liability insurance and fidelity bond coverage meeting the insurance and fidelity bond requirements for planned communities established by FNMA, GNMA and FHLMC, so long as any of which is a Mortgagee or Owner of a Dwelling Unit, except to the extent such coverage is not available or has been waived in writing by FNMA, GNMA and FHLMC, as applicable.

      (c)    Each Owner shall obtain property insurance for its own Lot and shall promptly repair or replace any damage or destruction to that Lot.

    10.2    **Policies and Use of Proceeds.**

      (a)    Insurance policies required to be carried by the Master Association must provide to the extent reasonably available that:

      (i)    Each Owner is an insured person under the policy with respect to liability arising out of its interest in the Common Elements or membership in the Master Association,

      (ii)    The insurer waives its right to subrogation under the policy against any Owner or member of its household,

      (iii)    No act or omission by any Owner, unless acting within the scope of its authority on behalf of the Master Association, will void the policy or be a condition to recovery under the policy; and

      (iv)    If, at the time of a loss under the policy, there is other insurance in the name of a Owner covering the same risk covered by the policy, the Master Association's policy provides primary insurance.

      (b)    Any loss covered by any insurance policy carried by the Master Association must be adjusted with the Master Association, but the proceeds for that loss are payable to any trustee designated for that purpose, or otherwise to the Master Association, and not to any holder of a Security Interest. The trustee or the Master Association shall hold any proceeds in trust for the Master Association, Owners and lienholders as their interests may appear. Subject to the provisions of Section 10.3, the proceeds must be disbursed first for the repair or restoration of the damaged property, and the Master Association, Owners, and lienholders are not entitled to receive payment of any portion of the proceeds unless there is a surplus of proceeds after the property has been completely repaired or restored, or the Community, as a Planned Community under the Act, is terminated.

### 10.3    Repair or Replacement of Damaged or Destroyed Common Elements.

(a)    Any portion of the Common Elements for which insurance is required by this Declaration which is damaged or destroyed must be repaired or replaced promptly by the Master Association unless:

(i)    The Community, as a Planned Community under the Act is terminated,

(ii)    Repair or replacement would be illegal under any state or local statute or ordinance governing health or safety, or

(iii)    Eighty percent (80%) of the Owners vote not to rebuild.

(b)    If the entire Common Elements are not repaired or replaced, the proceeds attributable to the damaged Common Elements must be used to restore the damaged area to a condition compatible with the remainder of the Community and the remainder of the proceeds must be distributed to all Owners or lien holders, as their interests may appear. Remittance to Owners and their first Mortgagees shall be payable jointly to them.

### ARTICLE XI

11    Condemnation. If a Lot is acquired by eminent domain or part of a Lot is acquired by eminent domain leaving an Owner with a remnant that may not practically or lawfully be used for its intended purpose, the award must include compensation to such Owner for the Lot and its Allocated Interests whether or not any Common Elements are acquired. Upon acquisition, unless the decree otherwise provides, Allocated Interests of the Lot are automatically reallocated to the remaining Lots in proportion to the respective Allocated Interests of those Lots before the taking, and the Master Association shall promptly prepare, execute and record an amendment to this Declaration reflecting the reallocations. Any remnant of a Lot remaining after part of a Lot is taken is thereafter a Common Element. If part of a Lot is acquired by eminent domain, but the remnant may practically and lawfully be used for its intended purpose, the award must compensate the Owner for the reduction in value of the Lot and its interest in the Common Elements, whether or not any Common Elements are acquired. Upon acquisition, unless the decree otherwise provides, the Allocated Interests for such Lot shall not be changed. If part of the Common Elements is acquired by eminent domain, the portion of the award attributable to the Common Elements taken must be paid to the Master Association.

### ARTICLE XII

12.    Termination of Contracts and Leases of Declarant. If entered into before the expiration or termination of the Declarant Control Period, any management contract, employment contract or any other contract or lease between the Master Association and Declarant or an affiliate of Declarant or any contract or lease that is not in good faith or was unconscionable to the Owners at the time entered into under the circumstances then prevailing may be terminated without penalty by the Master Association at any time after the expiration or termination of the Declarant Control Period upon not less than ninety (90) days notice to the other party.

-28-

990E05.02111

## ARTICLE XIII

13. **Enforcement of Restrictions.**

13.1 **Parties Entitled to Enforce.** Declarant (so long as Declarant owns a Lot), any Participating Builder (so long as a Participating Builder owns a Lot), the Master Association and any Owner (after such Owner has made a demand on the Master Association and the Master Association has failed to act within a reasonable time) shall have the right to enforce all restrictions, conditions, covenants, reservations, liens and charges now or hereafter imposed by this Declaration.

13.2 **Remedies Cumulative.** No right, power or remedy conferred upon or reserved to any person is exclusive of any other right, power or remedy set forth or reserved in this Declaration, or otherwise afforded by law or in equity; but each and every right, power and remedy shall be cumulative to and concurrent with each and every other right, power and remedy now or hereafter provided in this Declaration, by law or in equity.

13.3 **No Waiver.** The failure by the Master Association or any Person to enforce any provision of this Declaration shall not constitute or be deemed a waiver of the right of any other Person to do so. Further, the failure by the Master Association or any Person to enforce any provision of this Declaration shall not constitute or be deemed a waiver of the right to do so by any Person with respect to subsequent occasions for similar or unrelated violations.

13.4 **Legal Proceedings.** Failure to comply with any of the terms of the Restrictions by an Owner, its family, guests, employees, invitees or tenants, is grounds for relief which may include, without limitation, an action to recover sums due for damages, injunctive relief, foreclosure of any lien, or any combination thereof as permitted by law.

13.5 **Additional Remedies.** The Executive Board May adopt a schedule of reasonable fines or penalties which, in its reasonable discretion, it may assess against an Owner for the failure of such Owner, or of a resident of or visitor to such Owner's Lot, to comply with the Restrictions. Such fines or penalties may only be assessed after "Notice and Hearing." After Notice and Hearing, the Executive Board may direct the officers of the Master Association to Record a notice of noncompliance against a Lot owned by any Owner who has violated any provision of this Declaration. The notice shall include a legal description of the Lot and shall specify the provision of the Declaration that was violated, the violation committed, and the steps required to remedy the noncompliance. Once the noncompliance is remedied or the noncomplying Owner has taken such other steps as reasonably required by the Board, the Board shall direct the officers of the Master Association to Record a notice that the noncompliance has been remedied

## ARTICLE XIV

14. **Declarant's Rights.**

14.1 **Reservation of Development Rights.** Declarant reserves all Development Rights described in the Act, including the following Development Rights which may be exercised with respect to all or any portion of the Additional Property and, where applicable, anywhere within the Community:

990806.02111

(a)  The right, but not the obligation, by amendment to expand the Community to include all or any part of the Additional Property. Declarant shall have the unilateral right to transfer to any other person the right to expand which is herein reserved. Such expansion may be accomplished by Recording a Notice of Annexation or a Supplemental Declaration, as provided in Article III.

(b)  The right, but not the obligation, by amendment to create Lots and Common Elements or Limited Common Elements within the Community, including the Additional Property and any other real property annexed into the Community.

(c)  The right, but not the obligation, by amendment to subdivide Lots or convert Lots into Common Elements.

(d)  The right, but not the obligation, to construct underground utility lines, pipes, wires, ducts, conduits and other facilities upon the real property within the Community, for the purpose of furnishing utility and other services to buildings and Improvements to be constructed in the Community.  Declarant also reserves the right to withdraw and grant easements to public utility companies and to convey Improvements within those easements anywhere in the Community not occupied by buildings, for the purposes mentioned above.

(e)  The right, but not the obligation, to withdraw any real property from this Declaration at any time prior to the sale or conveyance of that real property by Declarant.  Such withdrawal shall be accomplished by Recording a declaration of withdrawal, describing the real property to be withdrawn, and providing for any necessary readjustment of voting rights and assessment allocations provided for herein.  Such declaration of withdrawal shall not require the consent of the Owners. Any such withdrawal shall be effective upon the filing for Record of such declaration of withdrawal except as provided therein.  The withdrawal may be accomplished in stages by successive declarations or in one declaration of withdrawal.

(f)  The right, but not the obligation, to create Sub-Associations and Supplemental Declarations for the operation thereof.

14.2  Limitations on Development Rights.  The Development Rights reserved in Section 14.1 are limited as follows:

(a)  The Development Rights may be exercised at any time within seven years after the initial Recording of the Declaration;

(b)  The Community shall not include more than 1,500 Lots;

(c)  All Lots and Common Elements created pursuant to the Development Rights will be restricted to residential use in the same manner and to the same extent as the Lots created under this Declaration as initially Recorded;

(d)  All taxes, assessments, mechanic's liens and other charges affecting the Community arising in connection with Declarant's ownership of, and construction of improvements

upon, the Community, which may adversely affect the rights of existing Owners, or the priority of any first Mortgage on any Lots in the Community, are to be paid or otherwise satisfactorily provided for by Declarant;

(e)     To the extent required by law, Declarant shall not exercise any Development Rights unless approved by the VA and HUD.

(f)     Declarant shall Record new Plats and Plans as necessary to conform to the applicable requirements of NRS 116.2109 or new certifications of the Plat if the Plat otherwise conforms to the requirements of NRS 116.2109.

14.3    Phasing of Development Rights.  No assurances are made by Declarant as to the Additional Property, as to whether Declarant will exercise its Development Rights or the order in which such portions, or all of the areas, will be developed.  The exercise of Development Rights as to some portions will not obligate Declarant to exercise its Development Rights as to other portions.

14.4    Special Declarant Rights.  Declarant reserves all Special Declarant Rights described in the Act, including the following Special Declarant Rights, which may be exercised, where applicable, anywhere within the Community:

(a)     To complete the Improvements indicated on Plats and Plans.

(b)     To exercise any Development Right reserved in this Declaration;

(c)     To maintain sales offices, management offices, signs advertising the Community and models which are reasonably necessary to market the Lots;

(d)     To use easements through the Common Elements for the purpose of making Improvements within the Community or within real estate which may be added to the Community;

(e)     To merge or consolidate the Community with another Community of the same form of ownership; and

(f)     To appoint or remove any officer of the Master Association or Director during the Declarant Control Period, subject to the provisions of Section 14.9.

14.5    Models, Sales Offices and Management Offices.  For so long as Declarant is an Owner, Declarant, its duly authorized agents, representatives and employees may maintain any Lot owned by Declarant or any portion of the Common Elements as a model Lot, sales office or management office.

14.6    Construction; Declarant's Easement.  Declarant reserves the right to perform warranty work, repairs and construction work in Lots and Common Elements, to store materials in secure areas, and to control and have the right of access to work and repairs until completion.  All work may be performed by Declarant without the consent or approval of the Executive Board.  Declarant has an easement through the Common Elements as may be reasonably necessary for the

purpose of discharging Declarant's obligations or exercising Special Declarant Rights, whether arising under the Act or reserved in this Declaration . This easement includes the right to convey utility and drainage easements to public utilities, municipalities, the State, or others to fulfill the plan of development.

    14.7   Signs and Marketing.  Declarant reserves the right to post signs and displays in the Common Elements or on the Lots owned by Declarant in order to promote sales of Lots. Declarant also reserves the right to conduct general sales activities in a manner which will not unreasonably disturb the rights of Lot Owners.

    14.8   Declarant's Personal Property.  Declarant reserves the right to retain all personal property and equipment used in the sales, management, construction and maintenance of the Community that has not been represented as property of the Master Association. Declarant reserves the right to remove from the Community (promptly after the sale and close of escrow of the last Lot) any and all goods and Improvements used in development, marketing and construction, whether or not they have become fixtures.

    14.9   Declarant Control of the Association

       (a)   Subject to Section 6.6, there shall be a period of Declarant control of the Master Association (the "Declarant Control Period"), during which Declarant or persons designated by Declarant, may appoint and remove the Directors and officers of the Master Association. The Declarant Control Period terminates no later than the earlier of:

       (i)   60 days after conveyance of 75 percent of the Lots that may be created to Owners other than Declarant; or

       (ii)   Five (5) years after Declarant has ceased to offer Lots for sale in the ordinary course of business; or

       (iii)   Five (5) years after any right to add new Lots was last exercised

Declarant may voluntarily surrender the right to appoint and remove Directors and officers of the Master Association before termination of the Declarant Control Period. In that event, Declarant may require, for the duration of the Declarant Control Period, that specified actions of the Master Association or Executive Board, as described in a Recorded instrument executed by Declarant, be approved by Declarant before they become effective.

       (b)   Notwithstanding any provision of this Declaration to the contrary, the termination of Declarant's control under this Section 14.9 shall not affect Declarant's rights as a Owner to exercise the vote allocated to Lots which Declarant owns.

    14.10   Limitations on Special Declarant Rights  Unless terminated earlier by an amendment to this Declaration executed by Declarant, any Special Declarant Right may be exercised by Declarant until the later of the following: as long as Declarant (a) is obligated under any warranty or obligation, (b) holds a Development Right to create additional Lots or Common Elements, (c)

owns any Lot; (d) owns any Security Interest in any Lots; or (e) 15 years have elapsed after Recording of this Declaration.  Earlier termination of certain rights may occur by statute.

14.11   Interference with Special Declarant Rights.  Neither the Master Association nor any Owner may take any action or adopt any rule that will interfere with or diminish any Special Declarant Right without the prior written consent of Declarant.

14.12   Rights of Lenders to Declarant.  Additional limitations on the right of Declarant to exercise Development Rights may be found in Section 15.9 and Article XVIII.

14.13   Priority of Declarant's Rights and Reservations.  Declarant shall have, and hereby retains and reserves, certain rights as set forth in this Declaration with respect to the Master Association and the Community.  The rights and reservations of Declarant set forth in this Declaration shall be deemed excepted and reserved in each Recorded Notice of Annexation, Supplemental Declaration, in each conveyance of property by Declarant to the Master Association and in each deed or other instrument by which any property encumbered hereby is conveyed by Declarant, whether or not specifically stated therein.  The rights, reservations and easements of Declarant set forth in this Declaration shall be prior and superior to any other provisions of this Declaration and may not, without Declarant's prior written consent be modified, amended, rescinded or affected by any amendment of this Declaration, including any amendment of this Section. Declarant's consent to any one such amendment shall not be construed as consent to any other or subsequent amendment.

14.14   Interest of Declarant.  Each Owner of land which is a part of the Property acknowledges by acceptance of a deed or other instrument of conveyance thereof, whether or not it shall be so expressed in any such deed or other instrument, that Declarant has a substantial interest to be protected with regard to the overall development of the Community, and in thus assuring compliance with and enforcement of this Declaration and any amendments thereto, including any Notice of Annexation or Supplemental Declaration. Notwithstanding any other provisions of this Declaration, until such time as Declarant no longer owns any of the Community or Additional Property, the following actions, before being undertaken by the Master Association and/or the Owners, shall first be approved in writing by Declarant:

(a)   The construction of new facilities or Improvements not originally included in or on the Common Elements; or

(b)   Any significant reduction of Master Association maintenance or other services, including any transfer of the Master Associations's maintenance obligations to the City, the County or any other public agency.

14.15   Exemptions for Declarant and Participating Builders.  Declarant and/or Participating Builders are undertaking the work of constructing Common Elements, Dwelling Units and other incidental Improvements within the Community.  The completion of that work, and the sale, rental and other disposition of the Improvements is essential to the establishment and welfare of the Community as a master Planned Community. In order that such work may be completed and the Community be established as a fully occupied master Planned Community as rapidly as possible, no Owner nor the Master Association may do anything to interfere with, and nothing in this

-33-

Declaration, including, without limitation, the restrictions set forth in Articles VIII or IX of this Declaration, may be understood or construed to prevent or prohibit Declarant or any Participating Builder from:

(a) Undertaking such activities within the Community as is reasonably necessary or advisable in connection with the completion of Improvements, including the rights: (a) to perform and complete excavation, grading, filling, construction, development and landscaping to and on any portion of the Community, or to alter the foregoing and its construction plans and designs, (b) to modify the Plats and Plans with all requisite governmental approvals, (c) to construct, alter, remodel, demolish or replace any Dwelling Units or other Improvements within the Community or any property owned by Declarant or such Participating Builder; (e) to undertake its activities and Improvements without the approval of the Design Review Committee or Master Association for any such activity or Improvement to property owned by Declarant or such Participating Builder within the Community. Declarant and Participating Builders shall have a blanket easement upon, across, over and under the Community for the purpose of ingress, egress, installation, replacement, repair and maintenance of Improvements, utility and service lines and systems.

(b) Erecting, constructing and maintaining within the Community such structures and construction trailers and devices as may be reasonable and necessary for the conduct of its business of completing Improvements and establishing the Community as a master Planned Community and disposing of the Lots and Dwelling Units by sale, lease or other disposition;

(c) Conducting within the Community the business of completing Improvements and of establishing a plan of disposing of the Lots and Dwelling Units by sale, lease or other disposition;

(d) Maintaining such signs, flags, poles, banners, parking, advertisements and other facilities attendant to sales, leasing and other marketing activities on any of the Lots or the Common Elements as may be necessary for the sale, lease or other disposition thereof;

(e) Designating and conveying Common Elements to the Master Association, and constructing such improvements thereon as deemed necessary by Declarant.

(f) Perform grading work as may be approved by any agency having jurisdiction, and storing construction materials and construction vehicles.

(g) establishing additional licenses, easements, reservations and rights-of-way to itself, to utility companies, to governmental agencies or to others as may from time to time be reasonably necessary to the proper development, utilization and disposal of the Community by Declarant or such Participating Builder.

14.16 Assignment of Declarant's Rights.

(a) Declarant may assign Declarant's Rights, in whole or in part, to any Participating Builder or other Person acquiring Lots for a discrete Phase of Development ("Assignee") by a written assignment which must be Recorded. The instrument is not effective

990506.02111

unless executed by the Declarant and the Assignee; provided, however, that a Person acquiring Lots pursuant to subsection (c) may unilaterally execute and Record an instrument to acquire some or all of Declarant's Rights. A partial assignment of Declarant's Rights does not prevent the Declarant from continuing to exercise Declarant's Rights with respect to real estate retained by the Declarant.

(h)     Upon assignment of any Declarant's Rights, the liability of the Declarant is as follows:

(i)     Declarant is not relieved of any obligation or liability arising before the transfer and remains liable for warranty obligations the Declarant has undertaken by contract or which are imposed upon the Declarant by the Act.

(ii)     If the successor to any Declarant's Rights is an Affiliate of Declarant (as defined in subsection (d)), the Declarant is jointly and severally liable with the successor for any obligation or liability of the successor relating to the pertinent Phase of Development.

(iii)     If Declarant retains any Declarant's Rights, but assigns other Declarant's Rights to a successor who is not an Affiliate of Declarant, the Declarant remains liable for any obligations and liabilities relating to the retained Declarant's Rights imposed on a declarant by this Declaration or the Act and arising after the transfer.

(iv)     Declarant has no liability for any act or omission, or any breach of contractual or warranty obligation arising from the exercise of a Declarant's Rights by an assignee who is not an Affiliate of Declarant.

(c)     Unless otherwise provided in a mortgage, deed of trust or other agreement creating a Security Interest, in the case of foreclosure of a Security Interest, sale by a trustee under an agreement creating a Security Interest, tax sale, judicial sale or sale under the Bankruptcy Code or a receivership, of any Lot owned by Declarant or a Participating Builder, a Person acquiring title to all the property being foreclosed or sold, but only upon request of such Person, succeeds to all Declarant's Rights related to that property held by Declarant or a Participating Builder.  The judgment or instrument conveying title must provide for transfer of only the Declarant's Rights requested.

(d)     For the purposes of this section, "Affiliate" or "Affiliate of Declarant" means any Person who controls, is controlled by or under common control with a Declarant.  A Person "controls" Declarant if the Person (i) is a general partner, officer, director or employer of the Declarant; (ii) directly or indirectly or acting in concert with one or more Persons or through one or more subsidiaries, owns, controls, holds with power to vote, or holds proxies representing more than twenty percent (20%) of the voting interests in the Declarant; (iii) controls in any manner the election of a majority of the directors of the Declarant; or (iv) has contributed more than twenty percent (20%) of the capital of the Declarant. A Person is "controlled by" a Declarant if the Declarant (1) is a general partner, officer, director or employer of the Person, (2) directly or indirectly or acting in concert with one or more other Persons or through one or more subsidiaries, owns, controls, holds with power to vote or holds proxies representing more than twenty percent (20%) of the voting interest in the Person, (3) controls in any manner the election of a majority of

the directors of the Person; or (4) has contributed more than twenty percent (20%) of the capital of the Person. Control does not exist if the powers described in this subsection are held solely as security for an obligation and are not exercised.

14.17   Liabilities and Obligations of Person Who Succeeds to Declarant's Rights. The liabilities and obligations of a Person (including a Participating Builder) who succeeds to Declarant's Rights are as follows:

(a)     A successor to any Declarant's Rights who is an Affiliate of a Declarant is subject to all obligations and liabilities imposed on the transferor by the Restrictions or the Act.

(b)     A successor to any Declarant's Rights, other than a successor described in subsections (c) or (d) or a successor who is an Affiliate of a Declarant, is subject to all obligations and liabilities imposed by the Restrictions or the Act: (i) on a declarant which relate to such declarant's exercise or non-exercise of Declarant's Rights; or (ii) on the transferor, other than: (A) misrepresentations by any previous declarant; (B) warranty obligations, if any, on Improvements made by any previous declarant, or made before the Community was created; (C) breach of any fiduciary obligation by any previous declarant or such declarant's appointees to the Executive Board; or (D) any liability or obligation imposed on the transferor as a result of the transferor's acts or omissions after the transfer.

(c)     A successor to only a right reserved in the Restrictions to maintain models, sales offices, customer service offices and signs, if such successor is not an Affiliate of Declarant, may not exercise any other Declarant's Rights, and is not subject to any liability or obligation as Declarant, except the obligation to provide a public offering statement and any liability arising as a result thereof.

(d)     A successor to all Declarant's Rights held by a transferor who succeeded to those rights pursuant to a deed or other instrument of conveyance in lieu of foreclosure or a judgment or instrument conveying title pursuant to a foreclosure of a Security Interest, sale by trustee under an agreement creating a Security Interest, tax sale, judicial sale or sale under the Bankruptcy Code or a receivership, may declare in a Recorded instrument the intention to hold those rights solely for transfer to another person. Thereafter, until transferring all Declarant's Rights to any person acquiring title to any Lot or real estate subject to Development Rights owned by the successor, or until Recording an instrument permitting exercise of all those rights, that successor may not exercise any of those rights other than any right held by its transferor to control the Executive Board for the duration of any period of Declarant's control, and any attempted exercise of those rights is void. So long as a successor Declarant may not exercise Declarant's Rights under this Section, such successor Declarant is not subject to any liability or obligation as a Declarant other than liability for acts or omissions pursuant to such Declarant's right to appoint and remove the Directors and officers of the Master Association as provided in Section 14.4

14.18   Successor Declarant's Liabilities and Obligations. Any successor to a Declarant's Right is not subject to any claims against or other obligations of Declarant, other than claims and obligations arising under the Act or under this Declaration.

99030n.02111

14.19  General.  No Owner nor the Master Association shall do anything to interfere with, and nothing in this Declaration shall be understood or construed to, prevent Declarant or any successor declarant, including a Participating Builder, their successors or assigns, or their contractors or subcontractors, from the exercise of Declarant's Rights. All Participating Builders shall be "dealers", as that term is defined in the Act. Accordingly, in addition to the right to exercise Declarant's Rights that may be assigned to them under this Article, Participating Builders shall have the obligation to comply with the Act.

14.20  Termination.  Subject to any more specific provision contained elsewhere in this Declaration and subject to the provisions of the Act, the rights and reservations set forth in this Article shall terminate on the earlier of (a) the date Declarant no longer owns any land within the Community or the Additional Property, or (b) the fifteenth (15th) anniversary after the initial Recordation of this Declaration.

## ARTICLE XV

15.  General Provisions.

15.1  Severability.  Invalidation of any one of these covenants or restrictions by judgment or a court order shall not affect any other provisions, which shall remain in full force and effect.

15.2  Violation of Law.  Any violation of laws, ordinances or regulation of any state, county or other local authority having jurisdiction over the Community is hereby declared to be a violation of this Declaration and subject to any or all of the enforcement procedures set forth in this Declaration.

15.3  Delivery of Notices and Documents.  Any written notice or other documents relating to or required by this Declaration may be delivered either personally or by mail or any other manner permitted by the Act. If by mail, notice shall be deemed to have been given twenty four (24) hours after a copy of the same has been deposited in the United States mail, postage prepaid, addressed to an Owner at the address of its Lot or to any other address last furnished by an Owner to the Master Association.

15.4  Acceptance, Binding Effect.  By acceptance of a deed, lease or document of conveyance, or acquiring any ownership or leasehold interest in any of the real property included within this Declaration, each person binds such person and such person's heirs, personal representatives, successors, transferors and assigns to all of the provisions, restrictions, covenants, conditions, rules and regulations now or hereafter imposed by this Declaration and any amendment hereto.  In addition, each such person by so doing hereby acknowledges that this Declaration sets forth a general scheme for the improvement and development of the real property covered hereby and evidences such person's intent that all the restrictions, conditions, covenants, rules and regulations contained in this Declaration, as amended, shall run with the land and be binding on all subsequent and future owners, lessees, grantees, purchasers, assignees and transferees of property subject to this Declaration.  Each such person fully understands and acknowledges that this Declaration shall be mutually beneficial and enforceable as provided herein by the various subsequent and future Owners.

15.5 Headings; Construction

(a) The headings and captions which have been used throughout this Declaration have been inserted for convenience of reference only and do not constitute words to be construed in interpreting this Declaration.

(b) Words of any gender used in this Declaration shall be construed to include any other gender and words in the singular number shall include the plural, and visa versa, unless the context requires otherwise.

(c) Words such as "herein," "hereof," "hereby," and "hereunder", when used in this Declaration shall refer to this Declaration as a whole unless a specific provision of this Declaration is expressly identified.

(d) The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to." No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Declaration.

(e) The exhibits to this Declaration are hereby incorporated by reference in this Declaration.

(f) References to Sections, subsections and Exhibits refer to the Sections, subsections and exhibits of this Declaration.

15.6 Litigation; Attorney Fees. If any Person commences litigation to enforce any of the covenants, conditions or restrictions herein contained, except for those disputes governed by Article XVI, the prevailing party in such litigation shall be entitled to costs of suit and such attorneys' fees as the court may adjudge reasonable and proper.

15.7 Enforcement. If a violation of this Declaration may be enforced by the Master Association by imposing monetary penalties, suspensions of an Owner's right to use Common Elements, or other appropriate discipline, the Executive Board may do so if such Owner has been given notice and has had an opportunity to present a written or oral defense to the charges in a hearing before the Executive Board in compliance with the Act. The Executive Board shall determine whether the Owner's defense shall be oral or written. After the hearing, but before any disciplinary action is taken, the Owner shall be notified of the decision of the Executive Board.

15.8 Construction of Declaration and Bylaws. If a conflict exists between the provisions of this Declaration and the Bylaws, this Declaration prevails. If a conflict exists between the provisions of this Declaration and the applicable provisions of the Act, the applicable provisions of the Act shall prevail. If there should exist any ambiguity in any provision of the Articles or Bylaws, then such provision shall be construed so as to be consistent with the provisions of this Declaration.

15.9 FHA/VA Approval. So long as Declarant and any Participating Builders have effective control of the Master Association, the following actions will require the prior approval of the FHA and the VA, as applicable:

SEE005.02111

(a)     The addition or withdrawal of additional properties in the Community (other than the Additional Property);

(b)     Dedication, conveyance or encumbrance of the Common Elements;

(c)     Amendment of this Declaration, the Bylaws or the Articles;

(d)     Mergers, consolidations or dissolutions of the Master Association; and

(e)     Any alteration of Declarant's construction plans if such alteration is inconsistent with the general plan of development of the Community submitted to and approved by FHA and VA.

## ARTICLE XVI

16     Dispute Notification and Resolution Procedure. Before the Master Association or any Owner ("Claimant") brings any cause of action against the Declarant, a Participating Builder, or any director, officer, partner, employer, subcontractor or agent of the Declarant or a Participating Builder (collectively "Respondent" for purposes of this Article) relating to damages arising from "constructional defects," as defined by Nevada Revised Statutes Section 40.615 ("Defects"), the Claimant shall comply with the provisions of NRS 40.600 through 40.695, as modified by this Article. This Article shall not apply to disputes concerning (i) the enforcement of the use restrictions contained in Article IX, (ii) the enforcement of the architectural and landscaping control provisions contained in Article VIII, or (iii) the collection of any unpaid assessments in Article VII.

16.1     Claim Notice. The Claimant must give written notice ("Claim Notice") by certified mail, return receipt requested, to the Respondent specifying in reasonable detail any alleged Defects or any damages or injuries resulting therefrom.

16.2     Right to Inspect. Within thirty-five (35) days after receipt of the Claim Notice via certified mail, upon written request, the Respondent and the Claimant shall meet at a mutually acceptable place within the Community to discuss the claim. The Claimant and the Respondent (collectively "Parties") shall negotiate in good faith in an attempt to resolve the claim. The Respondent shall be entitled to inspect the property that is the subject of the claimed Defect in order to determine the nature and cause of the Defect, damage or injury and the nature and extent of repairs necessary to remedy the Defect. The Respondent may take reasonable steps to establish the existence of the Defect. If the Defect is covered by a warranty or contract of insurance issued by an insurer authorized by Nevada to issue such a warranty or contract, the Claimant must diligently pursue a claim under the warranty or contract.

16.3     Right to Corrective Action. Within sixty (60) days after the Respondent receives the Claim Notice (calculated from the certified mail return receipt date), the Respondent may make a written offer of settlement to the Claimant.

(a)     The offer must be served to the Claimant by certified mail, return receipt requested, at the Claimant's last known address.

995806.00111

(b)      The offer must respond to each Defect set forth in the Claim Notice, and describe in reasonable detail the cause of the Defect, if known, the nature and extent of the damage or injury resulting from the defect, and, unless the offer is limited to a proposal for monetary compensation, the method, adequacy and estimated cost of the proposed repair.

(c)      The offer may include (i) a proposal for monetary compensation, (ii) an agreement to make the proposed repairs, if the Respondent is licensed to make such repairs, or (iii) an agreement to cause the repairs to be made, at the Contractor's expense, by another contractor who is licensed, bonded and insured to make the repairs.

(d)      The proposed repairs must be made within sixty (60) days after the contractor receives written notice of acceptance of the offer (via certified mail, return receipt requested), unless completion is delayed by the Claimant or by other events beyond the control of the Respondent.

(e)      Pursuant to NRS 40.645, the Parties agree to the extended time periods prescribed by this Section 16.3. The Parties may also agree in writing to further extend the time periods prescribed by this Section 16.3.

16.4     Non-Binding Mediation  If the Parties cannot resolve the claim pursuant to the procedures described in Sections 16.1 through 16.3, then the matter must be submitted to non-binding mediation. The Parties must select a mediator by agreement. If the Parties fail to agree to a mediator within forty-five (45) days after a mediator is first selected by the Claimant, either party may petition the American Arbitration Association, the Nevada Arbitration Association, the Nevada Dispute Resolution Services or any other mediation service acceptable to the Parties for the appointment of a mediator. A mediator so appointed may discover only those documents or records which are necessary to conduct the mediation. The mediator shall convene the mediation within sixty (60) days after the matter is submitted to him, unless the Parties agree to extend the time. The Respondent shall deposit with the mediator before mediation begins the entire amount estimated by the mediator as necessary to pay the salary and expenses of the mediator, and shall deposit additional amounts demanded by the mediator as incurred for that purpose. The total fees for each day of mediation and the mediator must not exceed $750 per day. No person shall serve as a mediator in any dispute in which the person has any financial or personal interest in the result of the mediation, except by the written consent of all Parties. Prior to accepting any appointment, the prospective mediator shall disclose any circumstances likely to create a presumption of bias or prevent a prompt commencement of the mediation process. If the matter is submitted to mediation, then the following shall apply:

(a)      Within ten (10) days of the selection of the mediator, each party shall submit a brief memorandum setting forth its position with regard to the issues that need to be resolved. A party's pre-mediation memorandum may not be disclosed by the mediator to the other party without the consent of the party submitting the same. The mediator shall have the right to schedule a pre-mediation conference and all Parties shall attend unless otherwise agreed. The mediation shall be commenced within sixty (60) days following the submittal of the memorandum and shall be concluded within fifteen (15) days from the commencement of the mediation unless the Parties mutually agree to extend the mediation period. The mediation shall be held within the County at a place reasonably convenient to the Parties.

(b)     The mediator shall have discretion to conduct the mediation in the manner in which the mediator believes is most appropriate for reaching a settlement of the dispute. The mediator is authorized to conduct joint and separate meetings with the Parties and to make oral and written recommendations for settlement. Whenever necessary, the mediator may also obtain expert advice concerning technical aspects of the dispute, providing the Parties agree and assume the expenses of obtaining such advice. The mediator does not have the authority to impose a settlement on the Parties.

(c)     Prior to the commencement of the mediation session, the mediator and all Parties to the mediation shall execute an agreement in order to exclude the use of any information, testimony, admission or evidence produced or made at or in connection with the mediation and any subsequent dispute resolution forum, including, but not limited to, court proceedings or arbitration hearings.

(d)     Persons other than the Parties, their representatives and the mediator may attend mediation sessions only with the permission of the Parties and the consent of the mediator. Confidential information disclosed to a mediator by the Parties or by witnesses in the course of the mediation shall not be divulged by the mediator, without the consent of the disclosing party. All records, reports, or other documents received by the mediator while serving in such capacity shall be confidential. There shall be no stenographic record of the mediation process.

(e)     The expenses of witnesses for either party shall be paid by the party producing such witnesses.

16.5     Litigation. Nothing herein shall prevent the Claimant from commencing any legal action which in the good faith determination of the Executive Board or Owner is necessary to preserve any rights under any applicable statute of limitations. However, the commencement of any legal action shall only serve to toll any applicable statutes of limitation. The Master Association and the Owners shall remain bound by the mediation and arbitration requirements in this Declaration.

16.6     Miscellaneous. Except as prescribed by NRS 40.600 through 40.695, each Party shall bear its own attorneys fees. Except as expressly modified in this Article, the Parties shall remain subject to all rights and obligations prescribed by NRS 40.600 through 40.695, which are incorporated herein by reference.

Any and all communications by and between the Parties, whether written or oral, which are delivered by the Parties or their attorneys or other representatives in an effort to settle the matter shall be considered communications undertaken in the course of effecting a settlement or compromise as such shall not be admissible as an admission on the part of any party or any representative or agent of that party to be utilized for any such purpose in any action or proceeding.

## ARTICLE XVII

17.     Arbitration, Legal Expenses, Limitations on Damages

17.1     Binding Arbitration. Any disputes between Declarant or a Participating Builder, on the one hand, and the Master Association or any Owner, on the other hand, arising under the

990305.02111

Restrictions, including those claims which are not resolved pursuant to the procedures described in Article XVI above, shall be submitted to binding arbitration. The Parties shall cooperate in good faith to ensure that all necessary and appropriate Parties are included in the arbitration proceeding.

The arbitrator shall have the authority to try all issues, whether of fact or law, and to report a statement of decision. The Parties shall use the procedures adopted by the American Arbitration Association (or any other entity offering arbitration procedures as may be mutually acceptable to the Parties), provided that the following rules and procedures shall apply in all cases unless the Parties agree otherwise:

      (a)    The arbitration shall be heard in the County;

      (b)    The arbitrator must be a retired judge or an attorney with substantial experience in relevant real estate matters;

      (c)    Any dispute regarding the selection of the arbitrator shall be resolved by the entity providing the reference services or, if no entity is involved, by the court with appropriate jurisdiction,

      (d)    The arbitrator may require one or more pre-hearing conferences;

      (e)    The Parties shall be entitled to discovery, and the arbitrator shall oversee discovery and may enforce all discovery orders in the same manner as any trial court judge;

      (f)    A stenographic record of the hearing shall be made, provided that the record shall remain confidential except as may be necessary for post-hearing motions and any appeals;

      (g)    The arbitrator's statement of decision shall contain findings of fact and conclusions of law to the extent applicable; and

      (h)    The arbitrator shall have the authority to rule on all post-hearing motions in the same manner as a trial judge.

    17.2    Limitation on Expenditures for Legal Proceedings. The Master Association may not incur expenses, including attorneys' or consultants' fees, if the Master Association initiates legal proceedings or is joined as a plaintiff in legal proceedings for recovery of damages of fifty thousand dollars ($50,000) or more unless it has obtained the approval of a majority of the Master Association's voting power (excluding the voting power of any Owner who would be a defendant in such proceedings). Nothing in this Section shall preclude the Master Association from initiating legal proceedings in order to toll any applicable statute of limitation; provided, however, that the Master Association may not further prosecute such legal proceedings until the requisite Owner approvals have been obtained. The provisions of this Section are in addition to, and not in limitation of, the provisions of NRS 116.3115 regarding the commencement of civil actions.

    17.3    Limitation on Damages. Each Owner, by acceptance of a deed conveying a Lot in the Community, agrees that any damages recoverable against Declarant or a Participating Builder,

er their respective contractors or sub-contractors, for "constructional defects" (as defined in NRS 40.615), shall be limited to such damages arising from constructional defects which reduce the stability or safety of an Improvement below acceptable standards or restrict the normal intended use of all or a part of an Improvement. In no event shall an Owner recover any damages solely for variations in the construction of Improvements from any plans or specifications or local building ordinances which do not reduce the stability or safety of an Improvement below acceptable standards or restrict the normal intended use of all or a part of an Improvement.

## ARTICLE XVIII

18.    Rights of Mortgagees.  Except, as otherwise required in Section 7.10(b) liens created hereunder upon any Lot shall be subject and subordinate to, and shall not affect, the rights of a first Mortgagee under any Recorded first Security Interest upon such Lot made in good faith and for value, provided that after the foreclosure of any such Security Interest, the amount of all Assessments assessed hereunder to the purchaser at such foreclosure as an Owner after the date of such foreclosure shall become a lien upon such Lot. No amendment to this Declaration shall impair the rights of any first Mortgagee who does not join in the execution thereof, provided that prior to Recordation of such amendment its Security Interest is Recorded.  No breach of this Declaration shall defeat or render invalid the lien of any first Security Interest made in good faith and for value, but this Declaration shall be binding upon and effective against any Owner whose title is derived through foreclosure or trustee's sale, or otherwise.

For purposes of any provisions of the Restrictions which require the vote or approval of a specified percentage of first Mortgagees, such vote or approval is determined based upon one (1) vote for each Lot encumbered by each Security Interest.  In order to induce VA, FHA, FHLMC, GNMA and FNMA to participate in the financing of the sale of Lots, the following provisions are added hereto (and to the extent these added provisions conflict with any other provisions of the Restrictions, these added provisions control):

(a)    Each Mortgagee, insurer and guarantor of a first Security Interest encumbering one or more Lots, upon filing a written request for notification with the Board, is entitled to written notification from the Master Association of:

(1)    any condemnation or casualty loss which affects either a material portion of the Community or the Lots securing the Security Interest; and

(2)    any delinquency of sixty (60) days or more in the performance of any obligation under the Restrictions, including without limitation the payment of Assessments or charges owed by the Owners of Lots securing the respective first Security Interests, which notice each Owner hereby consents to and authorizes; and

(3)    a lapse, cancellation, or material modification of any policy of insurance or fidelity bond maintained by the Master Association; and

(4)    any proposed action of the Master Association which requires consent by a specified percentage of first Mortgagees.

-43-

(b)     Each Owner, including each first Mortgagee of a first Security Interest encumbering any Lot which obtains title to such Lot pursuant to the remedies provided in such Security Interest, or by foreclosure of such Security Interest, or by deed or assignment in lieu of foreclosure, shall be exempt from any "right of first refusal" created or purported to be created by the Restrictions.

(c)     Each first Mortgagee of a first Security Interest encumbering any Lot that obtains title to such Lot pursuant to the remedies provided in such Security Interest or by foreclosure of such Security Interest, shall take title to such Lot free and clear of any claims for unpaid assessments or charges against such Lot which accrued prior to the time such Mortgagee acquires title to such Lot, except as otherwise provided in Section 7.10(b)

(d)     Unless at least sixty-seven percent (67%) of the first Mortgagees or sixty-seven percent (67%) of the Owners (other than Declarant) have given their prior written approval, the Master Association may not:

(1)     by act or omission seek to abandon, partition, subdivide, encumber, sell or transfer the Common Element and the Improvements thereon which are owned by the Master Association; provided that the following acts shall not be limited by the terms of this clause: (i) the granting of easements for public utilities or for other purposes consistent with the intended use of such property by the Master Association as provided in this Declaration; or (ii) the granting to an Owner or Owners of exclusive easements over portions of the Common Element or of fee interests in portions of the Common Element pursuant to a Recorded lot line adjustment approved by the requisite governmental entity, so long as each such grant to an Owner is reasonably required for purposes of conformity with the as-built location of authorized Improvements;

(2)     change the method of determining the obligations, assessments, dues or other charges which may be levied against a Lot Owner, or the method of allocating distributions of hazard insurance proceeds or condemnation awards;

(3)     by act or omission change, waive or abandon any scheme of regulations, - or enforcement thereof, pertaining to the architectural design or the exterior appearance of the Dwelling Units and other Improvements on the Lots, the exterior maintenance of the Dwelling Units, or the maintenance of the Common Elements;

(4)     fail to maintain fire and extended coverage insurance on insurable Common Elements on a current replacement cost basis in an amount as near as possible to one hundred percent (100%) of the insurance value (based on current replacement cost); or

(5)     use hazard insurance proceeds for losses to any Common Element property for other than the repair, replacement or reconstruction of such property.

(e)     All Mortgagees, insurers and guarantors of first Security Interests, upon written request to the Master Association, shall have the right to-

(1)   examine current copies of the Master Association's books, records and financial statements and the Restrictions in the same manner as Owners.

(2)   audit the Master Association's financial records.

(3)   receive written notice of all meetings of Owners; and

(4)   designate in writing a representative who shall be authorized to attend all meetings of Owners.

(f)   All Mortgagees, insurers and guarantors of first Security Interests, who have filed a written request for such notice with the Board shall be given thirty (30) days' written notice prior to (1) any abandonment or termination of the Master Association, (2) the effective date of any proposed, material amendment to this Declaration or the Articles of Incorporation or Bylaws of the Master Association, and (3) the effective date of any termination of any agreement for professional management of the Community following a decision of the Owners to assume self-management of the Community.

(g)   First Mortgagees may, jointly or singly, pay taxes or other charges which are in default and which may or have become a charge against any Common Element property and may pay any overdue premiums on hazard insurance policies, or secure new hazard insurance coverage on the lapse of a policy, for Common Element property, and first Mortgagees making such payments shall be owed immediate reimbursement therefor from the Master Association.

(h)   When professional management has been previously required by a vote of the Owners, a Mortgagee, insurer or guarantor of a first Security Interest, any decision to establish self-management by the Master Association shall require the approval of sixty-seven percent (67%) of the voting power of the Master Association and the Mortgagees of fifty-one percent (51%) of the first Security Interests of Lots in the Community.

(i)   The Executive Board may enter into such contracts or agreements on behalf of the Master Association as are required in order to satisfy the guidelines of VA, FHA, FHLMC, FNMA, GNMA or any similar entity, so as to allow for the purchase, insurance or guaranty, as the case may be, by such entities of first Security Interests encumbering Lots with Dwelling Units thereon. Each Owner hereby agrees that it will benefit the Master Association and its members, as a class of potential Security Interest borrowers and potential sellers of their Lots, if such agencies approve the Community as a qualifying subdivision under their respective policies, rules and regulations. Each Owner hereby authorizes its Mortgagees to furnish information to the Executive Board concerning the status of any Security Interest encumbering a Lot.

## ARTICLE XVIII

19    Duration and Amendment.

19.1    Duration. This Declaration shall continue in full force unless a writing satisfying the requirements of an amendment to this Declaration as set forth in Section 19.2 is Recorded. No severance by sale, conveyance, encumbrance, or hypothecation of an interest in any Lot from the

appurtenant membership in the Master Association may occur as long as this Declaration continues in full force

19.2   Termination   Termination of the Community may be accomplished only in accordance with NRS 116.2118. In addition no such termination is effective unless it is also approved in advance either by fifty-one percent (51%) of the Mortgagees of the first Security Interests on all of the Lots in the Community who have submitted a written request to the Master Association that they be notified of proposed actions requiring the consent of a specified percentage of such Mortgagees (if termination is proposed due to substantial destruction or condemnation of the Community) or by sixty-seven percent (67%) of such Mortgagees (if termination is for reasons other than such substantial destruction or condemnation)

19.3   Amendments In General.  Except in cases of amendments that may be executed (i) by Declarant in the exercise of its Development Rights, (ii) by the Master Association under Article XI and NRS 116.1107 or (iii) by certain Owners under Section 19.2 and NRS 116.2118, and except as limited by Sections 19.6, 19.8 and 19.9, this Declaration, including the Plat, may be amended only by vote or agreement of Owners of Lots to which at least a two-thirds (⅔) majority of the votes in the Master Association are allocated.  The procedure for amendment must follow the procedures set forth in NRS 116.2117. Notice of the subject matter of a proposed amendment to this Declaration in reasonably detailed form must be included in the notice of any Master Association meeting at which a proposed amendment is to be considered.  The Master Association must notify all Owners at least twenty-five (25) days prior to the meeting.  The notice must state the purpose of the meeting and contain a summary of the amendment proposed, and must include a copy of a proxy that can be cast in lieu of attendance at the meeting.  A quorum of at least ten percent (10%) of the members must be present at such a meeting.

19.4   Limitation of Challenges.  An action to challenge the validity of an amendment adopted by the Master Association pursuant to this Article may not be brought more than one year after the amendment is Recorded. [A certificate of amendment prepared in accordance with Section 19.7 which recites that the requisite percentage of votes or written consents approving of such amendment have been obtained, when Recorded, is conclusive evidence of that fact. The Master Association shall maintain in its files the record of all such votes or written consents for at least four (4) years.

19.5   Recordation of Amendments.  Each amendment to this Declaration must be Recorded, and the amendment is effective only upon Recording

19.6   Unanimous Consent.  Except to the extent expressly permitted or required by other provisions of this Declaration or the Act, an amendment may not create or increase Special Declarant Rights, increase the number of Lots, change the boundaries of any Lot, change the Allocated Interests of a Lot or change the uses to which any Lot is restricted, except by unanimous consent of the Owners affected and the consent of a majority of the Owners of the remaining Lots

19.7   Execution of Amendments.  An amendment to this Declaration required by the Act to be Recorded by the Master Association, which has been adopted in accordance with this Declaration and the Act, must be prepared, executed, Recorded and certified on behalf of the Master

Association by at least two (2) officers of the Master Association designated for that purpose or, in the absence of designation, by the president and the secretary of the Master Association.

19.8    Special Declarant Rights.   Provisions in this Declaration creating Special Declarant Rights may not be amended without the consent of Declarant.

(a)    Notwithstanding any other provisions of this Article XIX, for so long as Declarant owns any portion of the Community or the Additional Property, Declarant may unilaterally amend this Declaration by Recording a written instrument signed by Declarant in order to conform this Declaration to the requirements of VA, FHA, FNMA, GNMA or FHLMC.

(b)    Declarant's prior written approval is required for any amendment to the Restrictions which would impair or diminish Declarant's rights to complete the Community, until the later to occur of the following dates: (i) seven (7) years after the Recordation of this Declaration, or (ii) five (5) years after the most recent Recordation of a Notice of Annexation for the Community.

19.9    Consent of Holders of Security Interests, Insurers and Guarantors.   Amendments are subject to the consent requirements of Section 15.9 and Article XVIII.

The undersigned, being the legal owner of all of the real property comprising the initial Property, has executed this Declaration as of _Jury 27_ , 1999.

THE GATES, LLC
a Nevada limited liability company

By: _Joseph Tom_    _attorney_

Name: _JOSEPH TOM_   /KENNETH GRAGSON

Title: _MANAGER_   / MANAGER

"Declarant"

STATE OF NEVADA

COUNTY OF CLARK

This instrument was acknowledged before me on _July 27,_ ___, 1999, by _Kenneth Gragson & Joseph Tom._

_Susan K Carroll_
Notary Public

My appointment expires: _6/19/2002_

Notary Public  State of Nevada
County of Clark
SUSAN K. CARROLL
My Appointment Expires
June 18, 2002

-57-

EXHIBIT "A"

DESCRIPTION OF INITIAL PROPERTY

BEING PORTIONS OF SECTION 13 , TOWNSHIP 19 SOUTH, RANGE 60 EAST, M.D.M. CITY OF LAS VEGAS, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL OF LOT 9A of LYNBROOK (LARGE LOTS). A COMMON INTEREST COMMUNITY, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 89 OF PLATS. PAGE 26. OFFICIAL RECORDS. CLARK COUNTY, NEVADA.

990805.00111

## EXHIBIT "B"

## DESCRIPTION OF ADDITIONAL PROPERTY

BEING PORTIONS OF SECTION 13 , TOWNSHIP 19 SOUTH, RANGE 60 EAST, M.D.M
CITY OF LAS VEGAS, CLARK COUNTY, NEVADA, MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

ALL OF LYNBROOK (LARGE LOTS), A COMMON INTEREST COMMUNITY, AS
SHOWN BY MAP THEREOF ON FILE IN BOOK 89 OF PLATS, PAGE 26, OFFICIAL
RECORDS, CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THE INITIAL PROPERTY, AS DEFINED IN THIS
DECLARATION.

Exhibit B

990906.02111

## EXHIBIT "C"

## DESCRIPTION OF COMMON ELEMENTS
## RELATING TO THE INITIAL PROPERTY

None.

H:\55-85\MFB\LYNBROOK HOA Master Dec\Exhibit 2.wpd 164103

Exhibit C

CLARK COUNTY, NEVADA
JUDITH A. VANDEVER, RECORDER
RECORDED AT REQUEST OF:

NEVADA TITLE COMPANY

08-06-1999  15:47   CCD        56
OFFICIAL RECORDS
BOOK:    990806  INST.     02111

FEE:        62.00  RPTT              .00

# EXHIBIT 2

BOOK 1094

1053418
34-1

Return to Stewart Title Ins.

A-2211        DECLARATIONS OF RESTRICTIONS

(ENABLING DECLARATION ESTABLISHING A PLAN FOR CONDOMINIUM OWNERSHIP OF WILLOWTREE ASSOCIATES LTD.)

RECITALS:

1. WILLOWTREE ASSOCIATES LTD. a Nevada Partnership, hereinafter referred to a "Declarant" is the Owner of the real property located in the City of Las Vegas, County of Clark State of Nevada, more particularly described as:

The West half (W½) of the Southeast Quarter (SE¼) of the Northeast Quarter (NE¼) of Section 27, Township 20 South, Range 60 East, MDB & M. EXCEPTING THEREFROM that portion conveyed to the State of Nevada for US-95 Rainbow Expressway - Las Vegas (including abutter's rights) by the Deed recorded January 4, 1977 in Book 694 of Official Records as Document No. 653512 and by the Resolution recorded February 15, 1977 as Document No. 667024, Official Records, Clark County, Nevada. FURTHER EXCEPTING THEREFROM the North Thirty (30) feet of the West Seventy-five (75) feet and the South Forty (40) feet of the West Seventy-five (75).

In addition, wherever in said Declaration of Restrictions the term "Declarant" is used, said term shall refer at all times to WILLOWTREE ASSOCIATES, LTD. a Nevada Partnership.

2. The real property referred to above has been approved or will be improved by the construction of multi-family structures, more fully described in the Condominium Plan defined in Article 1, Section 8 herein below.

3. Declarant hereby establishes by this Declaration a plan for individual ownership of the real property estate consisting of the area or space contained in each of the Units in each of the multi-family structures, together with the co-ownership by the individual and separate Owners hereof, as tenants in common and as hereafter set forth, of all of the remaining real property which is hereinafter defined and referred to herein as the "Common Area".

-1-

**BOOK 1094**

**I 0 5 3 4 1 8**

*DECLARATION:*

*Declarant, the fee owner of the real property described in recital Paragraph 1 above, hereby makes the following declaration as to divisions, easements, rights, liens, charges, covenants, conditions, limitations, restrictions and uses to which the Project may be put. Each and all of the restrictions, limitations, conditions, covenants, liens, reservations and charges herein contained shall run with the land and shall be binding on Declarant, its successors and assigns and all subsequent Owners of all or part of the Project, together with their grantees, successors, heirs, executors, administrators, devisees or assigns:*

### ARTICLE I
#### DEFINITIONS

*Section 1. "Project" shall mean all of the real property herein described in Paragraph 1 of the Recitals hereinabove, including all structures and other improvements thereon, and any additions thereto annexed pursuant to the provisions of this Declaration.*

*Section 2. "Unit" shall mean the elements of a Condominium which are not owned in common with Owners of other Condominiums in the Project, such Units being more particularly described in Article II hereof, and the Condominium Plan, referred to herein.*

*Section 3. "Common Area" shall mean the real property described as:*

*The West Half (W½) of the Southeast Quarter (SE¼) of the Northeast Quarter (NE¼) of Section 17, Township 20 South, Range 60 East, MDB & M EXCEPTING THEREFROM that portion conveyed to the State of Nevada for US-95 Rainbow Expressway – Las Vegas (including abutter's rights) by the Deed recorded January 4, 1977 in Book 694 of Official Records as Document No. 653512 and by the Resolution recorded February 15, 1977 as Document No. 667024, Official Records, Clark County, Nevada. FURTHER EXCEPTING THEREFROM the North Thirty (30) feet of the West Seventy-five (75) feet and the South Forty (40) feet of the West Seventy-five (75).*

BOOK 1094                                                    1053418

in Recital 1 hereinabove, together with all improvements constructed thereon, excepting therefrom all the Condominium Units ad described in Section 2 immediately above and so specified and established in Article 11 hereof.

Section 4. "Condominium" shall mean no estate in real property as defined in Nevada Revised Statutes, Sections 117.010, et. seq., consisting of a separate interest in a Unit, together with an undivided interest in the Common Area. For the purpose of this Declaration, the ownership of each Condominium shall include a Unit, all easements appurtenant thereto, and the respective undivided interest in the Common Area as hereinafter specified.

Section 5. "Owner" shall mean the record Owner, or Owners, if more than one, of a Condominium in the Project.

Section 6. "Association" shall mean WILLOWTREE HOMEOWNERS ASSOCIATION, a Nevada non-profit corporation, in which all Owners shall have a membership interest as more particularly described in Article V hereof, provided that membership shall be limited to Owners.

Section 7. "Land" is the material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock or other substance, and includes free or occupied space for an indefinite distance upwards as well as downwards, subject to limitations upon the use of airspace imposed, and rights in the use of airspace granted, by law.

Section 8. "Condominium Plan" shall mean that certain Condominium Plan known as Willowtree for "Condominium Purposes", referred to in Paragraph 1 of the Recitals herein above.

Section 9. "Declarant" shall mean and refer to WILLOWTREE ASSOCIATES LTD., its successors and assigns if such successors and assigns shall acquire more than one undeveloped Condominium from the Declarant for the purpose of development.

BOOK 1094

1053418

Section 10. "Mortgage" shall mean and include a Deed of Trust as well as a Mortgage in the conventional sense.

Section 11. "Mortgagee" shall mean a person or entity to whom a mortgage is made and shall include the beneficiary of a Deed of Trust; "Mortgagor" shall mean a person or entity who mortgages his or its property to another i.e., the maker of a Mortgage, and shall include the Trustor of a Deed of Trust.

Section 12. "Member" shall mean and refer to every person or entity who holds membership in the Association.

Section 13. "Association Property" shall mean the real property comprised of and the improvements constructed on Lot 1 and Lot "A" of Project as shown on the recorded plat map on file with the Clark County Recorder.

Section 14. The aforesaid definitions shall be applicable to this Declaration and also to any supplemental Declaration (unless the context shall prohibit), filed pursuant to the provisions of this Declaration.

## ARTICLE II

### DESCRIPTION OF CONDOMINIUM

Declarant, in order to establish a plan of Condominium ownership for the Project, hereby covenants and agrees that it hereby divides the Project into the following freehold estates:

Section 1. Each of the Units in each multifamily structure, each separately shown, numbered and designated on the Condominium Plan shall be a separate freehold estate as defined in Sections 117.010 et seq., of the Nevada Revised Statutes, consisting of the space bounded by and contained within the interior finished surfaces of the perimeter walls, floors, ceilings, windows and doors of each Unit. Each Unit includes both the portion of the building so described and the airspace so encompassed, but the following are not a part of the Unit: bearing walls, columns, floors, roofs, foundations, tanks, pumps, water heaters and other central services, pipes, ducts, flues, chutes, conduits, wires and other utility installations, wherever located, except such utilities

and the outlets thereof when located within the Unit. In interpreting the Declaration, the Condominium Plan and conveyances, the existing physical boundaries of the Unit, or of a Unit reconstructed in substantial accordance with the original Condominium Plan thereof, shall be conclusively presumed to be its boundaries rather than the metes and bounds (or other description) expressed in the Declaration, Condominium Plan or conveyance regardless of minor variance between boundaries shown on the Condominium Plan or in the deed and Declaration and those of the building.

Section 2. A freehold estate and consisting of an undivided interest in that remaining portion of the Project described and referred to herein as the "Common Area". The Common Area shall include, without limitation, that portion of the land within the Project described as:

> The West Half (W½) of the Southeast Quarter (SE¼) of the Northeast Quarter (NE¼) of Section 27, Township 20 South, Range 60 East, MDB & M. EXCEPTING THEREFROM that portion conveyed to the State of Nevada for US-95 Rainbow Expressway - Las Vegas (including abutter's rights) by the Deed recorded January 14, 1977 in Book 694 of Official Records as Document No. 653512 and by the Resolution recorded February 15, 1977 as Document No. 667024, Official Records, Clark County, Nevada. FURTHER EXCEPTING THEREFROM the North Thirty (30) feet of the West Seventy-five (75) feet and the South Forty (40) feet of the West Seventy-five (75).

each multifamily structure (except for the Units), together with all bearing walls, columns, floors, roofs, slabs, foundations, storage spaces, lobbies, patios, laundry facilities, reservoirs, tanks, pumps and other central services, pipes, ducts, flues, chutes, conduits, wires, hot water tanks, extension lighting and other utility installations of the multifamily structures wherever located (except) all utility installations and/or the outlets thereof when located within the Units), garages, parking spaces, lawns, pavements, trees and all other landscaping.

BOOK 1094                                        K 0 5 3 4 1.8

Section 3.  The undivided interest established and to be conveyed with the respective Units cannot be changed, and said Declarant, its successors, assigns and grantees, covenant and agree that the undivided interest in the Common Area and facilities and the fee titles to the respective Units conveyed therewith, shall not be separated or separately conveyed or encumbered without its respective Unit even though the description in the instrument of conveyance may refer only to the fee title to the Unit.  Each Unit, together with the respective undivided interest in the Common Area specified and established in herein, is defined and hereinafter referred to as a Condominium and shall include a Unit and such undivided interest in the Common Area.

Section 4.  The undivided interest hereby established and which shall be individually conveyed are described in the Condominium Plan.

Section 5.  The fractional undivided interest of each Owner in the Common Areas shall not be separated from the Unit to which it appertains and shall be deemed to be conveyed or encumbered or released from liens with the Unit even though such interest is not expressly mentioned or described in the conveyance or other instrument.

Section 6.  The Owners of each Condominium shall, in addition to owning a fee simple interest in their Condominium have an exclusive easement, appurtenant to their Condominium, for the use of the Restricted Common Areas designated as appurtenant to their Units.  Such easement shall not entitle any Owner to change any structural part thereof or to paint or otherwise do or allow to be done anything affecting the appearance thereof without the prior written consent of the Association.

Section 7.  Except as otherwise limited in this Declaration, each Owner shall have the right to use the Common Areas for all purposes incident to the use and occupancy of his Unit as a place of residence, and such other incidental uses permitted by this Declaration, without hindering or encroaching upon the lawful rights of other Owners, which right shall be appurtenant to and run with the Unit.  Any Owner may delegate, in such manner as the Association may provide,

### ARTICLE III

 RESTRICTED COMMON AREA

*Section 1.* Portions of the Common Area, described as patios and garages, are hereby set aside and allocated for the exclusive use of the respective Units as shown on the Condominium Plan. Such areas shall be designated "Garage" and "Patio", respectively, followed by a letter coinciding with the letter type of the respective Unit. For example: "Garage C" or "Patio B". Such portions of the Common Areas shall be exclusive easements appurtenant to the respective Units for the exclusive uses and purposes as set forth in this Declaration. It shall be the obligation of every Owner to maintain his patio(s) and garage(s) areas in good and clean condition at all times, and said Owner shall bear the expense of such cleaning and maintenance.

### ARTICLE IV
#### USE RESTRICTIONS

The Units and Common Area shall be occupied and used only as follows:

*Section 1.* Each Unit shall be used as a private dwelling, and for no other purpose except such temporary used as shall be permitted by Declarant while the Project is being developed and Condominiums are being sold by Declarant. Provided, however, that Declarant reserves the right, for a period of five (5) years from recordation hereof or until all Condominiums in the Project are sold, whichever shall first occur, to carry on normal construction and sales activity on the Project, and Declarant shall have, during the above period, the nonexclusive right to use the recreation area and building(s) for such purposes.

*Section 2.* Subject to the provisions of those restrictions, use of the Common Area shall be in accordance with the subject to limitation as determined by the Association. Use of the Restricted Common Area shall be subject to the limitations set forth in Article III hereof.

BOOK 1094      1053418

Section 3. Nothing shall be done or kept in any Unit or in any Common Area which will increase the rate of insurance on the Common Area without the approval of the Association. No Owner shall permit anything to be done or kept in his Unit or in any Common Area which will result in the cancellation of insurance on any Common Area or which would be in violation of any law.

Section 4. No sign of any kind shall be displayed to the public view on or from any Unit or any Common Area, without the approval of the Association, except such signs as may be used by Declarant in connection with the development of the Project and sale of Condominiums.

Section 5. No animals of any kind shall be raised, bred or kept in any Unit, or in the Common Area, except that dogs, cats or other household pets may be kept in Units subject to approval of the Association, provided that no animal shall be kept, bred or maintained for any commercial purpose.

Section 6. No owner shall rent or lease any Unit for less than thirty (30) day periods and all leases must be in writing and are subject to this Declaration and the By-Laws of the Association.

Section 7. The Owner shall not permit or suffer anything to be done or kept upon said premises which will increase the rate of insurance on the building, or on the contents thereof, or which will obstruct or interfere with the rights of other occupants, or annoy them by unreasonable noises or otherwise, nor will he commit or permit any nuisance on the premises or commit or suffer any immoral or illegal act to be committed thereon. The Owner shall comply with all of the requirements of the Board of Health and of all other governmental authorities with respect to the said premises. If by reason of the occupancy or uses of said premises by the Owner the rate of insurance on the building shall be increased, the Owner shall become personally liable for the additional insurance premiums.

BOOK 1094

1053418

Section 8. Nothing shall be done in any Unit or in, on, or to any building in any Common Area which would structurally change any such building, except as is otherwise provided herein.

Section 9. There shall be no structural alteration, construction or removal of any building, fence or other structure in the Project (other than repairs or rebuilding pursuant to Article XII hereof) without the approval of the Architectural Control Committee as set forth in Article IX hereof. No building, fence or other structure shall be constructed upon any portion of any Common Area other than such building and structures as shall be constructed (a) by the Declarant (or a person to whom Declarant assigns its rights as developer), or (b) by the Association pursuant to Article XI or Article XII. In the case of any conflict with the Articles of Incorporation or the By-laws of the Association and this Declaration, this Declaration shall control.

Section 10. No professional, commercial or industrial operations of any kind shall be conducted in or upon any Unit or the Common Areas except such temporary uses as shall be permitted by Declarant while the Development is being constructed and Condominiums are being sold by the Declarant. No noxious or offensive activities shall be carried on in any unit, or upon any part of the property, nor shall anything be done thereon which may be, or become a annoyance or nuisance to the neighborhood or which shall in any way interfere with the quiet enjoyment of any Owner of his respective unit.

Section 11. No Owner of a Unit shall park, store, or keep any vehicle except wholly within the parking area designated therefor. No Owner shall park, store, or keep any large commercial type vehicle (dump truck, cement mixer truck, oil or gas trucks, etc.), boats over twenty feet in length, or aircraft or any vehicle, other than a private passenger vehicle, any place within the Project, except totally within a covered parking space or within the designated recreational vehicle lot. No Owner of a Unit shall conduct major repairs or major restorations on any motor vehicle, boat, trailer, aircraft or other vehicle upon any lot or upon

the Common Area, except for emergency repairs or minor repairs thereto, and then only to the extent necessary to enable removal thereof to a proper repair facility.

Section 12. All Owners shall be members of the Association and shall comply with the terms and conditions as set forth in the Articles of Incorporation and By-Laws and any rule or regulation of the Association. No owner shall transfer any membership or interest in the Association, except upon the transfer of the Condominium to which it is appurtenant.

Section 13. Nothing in this Article or elsewhere in these Restrictions shall limit the right of Declarant to complete construction of improvements to the Common Area and to Units owned by Declarant or to alter the foregoing or to construct such additional improvements as Declarant deems advisable prior to completion and sale of the entire Project. The rights of Declarant hereunder and elsewhere in these Restrictions may be assigned by Declarant to any successor to all or any part of Declarant's interest in the Development, as developer, by an express assignment incorporated in a recorded deed transferring such interest to such successor.

Section 14. The all air-conditioning units installed at the time of the initial sale of each Condominium, and where purchased by the Owner as part of the Unit, shall be the property of said Owner. An easement over the Common Area is hereby established where the air conditioning unit is installed outside the Unit. Each Owner shall bear full responsibility for the cost of maintaining his air conditioning unit. Provided, however, that no Owner shall install an air-conditioning unit or replace his present air conditioning unit without the prior written approval of the Architectural Committee who shall have the right to approve or disapprove size, shape, noise level and proposed location of such Unit.

BOOK 1094

1053418

Section 15. That no Owner shall install or cause to be installed any T.V. or radio antenna or other similar electronic receiving devise on any portion of the exterior of any building in the Project.

Section 16. That no Owner shall install or cause to be installed any patio cover or roof in or on the patio areas without the prior written consent of the Architectural Committee and, where required by the City of Las Vegas the prior written consent of said City.

## ARTICLE V

### MEMBERSHIP IN ASSOCIATION

Section 1. Membership. Every person or entity who is a record Owner of a fee or undivided fee interest in any Condominium which is subject by covenants or record to assessment by the Association, shall be a member of the Association. The foregoing is not intended to include persons or entities who hold an interest merely as security for the performance of an obligation. No Owner shall have more than one membership; however, an Owner is entitled to one vote for each Condominium owned. Provided further, that where more than one person owns an interest in a Condominium, such Owners shall jointly cast only one vote for each Condominium so owned. Membership shall be appurtenant to and may not be separated from the fee ownership of any Condominium which is subject to assessment by the Association. Ownership of such Condominium shall be the sole qualification for membership.

Section 2. Transfer. The Association Membership held by any Owner of a Condominium shall not be transferred, pledged or alienated in any way, except upon the sale or encumbrance of such Condominium, and then only to the purchaser or mortgagee of such Condominium upon foreclosure. Any attempt to make a prohibited transfer is void, and will not be reflected upon the books and records of the Association.

BOOK 1094

1053418

## ARTICLE VI

### POWERS AND DUTIES OF ASSOCIATION

Section 1. The Association is hereby designated as the management body of the Project. The Members of the Association shall be the Owners in the Project as provided herein. The initial Board of Directors of the Association shall be appointed by the incorporators of their successors. Thereafter, the Directors shall be elected as provided in the By-Laws.

Section 2. The Association shall have the right and power to do all things for the management and operation of the Project. Subject to the provisions of the Articles of Incorporation and By-Laws of the Association and these Restrictions, the powers of the Association shall include, but not necessarily be limited to, the specific acts hereinafter enumerated and those set forth in the Articles of Incorporation and By-Laws.

Section 3. The Association, through its Board and its option, and for the benefit of the Condominiums, and the Owners in the Project, may acquire and may pay for out of the assessments hereinafter provided for, the following:

(a) Water, sewer, garbage, electrical and gas and other necessary utility services for the Common Area and (if not seperately metered or charged) for the Units.

(b) (1) A policy or policies of fire insurance, with extended coverage endorsement, for the full insurable replacement value of the Common Areas payable as provided in Article XII, or such other fire and casualty insurance as the Association shall determine gives substantially equal or greater protection, insuring the Owners, and their Mortgagees, as their interest may appear, and as to each of such policies which will not be voided or impaired thereby, the Owners hereby waive and release all claims against the Association, the Board, the Manager, the Declarant and agents and employees of each of the foregoing,

with respect to any loss covered by such insurance, whether
or not caused by negligence of or breach of any agreement by
said persons, but to the extent of the insurance proceeds
received in compensation for such loss only.

      (2)  A policy or policies insuring the Association,
the Board, the Declarant, the Managing Agent and the Owners
and agents and employees of each of the foregoing against any
liability incident to the ownership and/or use of the Common
Areas and Units, and if obtainable, a cross liability
endorsement insuring each insured against liability to each
other insured.

      (3)  The Association shall be deemed trustee of
the interests of all Owners in any insurance proceeds paid
to it under any such policies, and shall have full power to
receive and to receipt for their interests in such proceeds
and to deal therewith.

     (c)  Workmen's compensation insurance to the extent
necessary to comply with any applicable laws;

     (d)  Such other policies of insurance as the
Association may deem appropriate.

     (e)  The services of a person or firm to manage the
Common Areas (the "Manager") to the extent deemed advisable
by the Association as well as such other personnel as the
Association shall determine shall be necessary or proper for
the operation of the Common Areas whether such personnel are
employed directly by the Association or are furnished by the
Manager;

     (f)  A fidelity bond naming the Members of the
Association, the Association, and the Manager, and such
other persons as may be designated by the Board as
principals, and the Association as obligee.

-14-

1053418

(g)  The Association shall paint, maintain and repair the Common Area including all portions of each building in the Project (but excluding all elements of a Unit as described in Article I herein, including all glass) and such furnishings, equipment and landscaping for the Common Area as the Association shall determine are necessary and proper.  It shall be the right and obligation solely of the Association to paint and maintain all metal railings on stairways and balconies.

(h)  If the Association has incurred any liability or paid any costs or expenses for a single Unit or Owner, the cost thereof shall be especially assessed to the Owner of such Unit; provided, however, that nothing herein shall permit the Association to assess the Owners for any new improvements or additions to the Common Areas except pursuant to Article VI, Section 8 or Article VII or Article XII.

Section 4.  The Association may delegate any of its duties, powers or functions to any person, corporation or firm to act as Manager.  Neither the Association nor the Members of its Board shall be liable for any omission or improper exercise by the Manager of any such duty, power or function so delegated.

Section 5.  The Association or any person authorized by the Association may enter any Unit in the event of any emergency involving illness or potential danger to life or property or when necessary in connection with any maintenance or construction for which it is responsible.  Such entry shall be made with as little inconvenience to the Owner as practicable, and any damage caused thereby shall be repaired by the Association.

Section 6.  The Association shall provide for an annual independent audit of the accounts of the Association and for delivery of a copy of such

audit to each Owner within thirty (30) days after completion thereof.

Section 7.  The Association is authorized and empowered to grant such licenses, easements and rights of way for sewer lines, water lines, underground conduits, storm drains and other public utility purposes as may be necessary and appropriate for the orderly maintenance, preservation and enjoyment of the Common Area or for the preservation of the health, safety, convenience and welfare of the Owners, over those portions of the Common Area upon which no building or other structure has been erected.  Such licenses, easements and rights of way may be granted at any time prior to twenty-one (21) years after the death of the individuals who have signed these Restrictions and their issue who are in being as of the date hereof, and the right to grant such licenses, easements and rights of way is hereby expressly reserved.

Section 8.  Other than as provided in Article XII relating to restoration of damaged improvements, the Association may, with approval of the Architectural Control Committee, construct new improvements or additions to the Common Area of the Project or demolish existing improvements, provided that in the case of any improvement, addition or demolition involving a total expenditure in excess of $5,000, the written consent or vote of two-thirds (2/3rds) of the Owners (other than Declarant) in the Project as to the maximum total cost therefor shall first be obtained, and provided that no Unit shall be altered or damaged by any such demolition or construction without the consent of the Owner thereof.  The Association shall levy a special assessment on all Owners in the Project for the cost of such work.

Section 9.  In the event that any Owner of a Condominium shall not comply with any of the provisions of this Declaration of Restrictions, in a manner satisfactory to the Board of Directors of the Association, after five days written -otice to the defaulting Owner and an opportunity for a hearing before the Board of Directors, the Board of Directors shall have the right to take any reasonable action if deems necessary to remedy or stop violations including entry by agents and employees upon the property of the defaulting

-16-

1053418



Owner. This provision shall not be done to permit entry to the interior portion of the residence except in accordance with Section V hereof. The costs of such remedial action including the repair, alteration or removal of physical property, shall be added to and become part of the assessment to which the lot is subject. In addition, the Board shall have the right under this section to levy a reasonable assessment for continuing violations in the event that the Board does not desire to take other remedial action. The assessment shall become a lien on the property in the event the Board shall file a lien for such assessment and may be foreclosed upon after thirty days written notice pursuant to the requirements of Section VII, Article VI hereof by judicial foreclosure.

## ARTICLE VII

### ASSESSMENTS

Section 1.  Creation of the Lien and Personal Obligation of Assessment. The Declarant, for each Condominium owned within the Project, hereby covenants, and each Owner of any Condominium by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, it deemed to covenant and agree to pay to the Association or his deligate: (1) regular annual assessments, or charges, and (2) special assessments for capital improvements, such assessments to be established and collected as herein provided. The annual and special assessments, together with interest, costs and reasonable attorney's fees for the collection reof, shall be a charge on the land and shall be a continuing lien upon the property against which each such assessment is made. Each such assessment, together with interest, costs and reasonable attorney's fees, shall also be the personal obligation of the person who was the Owner of such property at the time when the assessment fell due. The personal obligation for delinquent assessments shall not pass to his successors in title unless expressly assumed by them, however, the lot shall be subject to the assessment if a lien has been recorded prior to a transfer of title to a successor.



Section 2. Purpose of Annual Assessments. The annual assessments levied by the Association shall be used exclusively to promote the health, safety and welfare of the residents in the Properties and for the improvements and maintenance of the Common Area. Said annual assessment shall include, and the Association shall acquire and pay for out of the funds derived from said annual assessments, the following:

(a) The cost of furnishing water, gas, electricity, garbage and trash collection and other utilities to the extent furnished by the Association.

(b) Maintenance and repair of storm drains, sanitary sewers and private driveways and streets lying within the Common Area.

(c) Fire insurance covering the full insurable replacement value of the Common Area with extended coverage.

(d) Liability insurance insuring the Association against any liability to the public or to any Owner, their invitees or tenants incident to their occupation and/or use of the Common Area, with limits of liability to be set by the Association, such limits and coverage to be reviewed at least annually by the Association and increased or decreased in its discretion.

(e) Workmen's Compensation Insurance to the extent necessary to comply with any applicable laws, and any other insurance deemed necessary by the Board of Directors of the Association.

(f) Standard fidelity bond covering all Members of the Board of Directors of the Association and other employees of the Association if and in an amount as determined by the Board of Directors.

(g) Painting, maintenance, repair and replacement of all buildings, equipment and landscaping in, on and of the Common Area



-18-

BOOK 1094

1053418

(excluding therefrom each Unit within said building), as the
Board of Directors of the Association shall determine is
necessary and proper.

(h) Landscape planting and maintenance (including
irrigation) and lighting and irrigation equipment installation
and maintenance service.

(i) Removal and replacement of any part of a patio or
fence that extends into the Common Area under authority of an
easement when access to a utility line underneath such patio or fence
is requested by any utility company. Provided, however, that said
cost shall be charged to the Owner of the Unit involved if said Owner
caused the patio or fence to be so placed on the Common Area.

(j) Any other material, supplies, furniture, labor, services,
maintenance, repairs, structural alterations, insurance, taxes or
assessments which the Association is required to secure or pay for
pursuant to the terms of these restrictions or by law or which in
the opinion of the Association's Board of Directors shall be necessary
or proper for the operation of the Common Area, or for the benefit
of these restrictions.

Section 3. Annual Assessments - Basis. The Owner(s) of each Condominium
shall share in the profits and common expenses of the Common Area and facilities
on an equal basis. That is, the Owner(s) of each Condominium shall be obligated
to pay an equal prorata proportion of the total expenses as assessed by the
Association. Provided, however, that if additional lands are annexed to the
Project pursuant to the terms hereof, this fractional share shall be decreased,
effective upon written notice by Declarant to the Association, to a fraction
having a numerator of one (1) and a denominator equal to the total number of
Condominiums actually included in and annexed to the Project.

K 1094

J 053418



Section 4. Special Assessments for Capital Improvements. In addition
the annual assessments authorized above, the Association may levy, in any
sessment year, a special assessment applicable to that year only for the purpose
defraying, in whole or in part, the cost of any construction, reconstruction,
air, or replacement of a capital improvement upon the Common Area, including
tures and personal property related thereto; provided that any such assessment
ill have the assent of fifty-one (51%) per cent of the votes of each class of
bers who are subject to each assessment.

Section 5. Date of Commencement of Annual Assessments: Due Dates.
annual assessments provided for herein shall commence as to all Condominiums
first day of the month following the first conveyance of any portion of the
mon Area. The first annual assessment shall be adjusted according to the
ber of months remaining in the fiscal year as set forth in Article XII of
By-Laws. The Board of Directors shall fix the amount of the annual assessment
inst each Condominium at least thirty (30) days in advance of each annual
essment period. Written notice of the annual assessment shall be sent to
ry Owner subject thereto. The due dates shall be established by the Board of
ectors. The Association shall, upon demand, and for a reasonable charge,
nish a certificate signed by an officer or agent of the Association, setting
th whether the assessments on a specified Condominium have been paid.

Section 6. Exempt Property. The following property subject to this
ation shall be exempt from the assessments herein:

(a) All properties dedicated to and accepted by a
local public authority; and

(b) All properties owned by a charitable or non-profit
organization exempt from taxation by the laws of the State of
Nevada. However, no land or improvements devoted to dwelling
use shall be exempt from said assessment.

BOOK 1094

1053418

ARTICLE VIII

EFFECT OF NON-PAYMENT OF ASSESSMENTS
REMEDIES OF THE ASSOCIATION

Section 1. Effect of Non-payment of Assessments: Remedies of the Association. Any assessment not paid within ten (10) days after the due date shall bear interest from the due date at the rate of ten (10%) per cent per annum. The Association may bring an action at law against the Owner personally obligated to pay the same, or foreclose the lien against his Condominium. No Owner may waive or otherwise escape liability for the assessments provided for herein by non-use of the Common Area or abandonment of his Condominium.

Section 2. Notice of Lien. No action shall be brought to foreclose said assessment lien or to proceed under the power of sale herein provided less than thirty (30) days after the date a notice of claim of lien is deposited in the United States Mail, certified or registered, postage prepaid, to the Owner of said Condominium if the address of the Owner of the Condominium is unknown notice shall be deemed given by mailing the notice of the claim of lien to the address of the Condominium, and a copy thereof is recorded by the Association in the office of the County Recorder in which the Project is located. Said notice of claim must recite a good and sufficient legal description of any such Condominium, the record Owner or reputed Owner thereof, the amount claimed (which may at Association's option include interest on the unpaid assessment at the rate of ten (10%) per cent plus reasonable attorney's fees and expenses of collection in connection with the debt secured by said lien), and the name and address of the claimant.

Section 3. Foreclosure Sale. Any such sale provided for above is to be conducted by the Board of Directors, its attorney or other persons authorized by the Board in accordance with the provisions of Section 117.070 and the provisions of Covenant Nos. 6, 7 and 8 of Section 107.030, 107.080 and 107.090 of Nevada Revised Statutes applicable to the exercise of powers of sale in mortgages and deeds of trust, or in any other manner permitted by law including judicial foreclosure of the assessment lien. The Association, through duly

10534 I.8

authorized agents, shall have the power to bid on the Condominium at foreclosure sales, and to acquire and hold, lease, mortgage and convey the same.

Section 4. Curing of Default. Upon the timely curing of any default for which a notice of claim or lien was filed by the Association, the officers thereof are hereby authorized to file or record, as the case may be, an appropriate release of such notice, upon payment by the defaulting Owner of a fee, to be determined by the Association, but not to exceed Fifteen ($15.00) Dollars, to cover the costs of preparing and filing or recording such release.

Section 5. Cumulative Remedies. The assessment lien and the rights to foreclosure and sale thereunder shall be in addition to and not in substitution for all other rights and remedies which the Association and its assigns may have hereunder and by law, including a suit to recover a money judgment for unpaid assessment, as above provided. In the event the Association has not annexed the Common Area for which a particular Condominium unit is subject, the Declarant or its successor in interest, has the right, as the delegate of the Association, to collect assessments in amounts of the Association as authorized by the Association and has all the remedies provided for by these Declaration of Restrictions.

### ARTICLE IX

### ARCHITECTURAL CONTROL - APPROVAL

Section 1. Architectural Control. Except for the purposes of proper maintenance and repair, and except as provided in Section 3 hereof, no person, persons, entity or entities shall install, erect, attach, apply, paste, hinge, screw, nail, build or construct any lighting, shades, basketball backboards, screens, awnings, patio covers, decorations, fences, aerials, antennas, radio or television broadcasting or receiving devices, or make any changes or otherwise alter whatsoever the exterior of any residential dwelling unit, residential carport, or residential garage constructed on or to be constructed on the

1053

**Section 4.** *Appointment of Architectural Committee.* This Declarant shall initially appoint the Architectural Committee, consisting of not less than three (3) members, who shall remain in office until: (a) five (5) years from the date of recording of this Declaration; or (b) ninety (90%) per cent of the Units in the existing Project have been conveyed, whichever shall first occur. From and after such time or event, as the case may be, the Architectural Committee shall be composed of the Board of Directors of the Association or three (3) or more representatives appointed by the Board, who need not be members of the Association. Prior to the time that the Board of Directors is vested with authority, Declarant shall have the power to remove persons from the Committee and shall have the power to fill all vacancies.

## ARTICLE X

### MORTGAGEE PROTECTION CLAUSE

**Section 1.** *Notwithstanding* any and all provisions hereof to the contrary, in order to induce the Family Savings and Loan Association to participate in the financing of the sale of Lots within the Properties, the following provisions are added hereto (and to the extent these added provisions conflict with any other provisions of the Declaration, these added provisions shall control):

(a) Each holder of a first mortgage or first Deed of Trust encumbering any Lot is entitled to written notification from the Association of any default by the Mortgagor of such Lot in the performance of such mortgagor's obligations under his Declaration, the Articles of Incorporation of the Association or the By-Laws of the Association which is not cured within sixty (60) days.

(b) Each holder of a first mortgage or first Deed of Trust encumbering any Lot which comes into possession of such Lot pursuant to the remedies provided in such mortgage or Deed of Trust, or by foreclosure of such mortgage or Deed of Trust, or by Deed (or assignment) in lieu of foreclosure, shall be exempt from any "right of first refusal", or other restriction on the sale or rental of such Lot including, but not limited to, restrictions on the age of the occupants of such Lot and restrictions on the posting of signs pertaining to the sale or rental of such Lot.



(c) Each holder of a first mortgage or first Deed of Trust encumbering any lot which comes into possession of such lot pursuant to the remedies provided in such mortgage or Deed of Trust, or by Deed (or assignment) in lieu of foreclosure, shall take title to such lot free and clear of any claims for unpaid assessments or charges against such lot which accrued prior to the time such holder comes into possession of such lot.

(d) Unless all holders of first mortgages or first Deed of Trust on lots have given their prior written approval, the Association shall not:

(1) change Section 1 of this Article;

(2) by act, or omission seek to abandon, partition, subdivid:, encumber, sell or transfer real estate or improvements thereon which are owned, directly or indirectly, by such Association; The granting of easements for public utilities or for other public purposes consistent with the intended use of such property by the Planned Unit Development shall not be deemed a transfer within the meaning of this clause.

(3) Change the method of determining the obligations, assessments, dues or other charges which may be levied against lot Owner;

(4) by act or omission change, waive or abandon any scheme or regulations, or enforcement thereof, pertaining to the architectural design of the exterior appearance of units, the exterior maintenance of units, the maintenance of party walls or common fences and driveways, or the upkeep of lawns and plantings in the Project;

(5) fail to maintain Fire and Extended Coverage on insurance Project common property on a current replacement cost basis in an amount not less than one hundred percent (100%) of the insurance value (based on current replacement cost);

(6) Use hazard insurance proceeds for losses to any Project common property for other than repair, replacement or reconstruction of such improvements.

(e) First mortgagees shall have the right to examine the books and records of the Association.

BOOK 1094                                                    1053418

Section 2. No breach of any of the foregoing covenants and
restrictions shall cause any forfeiture of title or reversion or bestow any
right of re-entry whatsoever, but, violation of any one or more of these
covenants or restrictions may be enjoined or abated by Declarant, its successors
and assigns, and by the Association, or by any Owner of a Unit in the Project,
by action of any court of competent jurisdiction, and damages may also be
awarded against such violations; provided, however, that any such violation
shall not defeat or render invalid the lien of any mortgage or Deed of Trust
made in good faith and for value as to said property or any part thereof, but
said covenants and restrictions shall be binding upon and effective against
any Owner of said property, or portion thereof, whose title thereto is
acquired by foreclosure, trustee's sale or otherwise.

## ARTICLE XI

### OBLIGATION TO MAINTAIN, REPAIR AND REBUILD

Section 1. Maintain by Owner: Subject to the provisions of Article
XII regarding insurance and reconstruction, and subject to the provisions of
this Declaration regarding exterior maintenance of all buildings in the
Project and Architectural Committee approval, each Owner shall, at his sole
cost and expense, maintain and repair his Unit, keeping the same in good
condition and making all structural repairs as they may be required.

Section 2. Damage and Destruction Affecting Units--Duty to Notify.
If all or any portion of any Unit is damaged or destroyed by fire or other
casualty in an amount in excess of the deductible of all insurance carried
by the Association, it shall be the duty of the Owner of said Unit to notify
the Association of such damage by written notice sent certified or registered
mail or delivered in person. A failure to so notify within fifteen (15) days
from date of damage shall render the Owner liable for all such damages.

## ARTICLE XII

### DAMAGE OR DESTRUCTION TO THE PROJECT

Section 1. Damage to or destruction of all or any portion of the
Project shall be handled in the following manner:



BOOK 1094

LL 053418

above described property. For the purpose of this provision the term "exterior" shall mean any outside walls, outward surfaces, roofs, outside doors, or other outside structures of said residential dwelling units, residential carports and residential garages, including, but not limited to, the roof, outside wall, outward surface, outside doors, and outside structures of all atrium type residential dwelling units.

Section 2. Present Construction Exempt. Except for the purpose of proper maintenance and repair, and except as provided in Section 3, hereof, no person, persons, entity, or entities shall install, construct or build any walkways, slabs, sidewalks, curbs, gutters, patios, porches, driveways, fences, lighting, decorations, aerials, antennas, radio or television broadcasting or receiving devices, or other structures of any kind, on the property developed for residential use, except for such walkways, fences, lighting, decorations, aerials, antennas, radio or television broadcasting or receiving devices, or other structures which are to be constructed concurrently with the construction of the residential dwellings, residential carports or residential garages on the above described property.

Section 3. Architectural Approval. No action described in Section 1 and 2 above may be taken by an Owner or caused by an Owner to be taken until the plans and specifications showing the nature, kind, color, shape, height, materials and location of the same shall have been submitted to and approved in writing as to harmony of external design and location in relation to surrounding structures and topography by the Architectural Committee provided for in Section 4 hereof. In the event said Committee, or its designated representatives, fails to approve or disapprove such design and location in writing within thirty [30] days after said plans and specifications have been submitted to it, approval will not be required, and this Article will be deemed to have been fully complied with.

BOOK 1094
Ц 0 5 3 4 1 3

## ARTICLE XIII

### VOTING RIGHTS

The Association shall have two classes of voting membership:

Class A. Class A Membership shall be all those Owners as defined in Article III with the exception of the Declarant. Class A Members shall be entitled to one vote for each Unit in which they hold the interest required for membership by Article V. When more than one person holds such interest in any Unit, all such persons shall be Members. The vote for such Unit shall be exercised as they among themselves determine, but in no event shall more than one vote be cast with respect to any Unit.

Class B. The Class B Member shall be the Declarant. The Class B Member shall be entitled to three (3) votes for each Unit in which it holds the interest required for membership by Article V; provided that the Class B membership shall cease and be converted to Class A membership on the happening of either of the following events, whichever occurs earlier:

(1) When the total votes outstanding in the Class A membership equal the total votes outstanding in the Class B membership, or

(2) On December 31, 1983

### ARTICLE XIV

### COVENANT AGAINST PARTITION

Section 1. By acceptance of his deed, each Owner shall be deemed to covenant for himself and for his heirs, representatives, successors and assigns, that he will not institute legal proceedings to effect judicial partition of his interest in the Project property, except upon the showing

BK 1094                                    1053418

(a)  In the event of damage or destruction to the Project, and the insurance proceeds are sufficient to effect total restoration, then the Association shall cause the Project to be repaired and reconstructed substantially as it previously existed.

(b)  If the insurance proceeds are within Five Thousand Dollars ($5,000.00) or less of being sufficient to effect total restoration to the Project, then the Association shall cause the Project to be repaired and reconstructed substantially as they previously existed and the difference between the insurance proceeds and the actual cost shall be levied as a special assessment equally against each of the Owners.

(c)  If the insurance proceeds are insufficient by more than Five Thousand Dollars ($5,000.00) to effect total restoration to the Project, then by written consent or vote of a majority of the Owners, they shall determine whether (a) to rebuild and restore in substantially the same manner as the improvements existed prior to damage and to raise the necessary funds over the insurance proceeds by levying equal assessments against all Condominiums (b) to rebuild and restore in a way which utilizes all available insurance proceeds and an additional amount not in excess of Five Thousand Dollars ($5,000.00) and which is assessable equally to all Condominiums but which is less expensive than replacing these improvements in substantially the same manner as they existed prior to being damaged, or (c) to not rebuild and to distribute the available insurance proceeds equally to the Owners and mortgagees of the Condominiums as their interests may appear.

(d)  If reconstruction or restoration has not actually commenced within one (1) year from the date of any damage to which this Article is applicable, then the covenant against partition provided shall terminate and be of no further force and effect.



BOOK 1094

1053418

that (1) three (3) years after damage or destruction to the Project which renders a material part thereof unfit for its use prior thereto, the Project has not been rebuilt or repaired substantially to its state prior to its damage or destruction, or (2) that three-fourths (3/4) or more of the Project has been destroyed or substantially damaged, and that Condominium Owners holding in aggregate more than a fifty (50%) per cent interest in the Common Area are opposed to repair or restoration of the Project, or (3) that the Project has been in existence in excess of fifty (50) years, that it is obsolete and uneconomic, and the Condominium Owners holding in aggregate more than fifty (50%) per cent interest in the Common Areas are opposed to repair or restoration of the Project. The fifty (50%) per cent interest in the Common Areas are opposed to repair or restoration of the Project. The fifty (50%) per cent interests hereinabove recited shall be computed on the basis of fifty (50%) per cent of the value of all Condominiums in the Project at the time of such partition.

Section 2. Nothing herein shall be deemed to prevent partition of a co-tenancy in any of said Condominiums.

ARTICLE XV

ANNEXATION OF ADDITIONAL PROPERTIES

Section 1. Annexation of additional property shall require the assent of two-thirds (2/3) of the Class A Members and two-thirds (2/3) of the Class B Members, if any, at a meeting duly called for this purpose, written notice of which shall be sent to all Members not less than thirty (30) days nor more than sixty (60) days in advance of the meeting setting forth the purpose of the meeting. There is no requirement that annexation or construction be phased in accordance with the sequence shown on the plat map. The presence of members or of proxies entitled to cast sixty (60%) per cent of the votes of each class of membership shall constitute a quorum. If the required quorum is not forthcoming at any meeting, another meeting may be called, subject to the notice requirement set forth above, and the required quorum at such subsequent meeting shall be one-half (1/2) of the required quorum of the preceding meeting. No such subsequent meeting shall be held more than thirty (30) days following the preceding meeting.

BOOK 1094

In the event that two-thirds (2/3) of the Class A membership or two-thirds of the Class B membership are not present in person or by proxy, Members present may give their written assent to the action taken thereat.

Section 2. If, within five (5) years of the date of recordation of this Declaration, the Declarant should develop additional lands within the area described in Exhibit "A" which is attached hereto and by this reference made a part hereof, such additional lands may be annexed to said property without the assent of the Class A Members; provided, however, that the development of the additional lands described in this section shall be in accordance with a general plan submitted to and approved by the City of

## ARTICLE XVI

### GENERAL PROVISIONS

Section 1. Enforcement. In addition to all other remedies provided by law, the Declaration of Restrictions, the Articles of Incorporation and the By-Laws may be enforced by the Association as follows:

(a) Breach of any of the covenants contained in the Declaration and the continuation of any such breach may be enjoined, abated or remedied by appropriate legal proceedings by any Owner, by the Association or the successors in interest of the Association.

(b) The result of every act or omission whereby any of the covenants contained in this Declaration are violated in whole or in part is hereby declared to be and constitutes a nuisance, and every remedy allowed by law or equity against a nuisance either public or private shall be applicable against every such result and may be exercised by any Owner, by the Association or its successors in interest.

(c) The remedies herein provided for breach of the covenants contained in this Declaration shall be deemed cumulative, and no one of such remedies shall be deemed exclusive.

BOOK 1094

1053418

(d) The failure of the Association to enforce any of the covenants contained in this Declaration shall not constitute a waiver of the right to enforce the same thereafter.

(e) A breach of the covenants contained in this Declaration shall not affect or impair the lien or charge of a bona fide mortgage or deed of trust made in good faith and for value on any Condominium or the improvements thereon, provided, however, that any subsequent Owner of such property shall be bound by said covenants, whether such Owner's title was acquired by foreclosure in a trustee's sale or otherwise.

(f) The Association shall have the right to suspend the voting rights and right to use of the recreational facilities by a Member for any period during which any assessment against his Condominium remains unpaid; and for a period not to exceed thirty (30) days after notice and hearing for any infraction of its published rules and regulations

Section 2. Severability. Invalidation of any one of these covenants or restrictions by judgment or court order shall in no way affect any other provisions which shall remain in full force and effect.

Section 3. Term. The covenants and restrictions of this Declaration shall run with and bind the Project, and shall inure to the benefit of and be enforceable by the Association or the Owner of any land subject to this Declaration, their respective legal representatives, heirs, successors and assigns, for a term of fifty (50) years from the date this Declaration is recorded, after which time said covenants and restrictions shall be automatically extended for successive periods of ten (10) years, unless an instrument, signed by a majority of the then Owners, has been recorded, agreeing to change said covenants and restrictions in whole or in part.

Section 4. Construction. The provisions of this Declaration shall be liberally construed to effectuate its purpose of creating a uniform plan for the development of a Condominium Project and for the maintenance of said Project. The article and section headings have been inserted for convenience

BOOK L094

1053418

only, and shall not be considered or referred to in resolving questions or interpretation or construction.

Section 5. Amendments. This Declaration of Restrictions may be amended only by an affirmative vote of not less than seventy-five (75%) per cent of the Class A membership, seventy-five (75%) per cent of the Class B membership, (so long is it exists), seventy-five (75%) per cent of the holders of first mortgages on the Project; and further, this amendment provisions shall not be amended to allow amendments by vote of less than seventy-five (75%) per cent of the Class A membership, seventy-five (75%) per cent of the Class B membership (so long is it exists), and seventy-five (75%) per cent of the holders of first mortgages on the Project.

Section 6. Encroachments. None of the rights and obligations of the Owners created herein or by the Deed, shall be altered in any way by encroachments due to settlement or shifting or structures or any other cause. There shall be valid easements for the maintenance of said encroachments so long as they shall exist; provided, however, that in no event shall a valid easement for encroachment be created in favor of an Owner or Owners if said encroachment occurred due to the willful conduct of said Owner or Owners.

Section 7. Notices. Any notice permitted or required to be delivered as provided herein shall be in writing and may be delivered either personally or by mail. If delivery is made by registered or certified mail, it shall be deemed to have been delivered twenty-four (24) hours after a copy of same has been deposited in the United States mail, postage prepaid, addressed to any person at the address given by such person to the Association for the purpose of service of such notice, or to the Unit of such person if no address has been given to the Association. If such notice is so sent by regular mail, it shall be deemed to have been delivered when received. Such address may be changed from time to time by notice in writing to the Association.

Section 8. Attorney Fees. If an Owner defaults in making a payment of assessments or in the performance or observance of any provision of this Agreement, and the Association has obtained the services of an attorney with

BOOK 1094

1053418

his right of enjoyment to the Common Areas and facilities to the members of his family, his tenants, or contract purchasers who reside at the Project.

Easements are reserved throughout the Project as may be required for utility services of whatsoever nature or description including, but not limited to, those relating to telephone, electric, gas, hot and cold water, heating, refrigeration, air conditioning, ventilating, garbage and sewer disposal, in order to adequately serve the Project; provided, however, that easements of such nature through a Unit shall only be such as are shown in the plans for the buildings to be constructed, or as the buildings shall be constructed, unless approved in writing by the Owner of the servient Unit.

The existing physical boundaries of a Unit or of a Unit reconstructed in substantial accordance with the original plans thereof shall be conclusively presumed to be its boundaries rather than any metes and bounds expressed in the Plan or in an instrument conveying, granting or transferring a Unit, regardless of settling or lateral movement and regardless of minor variances between boundaries shown on the Plan or reflected in the instrument of grant, assignment or conveyance and those existing from time to time.

Section 8. No Owner shall be entitled to sell, lease or otherwise convey or encumber his interest in any of the Common Areas, or in any element of the component interests which comprise his Condominium, except in conjunction with a conveyance of his Condominium, and any attempted or purported transaction in violation of this provision shall be void.

Section 9. There is hereby granted a nonexclusive easement for pedestrian and vehicular ingress and egress over all Association Property as described in this Declaration, as well as all such property as might be annexed by the Declarant hereto in the future. Declarant reserves the right to grant such easements over said property to future Owners of Units which might be annexed hereto in the future.

BOOK 1094

1053418
33

respect to the defaults involved, the Owner covenants and agrees to pay to the Association any costs or fees involved, including reasonable attorney's fees, notwithstanding the fact that a suit has not yet been instituted. In case a suit is instituted, the Owner shall also pay the cost of the suit, in addition to other aforesaid costs and fees.

IN WITNESS WHEREOF, the undersigned, being the Declarant herein, has hereunto set its hand and seal this 26th day of July 19 79.

WILLOWTREE ASSOCIATES, LTD, A Limited Partnership

Dwight Jory-General Partner



OFFICIAL SEAL
CAROLYN BULLIS
NOTARY PUBLIC - STATE OF NEVADA
COUNTY OF CLARK
My Comm. Expires May 11, 1981

1 0 5 3 4 1 8
34 - 34

## EXHIBIT A

*The West half (W½) of the Southeast Quarter (SE¼) of the Northeast Quarter
(NE¼) of Section 27, Township 20 South, Range 60 East, MDB & M.
EXCEPTING THEREFROM that portion conveyed to the State of Nevada for
US-95 Rainbow Expressway - Las Vegas (including abutter's rights) by
the Deed recorded January 4, 1977 in Book 694 of Official Records as
Document No. 653512 and by the Resolution recorded February 15, 1977 as
Document No. 667024, Official Records, Clark County, Nevada.
FURTHER EXCEPTING THEREFROM the North Thirty (30) feet of the West
Seventy-five (75) feet and the South Forty (40) feet of the West
Seventy-five (75).*

CLARK COUNTY NEVADA
JOAN L. SWIFT, RECORDER
RECORDED AT REQUEST OF
STEWART TITLE INSURANCE OF NEVADA
JUL 31 10 22 AM '79
FEE DEPUTY
OFFICIAL RECORDS
BOOK INSTRUMENT
1094 1053418.

# EXHIBIT 3

02/16/2008  16:48    7026393125                   CONSOLIDATED R              PAGE  01/01
11/22/2010  14:33    7022625861                   CMA                        PAGE  01/01
11/22/2010  11:13    7028048887                   NAS

**Nevada Association Services, Inc**

6224 W. Desert Inn Rd., Suite A
Las Vegas, Nevada 89146
Tel: 702.804.8885 / 775.322.8005
Fax: 702.804.8887 / 775.322.8009
www.nas-inc.com

## Consent and Authorization

_____ Union Tree HOA _____ (the "Association") hereby appoints Nevada Association Services, Inc. ("NAS"), as the Association's agent for the purpose of collecting delinquent assessments, and/or fines, from Association homeowners. NAS is given full power and authority to act on behalf of and in the name of the Association to do all things in which NAS deems appropriate to effect the collection of the delinquency. This process may include, but is not limited to, sending demand letters, recording of a Delinquent Assessment Lien and if necessary proceeding with a non-judicial foreclosure. NAS is hereby granted the authority to speak directly to the delinquent homeowner(s) on behalf of the Association. The Association agrees that it will not accept any payments directly from the delinquent homeowner(s) and direct that all payments are to be made to NAS. Should the Association or its agent (except for NAS) accept direct payment, NAS may, at its option and sole discretion, take such action as NAS deems prudent including, but not limited to, refusal to serve the delinquency of the homeowner whose payment was accepted by the Association or cancelling the file with fees and costs the responsibility of the Association.

NAS is being retained on an as-needed basis and NAS makes no representations or warranties regarding the successful result of its collection efforts. NAS has the option of declining to service the delinquency of any file presented by the Association. NAS may, in its own discretion, terminate the servicing of any Association collection file at any time.

The Association represents to NAS (and NAS is relying on such representation) that in referring any matter to NAS for collection of delinquent dues and assessments, the Association, in its assessment and delinquency determination, has complied with all applicable Federal and State rules and regulations, including, but not limited to applicable provisions of the Nevada Revised Statutes, Covenants Conditions and Restrictions (CC&R's), other Association governing documents and the Federal and State Fair Debt Collection Practices Act, if applicable. The Association also permits NAS to charge collection fees and costs as provided under applicable State and Federal law, and the Association's governing documents.

If NAS, its agents, officers or employees are named party to a lawsuit or other legal proceeding involving the Association and/or a homeowner, the Association agrees to indemnify and hold harmless NAS, its agents, officers or employees from any and all claims, losses, judgment, fees, charges and costs, including attorney's fees, incurred by NAS, its agents, officers or employees with respect to such lawsuit or legal proceeding (including defending a lawsuit). In addition to the indemnification described herein, if NAS, its agents, officers or employees, are named as a party to any lawsuit, the Association, at its own expense, will retain the services of legal counsel, satisfactory to NAS, to represent NAS in such proceeding. The fees and costs for such legal representation will be paid directly by the Association to legal counsel, or as otherwise agreed upon by the Association and NAS. This obligation of indemnification shall survive the termination of this Consent and Acknowledgment without time limitation.

The person signing below is a member of the Board of Directors or lawful agent of the Association with full power to bind the Association to the terms hereof.

_RUSS TISDALE_                    _BOARD PRESIDENT_              _6/30/07_
Print Name                         Title                          Date

_V Russell Tisdale_
Authorized Signature

January 2006(A)

EXHIBIT 4



Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
Phone (702) 804-8885
Fax (702) 804-8887
Toll Free (888) 627-5544

June 24, 2010

Nicolas Otomo
7720 Catalina Harbor Street
Las Vegas NV 89131

VIA REGULAR AND
CERTIFIED MAIL

2236469851

> *Re:  NAS #N60074*
> *7720 Catalina Harbor Street, Las Vegas, NV 89131*
> *Lynbrook Master Association*

Dear Sir/Madam:

Nevada Association Services (NAS) has been retained by Lynbrook Master Association (also called the Association) to collect from you the overdue homeowner's assessments you owe to the Association. As of today's date, records show a balance due on your account of $1,447.98. Any statements or invoices you receive from your association or its managing agent will not reflect the total amount due.

If you want to resolve this matter before a Notice of Delinquent Assessment Lien is recorded and sent to you pursuant to Nevada Revised Statutes, you must, within 10 days from the date of this letter, pay the balance due. Your payment must be in the form of cashier's check or money order, payable to Nevada Association Services, and mailed to the address indicated above. Should you decide not to pay within the 10 day period, this office will be entitled to proceed with the preparation and recordation of the Notice of Delinquent Assessment Lien. Should the Notice of Delinquent Assessment Lien be prepared and recorded, the additional cost to you will be $325.00 plus recording and mailing costs. There will also be a $30.00 charge to your account to release the Notice of Delinquent Assessment Lien, plus recording costs. These charges may not be all inclusive.

Federal Law gives you 30 Days from the date you receive this letter (the 30 Day Period) to dispute the validity of the debt or any part thereof. If you do not dispute the validity of the debt or any portion thereof as outlined above, NAS will assume the debt is valid. If you do contest the validity of this debt or any portion thereof, by notifying NAS in writing to that effect, NAS will, as required by law, obtain and mail to you verification of the debt. And, within the 30 Day Period you request in writing the name and address of your original creditor, if the original creditor is different from the current creditor, the Association, NAS will also furnish you with that information. Federal Law does not require NAS to wait until the end of the 30 Day Period to record the Notice of Delinquent Assessment Lien. If, however, you notify NAS, in writing, within the 30 Day Period, that begins with the receipt of this letter, that you dispute the debt or any portion thereof, or that you request the name and address of the original creditor, if the original creditor is different from the current creditor, the Association, NAS will, as required by law, cease collection of the debt or any disputed portion thereof until NAS obtains verification of the debt or the name and address of the original creditor and a copy of such verification or name of the original creditor is mailed to you by NAS.

If you have any questions, please contact an account manager at (702) 804-8885.

Sincerely,

M. Alexander

Megan Alexander
**Nevada Association Services, Inc.**



"Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to collect a debt. Any information obtained will be used for that purpose."

EXHIBIT 5



Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
Phone (702) 804-8885
Fax (702) 804-8887
Toll Free (888) 627-5544

February 13, 2009

Tim Mccright
1117 Willow Tree Drive #C
Las Vegas NV 89128

VIA REGULAR AND
CERTIFIED MAIL

Re:  *1117 Willow Tree Drive #C, Las Vegas, NV 89128*
*Willowtree*

Dear  Mr. Mccright:

Nevada Association Services (NAS) has been retained by Willowtree (also called the Association) to collect from you the overdue homeowner's assessment you owe to the Association. As of today's date, records show a balance due on your account of $1,510.50. Any statements or invoices you receive from your association or its managing agent will not reflect the total amount due.

If you want to resolve this matter before a Notice of Delinquent Assessment Lien is recorded and sent to you pursuant to Nevada Revised Statutes, you must, within 10 days from the date of this letter, pay the balance due. Your payment must be in the form of cashier's check or money order, payable to Nevada Association Services, and mailed to the address indicated above. Should you decide not to pay within the 10 day period, this office will be entitled to proceed with the preparation and recordation of the Notice of Delinquent Assessment Lien. Should the Notice of Delinquent Assessment Lien be prepared and recorded, the additional cost to you will be $325.00 plus recording and mailing costs. There will also be a $30.00 charge to your account to release the Notice of Delinquent Assessment Lien, plus recording costs. These charges may not be all inclusive.

Federal Law gives you 30 Days from the date you receive this letter (the 30 Day Period)  to dispute the validity of the debt or any part thereof. If you do not dispute the validity of the debt or any portion thereof as outlined above, NAS will assume the debt is valid. If you do contest the validity of this debt or any portion thereof, by notifying NAS in writing to that effect, NAS will, as required by law, obtain and mail to you verification of the debt.  And, within the 30 Day Period you request in writing the name and address of your original creditor, if the original creditor is different from the current creditor, the Association, NAS will also furnish you with that information. Federal Law does not require NAS to wait until the end of the 30 Day Period to record the Notice of Delinquent Assessment Lien. If, however, you notify NAS, in writing, within the 30 Day Period, that begins with the receipt of this letter, that you dispute the debt or any portion thereof, or that you request the name and address of the original creditor, if the original creditor is different from the current creditor, the Association, NAS will, as required by law, cease collection of the debt or any disputed portion thereof until NAS obtains verification of the debt or the name and address of the original creditor and a copy of such verification or name of the original creditor is mailed to you by NAS.

If you have any questions, please contact an account manager at (702) 804-8885.

Sincerely,

*M. Alexander*

Megan Alexander
**Nevada Association Services, Inc.**

"Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to collect a debt. Any information obtained will be used for that purpose."

EXHIBIT 6



Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
Phone (702) 804-8885
Fax (702) 804-8887
Toll Free (888) 627-5544

VIA REGULAR AND
CERTIFIED MAIL

July 29, 2010

Nicolas Otomo
7720 Catalina Harbor Street
Las Vegas NV 89131

> *Re: NAS #N60074*
> *7720 Catalina Harbor Street, Las Vegas, NV 89131*
> *Lynbrook Master Association / Nicolas Otomo*

Dear Sir/Madam:

As you were previously advised, Nevada Association Services, Inc. ('NAS') has been retained by Lynbrook Master Association (the Association) to collect from you the overdue homeowner's assessments you owe the Association. As of the date the lien was prepared, the total amount due, including collection fees and costs is $1,848.98 (also called the balance due or debt.) Since you have decided not to reinstate your account, a Notice of Delinquent Assessment Lien was recorded on your property. A copy of the lien is enclosed. The amount stated above does NOT include assessments, late fees, interest, fines, collection fees and costs, and other applicable charges, that have become due since the date the lien was recorded. Those additional amounts must be included when you submit your payment. Therefore, you may wish to contact this office to verify the amount due prior to sending your payment.

Nevada law permits NAS to proceed with the recordation of a Notice of Default and Election to Sell (also called an "NOD") which is the next step in the lien foreclosure process. If you want to resolve this matter before the recordation of the NOD, you must, within 30 days from the date of this letter, pay the balance due by cashier's check or money order payable to NAS. Recording of the NOD will result in additional charges for which you will be responsible. The 30 Day Period referenced in our prior "Initial Letter" still applies. Federal Law grants you 30 Days from the date of receipt of the Initial Letter to dispute the validity of the debt or any portion thereof. Should you fail to dispute, in writing, the validity of the debt or any portion thereof within the 30 Day Period, NAS will assume the debt is valid. If you dispute the debt or any portion thereof in writing, NAS will, to the extent required by law, cease collection efforts until validation of the debt is sent to you.

Sincerely,

Debbie Hansen
**Nevada Association Services, Inc.**
encl.



"Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to collect a debt. Any information obtained will be used for that purpose."

APN # 125-13-626-008
# N60074

Recorded On: 07/26/2010
Book/Instr: 0001610 Book 20100726
County Of: Clark

## NOTICE OF DELINQUENT ASSESSMENT LIEN

In accordance with Nevada Revised Statutes and the Association's declaration of Covenants Conditions
and Restrictions (CC&Rs), recorded on August 06, 1999, as instrument number 02111   Book 990806, of
the official records of Clark County, Nevada, the Lynbrook Master Association has a lien on the following
legally described property.

The property against which the lien is imposed is commonly referred to as 7720 Catalina Harbor Street Las
Vegas, NV 89131 and more particularly legally described as: Lynbrook Unit 10E, Plat book 101, Page 27,
Lot 687, Block 22 in the County of Clark.

The owner(s) of record as reflected on the public record as of today's date is (are):
Nicolas Otomo

Mailing address(es):
7720 Catalina Harbor Street, Las Vegas, NV 89131

*Total amount due through today's date is $1,848.98.
This amount includes late fees, collection fees and interest in the amount of $584.00.
     * Additional monies will accrue under this claim at the rate of the claimant's regular assessments or
special assessments, plus permissible late charges, costs of collection and interest, accruing after the date
of the notice.
     Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is
attempting to collect a debt.  Any information obtained will be used for that purpose.

Dated:   July 20, 2010

Winter Henrie

By: Winter Henrie, of Nevada Association Services, Inc., as agent for Lynbrook Master Association.

When Recorded Mail To:
Nevada Association Services, Inc.
TS #N60074
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
Phone: (702) 804-8885       Toll Free: (888) 627-554



EXHIBIT 7



Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
Phone (702) 804-8885
Fax (702) 804-8887
Toll Free (888) 627-5544

VIA REGULAR AND
CERTIFIED MAIL

March 03, 2009

Tim Mccright
1117 Willow Tree Drive #C
Las Vegas NV 89128

Re:  *1117 Willow Tree Drive #C, Las Vegas, NV 89128*
     *Willowtree / Tim Mccright*

Dear Mr. Mccright:

As you were previously advised, Nevada Association Services, Inc. ('NAS') has been retained by Willowtree (the Association) to collect from you the overdue homeowner's assessments you owe the Association. As of the date the lien was prepared, the total amount due, including collection fees and costs is $1,901.50 (also called the balance due or debt.) Since you have decided not to reinstate your account, a Notice of Delinquent Assessment Lien was recorded on your property. A copy of the lien is enclosed. The amount stated above does NOT include assessments, late fees, interest, fines, collection fees and costs, and other applicable charges, that have become due since the date the lien was recorded. Those additional amounts must be included when you submit your payment. Therefore, you may wish to contact this office to verify the amount due prior to sending your payment.

Nevada law permits NAS to proceed with the recordation of a Notice of Default and Election to Sell (also called an "NOD") which is the next step in the lien foreclosure process. If you want to resolve this matter before the recordation of the NOD, you must, within 30 days from the date of this letter, pay the balance due by cashier's check or money order payable to NAS. Recording of the NOD will result in additional charges for which you will be responsible. The 30 Day Period referenced in our prior "Initial Letter" still applies. Federal Law grants you 30 Days from the date of receipt of the Initial Letter to dispute the validity of the debt or any portion thereof. Should you fail to dispute, in writing, the validity of the debt or any portion thereof within the 30 Day Period, NAS will assume the debt is valid. If you dispute the debt or any portion thereof in writing, NAS will, to the extent required by law, cease collection efforts until validation of the debt is sent to you.

Sincerely,

*[signature]*

Sam Ahern
**Nevada Association Services, Inc.**
encl.

"Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to collect a debt. Any information obtained will be used for that purpose."

Receipt/Conformed Copy

Requestor:
NORTH AMERICAN TITLE COMPANY
03/02/2009 10:11:27 T20090069439
Book/Instr: 20090302-0002002
Lien                    Page Count: 1
Fees: $14.00        N/C Fee: $0.00

Debbie Conway
Clark County Recorder

APN # 138-27-612-103
#N42934

## NOTICE OF DELINQUENT ASSESSMENT LIEN

In accordance with Nevada Revised Statutes and the Association's declaration of Covenants Conditions
and Restrictions (CC&Rs), recorded on July 31, 1979, as instrument number 1053418 Book 1094, of the
official records of Clark County, Nevada, the Willowtree has a lien on the following legally described
property.

The property against which the lien is imposed is commonly referred to as 1117 Willow Tree Drive #C Las
Vegas, NV 89128 and more particularly legally described as: Willow Tree Unit 2, Plat Book 25, page 63,
Unit C, Bldg 43 in the County of Clark.

The owner(s) of record as reflected on the public record as of today's date is (are):
Tim Mccright

Mailing address(es):
1117 Willow Tree Drive #C, Las Vegas, NV 89128

*Total amount due through today's date is $1,901.50.
This amount includes late fees, collection fees and interest in the amount of $684.00.
   * Additional monies will accrue under this claim at the rate of the claimant's regular assessments or
special assessments, plus permissible late charges, costs of collection and interest, accruing after the date
of the notice.
      Nevada Association Services, Inc. is a debt collector.  Nevada Association Services, Inc. is
attempting to collect a debt.  Any information obtained will be used for that purpose.

Dated:   February 26, 2009

By  Autumn Fesel, of Nevada Association Services, Inc., as agent for Willowtree.

When Recorded Mail To:
Nevada Association Services, Inc.
TS #N42934
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
(702) 804-8885
(888) 627-5544

EXHIBIT 8

Inst #: **201007260001610**
Fees: $14.00
N/C Fee: $0.00
07/26/2010 09:09:50 AM
Receipt #: 439120
Requestor:
**NORTH AMERICAN TITLE COMPAN**
Recorded By: KGP  Pgs: 1
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN # 125-13-626-008
# N60074

## NOTICE OF DELINQUENT ASSESSMENT LIEN

In accordance with Nevada Revised Statutes and the Association's declaration of Covenants Conditions
and Restrictions (CC&Rs), recorded on August 06, 1999, as instrument number 02111  Book 990806, of
the official records of Clark County, Nevada, the Lynbrook Master Association has a lien on the following
legally described property.

The property against which the lien is imposed is commonly referred to as 7720 Catalina Harbor Street Las
Vegas, NV 89131 and more particularly legally described as: Lynbrook Unit 10E, Plat book 101, Page 27,
Lot 687, Block 22 in the County of Clark.

The owner(s) of record as reflected on the public record as of today's date is (are):
Nicolas Otomo

Mailing address(es):
7720 Catalina Harbor Street, Las Vegas, NV 89131

*Total amount due through today's date is $1,848.98.
This amount includes late fees, collection fees and interest in the amount of $584.00.
* Additional monies will accrue under this claim at the rate of the claimant's regular assessments or
special assessments, plus permissible late charges, costs of collection and interest, accruing after the date
of the notice.
Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is
attempting to collect a debt. Any information obtained will be used for that purpose.

Dated:  July 20, 2010

By: Winter Henrie, of Nevada Association Services, Inc., as agent for Lynbrook Master Association.

When Recorded Mail To:
Nevada Association Services, Inc.
TS #N60074
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
Phone: (702) 804-8885       Toll Free: (888) 627-554

# EXHIBIT 9

Receipt/Conformed Copy
Requestor:
NORTH AMERICAN TITLE COMPANY
03/02/2009 10:11:27 T20090069439
Book/Instr: 20090302-0002002
Lien            Page Count: 1
Fees: $14.00    N/C Fee: $0.00

Debbie Conway
Clark County Recorder

APN # 138-27-612-103
# N42934

## NOTICE OF DELINQUENT ASSESSMENT LIEN

In accordance with Nevada Revised Statutes and the Association's declaration of Covenants Conditions and Restrictions (CC&Rs), recorded on July 31, 1979, as instrument number 1053418 Book 1094, of the official records of Clark County, Nevada, the Willowtree has a lien on the following legally described property.

The property against which the lien is imposed is commonly referred to as 1117 Willow Tree Drive #C Las Vegas, NV 89128 and more particularly legally described as: Willow Tree Unit 2, Plat Book 25, page 63, Unit C, Bldg 43 in the County of Clark.

The owner(s) of record as reflected on the public record as of today's date is (are):
Tim Mccright

Mailing address(es):
1117 Willow Tree Drive #C, Las Vegas, NV 89128

 *Total amount due through today's date is $1,901.50.
This amount includes late fees, collection fees and interest in the amount of $684.00.
   * Additional monies will accrue under this claim at the rate of the claimant's regular assessments or special assessments, plus permissible late charges, costs of collection and interest, accruing after the date of the notice.
   Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to collect a debt. Any information obtained will be used for that purpose.

Dated:   February 26, 2009

By   Autumn Fesel, of Nevada Association Services, Inc., as agent for Willowtree.

When Recorded Mail To:
Nevada Association Services, Inc.
TS #N42934
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
(702) 804-8885
(888) 627-5544

# EXHIBIT 10



Nevada Association Services
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
Phone: (702) 804-8885
Fax: (702) 804-8887
Toll Free: (888) 627-5544

October 5, 2010

Nicolas Otomo
7720 Catalina Harbor Street
Las Vegas NV 89131

> RE: 7720 Catalina Harbor Street
> Lynbrook Master Association / Nicolas  Otomo
> NAS # N60074

Dear Sir/Madam:

As you know, your failure to pay your homeowner's association assessments has resulted in a
Notice of Delinquent Assessment Lien being recorded against your property. The Association will
soon proceed with a non-judicial foreclosure action, which could result in you losing your property.
You will also be responsible to pay the additional foreclosure fees and costs, which could total
approximately $700 in additional charges.

Both this office and your Association urge you to contact Nevada Association Services, Inc. in order
to arrange for immediate payment. Should you decide not to remit full payment in the form of
cashier's check or money order, to this office, within 10 days of the date of this letter, foreclosure
proceedings will commence.
<u>YOU MUST CONTACT THIS OFFICE TO VERIFY THE AMOUNT DUE PRIOR TO SENDING
YOUR PAYMENT.</u>

This will be the final correspondence you will receive prior to a Notice of Default being recorded on
your property.

Thank you in advance for your immediate payment.

Sincerely,

Shanel Macias

Shanel Macias
**Nevada Association Services, Inc.**

Nevada Association Services, Inc. is a debt collector.  Nevada Association Services, Inc. is attempting to collect a debt.  Any information
obtained will be used for that purpose.

# EXHIBIT 11



Nevada Association Services
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
(702) 804-8885
(702) 804-8887
(888) 627-5544

March 25, 2009

Tim Mccright
1117 Willow Tree Drive #C
Las Vegas NV 89128

     *RE: 1117 Willow Tree Drive #C*
     *Willowtree / Tim  Mccright*
     *Trustees Sale # N42934*

Dear Mr. Mccright:

As you know, your failure to pay your homeowner's association assessments has resulted in a lien being recorded against your property.  The Association will soon proceed with a non-judicial foreclosure action, which could result in you losing your property.  You will also be responsible to pay the additional foreclosure fees and costs, which could total approximately $700 in additional charges.

Both this office and your Association urge you to contact Nevada Association Services, Inc. in order to arrange for immediate payment.  Should you decide not to remit full payment in the form of cashier's check or money order, to this office, within 10 days of the date of this letter, foreclosure proceedings will commence.  <u>YOU MUST CONTACT THIS OFFICE TO VERIFY THE AMOUNT DUE PRIOR TO SENDING YOUR PAYMENT.</u>

This will be the final correspondence you will receive prior to a Notice of Default being recorded on your property.

Thank you in advance for your immediate payment.

Sincerely,

R. Silva
**Nevada Association Services, Inc.**

da Association Services, Inc. is a debt collector.  Nevada Association Services, Inc. is attempting to collect a debt.  Any information
ned will be used for that purpose.

# EXHIBIT 12

Inst #: 201010210001715
Fees: $15.00
N/C Fee: $0.00
10/21/2010 10:08:46 AM
Receipt #: 548794
Requestor:
**NORTH AMERICAN TITLE COMPAN**
Recorded By: SOL  Pgs: 2
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN # 125-13-626-008
NAS # N60074
North American Title # 28628
Property Address: 7720 Catalina Harbor Street

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER
## HOMEOWNERS ASSOCIATION LIEN

### IMPORTANT NOTICE

## WARNING! IF YOU FAIL TO PAY THE AMOUNT SPECIFIED IN THIS NOTICE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE!

IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION and you may have the legal right to bring your account in good standing by paying all your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account.  No sale date may be set until ninety (90) days from the date this notice · of default was mailed to you. The date this document was mailed to you appears on this notice.

This amount is $3,256.98 as of October 18, 2010 and will increase until your account becomes current.
While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage, or as required under your Covenants Conditions and Restrictions.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property or pay other obligations as required by your note and deed of trust or mortgage, or as required under your Covenants Conditions and Restrictions, the Lynbrook Master Association (the Association) may insist that you do so in order to reinstate your account in good standing.  In addition, the Association may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes and hazard insurance premiums.
Upon your request, this office will mail you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your Association may mutually agree in writing prior to the foreclosure sale to, among other things, 1) provide additional time in which to cure the default by transfer of the property or otherwise; 2) establish a schedule of payments in order to cure your default; or both (1) and (2).
Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your Association permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your Association.
To find out about the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: Nevada Association Services, Inc. on behalf of Lynbrook Master Association, 6224 W. Desert Inn Road, Suite A, Las Vegas, NV 89146.  The phone number is (702) 804-8885 or toll free at (888) 627-5544.
If you have any questions, you should contact a lawyer or the Association which maintains the right of assessment on your property.

NAS # N60074

Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

## REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.
## NOTICE IS HEREBY GIVEN THAT NEVADA ASSOCIATION SERVICES, INC.

is the duly appointed agent under the previously mentioned Notice of Delinquent Assessment Lien, with the owner(s) as reflected on said lien being Nicolas Otomo, dated July 20, 2010, and recorded on July 26, 2010 as instrument number 0001610 Book 20100726 in the official records of Clark County, Nevada, executed by Lynbrook Master Association, hereby declares that a breach of the obligation for which the Covenants Conditions and Restrictions, recorded on August 06, 1999, as instrument number 02111  Book 990806, as security has occurred in that the payments have not been made of homeowner's assessments due from January 01, 2010 and all subsequent homeowner's assessments, monthly or otherwise, less credits and offsets, plus late charges, interest, trustee's fees and costs, attorney's fees and costs and Association fees and costs.

That by reason thereof, the Association has deposited with said agent such documents as the Covenants Conditions and Restrictions and documents evidencing the obligations secured thereby, and declares all sums secured thereby due and payable and elects to cause the property to be sold to satisfy the obligations.

Nevada Association Services, Inc. is a debt collector.  Nevada Association Services, Inc. is attempting to collect a debt.  Any information obtained will be used for that purpose.

Nevada Associations Services, Inc., whose address is 6224 W. Desert Inn Road, Suite A, Las Vegas, NV 89146 is authorized by the association to enforce the lien by sale.

Legal_Description: Lynbrook Unit 10E, Plat book 101, Page 27, Lot 687, Block 22 in the County of Clark

Dated: October 18, 2010

By: Autumn Fesel, of Nevada Association Services, Inc.
on behalf of Lynbrook Master Association

When Recorded Mail To:
Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
(702) 804-8885
(888) 627-5544

# EXHIBIT 13

(           (

Inst #: 200911170003349
Fees: $15.00
N/C Fee: $0.00
11/17/2009 02:47:45 PM
Receipt #: 131345
Requestor:
FIRST AMERICAN TITLE NDTS
Recorded By: MGM   Pgs: 2
DEBBIE CONWAY
CLARK COUNTY RECORDER

APN # 138-27-612-103
Trustee's Sale # N42934
First American Title Nevada/NDTS #
PropertyAddress: 1117 Willow Tree Drive #C

First American Title

4315750-AT

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER HOMEOWNERS ASSOCIATION LIEN

### IMPORTANT NOTICE

## WARNING! IF YOU FAIL TO PAY THE AMOUNT SPECIFIED IN THIS NOTICE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE!

IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION and you may have the legal right to bring your account in good standing by paying all your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account. No sale date may be set until ninety (90) days from the date this notice of default was mailed to you. The date this document was mailed to you appears on this notice.

This amount is $1,901.50 as of November 12, 2009 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage, or as required under your Covenants Conditions and Restrictions. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property or pay other obligations as required by your note and deed of trust or mortgage, or as required under your Covenants Conditions and Restrictions, the Willowtree (the Association) may insist that you do so in order to reinstate your account in good standing. In addition, the Association may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes and hazard insurance premiums.

Upon your request, this office will mail you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your Association may mutually agree in writing prior to the foreclosure sale to, among other things, 1) provide additional time in which to cure the default by transfer of the property or otherwise; 2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your Association permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your Association.

To find out about the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: Nevada Association Services, Inc. on behalf of Willowtree, 6224 W. Desert Inn Road, Suite A, Las Vegas, NV 89146. The phone number is (702) 804-8885 or toll free at (888) 627-5544.

If you have any questions, you should contact a lawyer or the Association which maintains the right of assessment on your property.

Trustee's Sale # N42934

Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

### REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.
### NOTICE IS HEREBY GIVEN THAT NEVADA ASSOCIATION SERVICES, INC.

is the duly appointed agent under the previously mentioned Notice of Delinquent Assessment Lien, with the owner(s) as reflected on said lien being Tim McCright, dated February 26, 2009, and recorded on March 02, 2009 as instrument number 0002002 Book 20090302 in the official records of Clark County, Nevada, executed by Willowtree, hereby declares that a breach of the obligation for which the Covenants Conditions and Restrictions, recorded on July 31, 1979, as instrument number 1053418 Book 1094, as security has occurred in that the payments have not been made of homeowner's assessments due from November 01, 2008 and all subsequent homeowner's assessments, monthly or otherwise, less credits and offsets, plus late charges, interest, trustee's fees and costs, attorney's fees and costs and Association fees and costs.

That by reason thereof, the Association has executed and delivered to said agent a written authorization and has deposited with said agent such documents as the Covenants Conditions and Restrictions and documents evidencing the obligations secured thereby, and declares all sums secured thereby immediately due and payable and elects to cause the property to be sold to satisfy the obligations.

Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to collect a debt. Any information obtained will be used for that purpose.

Nevada Associations Services, Inc., whose address is 6224 W. Desert Inn Road, Suite A, Las Vegas, NV 89146 is authorized by the association to enforce the lien by sale.

Legal_Description: Willow Tree Unit 2, Plat Book 25, page 63, Unit C, Bldg 43 in the County of Clark

Dated: November 12, 2009

*N. Collins*

By: Natasha Collins, of Nevada Association Services, Inc.
on behalf of Willowtree

When Recorded Mail To:
Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
(702) 804-8885
(888) 627-5544

# EXHIBIT 14



Inst #: 201011230002309
Fees: $15.00
N/C Fee: $0.00
11/23/2010 01:16:08 PM
Receipt #: 588507
Requestor:
NEVADA ASSOCIATION SERVICES
Recorded By: LEX   Pgs: 2
DEBBIE CONWAY
CLARK COUNTY RECORDER

138-27-612-103
RECORDING REQUESTED BY:
FATCO
WHEN RECORDED MAIL TO:
NEVADA ASSOCIATION SERVICES, INC.
6224 W. DESERT INN RD. SUITE #A
LAS VEGAS, NEVADA 89146
N42934

NAME OF DOCUMENT TO BE RECORDED

NOTICE OF FORECLOSURE SALE

APN # 138-27-612-103                                                    NAS # N42934
Willowtree

## NOTICE OF FORECLOSURE SALE

**WARNING! A SALE OF YOUR PROPERTY IS IMMINENT! UNLESS
YOU PAY THE AMOUNT SPECIFIED IN THIS NOTICE BEFORE
THE SALE DATE, YOU COULD LOSE YOUR HOME, EVEN IF THE
AMOUNT IS IN DISPUTE. YOU MUST ACT BEFORE THE SALE
DATE. IF YOU HAVE ANY QUESTIONS, PLEASE CALL NEVADA
ASSOCIATION SERVICES, INC. AT (702) 804-8885. IF YOU NEED
ASSISTANCE, PLEASE CALL THE FORECLOSURE SECTION OF
THE OMBUDSMAN'S OFFICE, NEVADA REAL ESTATE DIVISION,
AT 1-877-829-9907 IMMEDIATELY.**

YOU ARE IN DEFAULT UNDER A DELINQUENT ASSESSMENT LIEN, February 26, 2009. UNLESS
YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF
YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU
SHOULD CONTACT A LAWYER.

NOTICE IS HEREBY GIVEN THAT on December 23, 2010 at 10:00 am at the front entrance to the
Nevada Legal News, 930 So. Fourth Street, Las Vegas, Nevada, under the power of sale pursuant to the terms
of those certain covenants conditions and restrictions recorded on July 31, 1979 as instrument number 1053418
Book 1094 of official records of Clark County, Nevada Association Services, Inc., as duly appointed agent
under that certain Delinquent Assessment Lien, recorded on March 2, 2009 as document number 0002002
Book 20090302 of the official records of said county, will sell at public auction to the highest bidder, for lawful
money of the United States, all right, title, and interest in the following commonly known property known as:
1117 Willow Tree Drive #C, Las Vegas, NV 89128. Said property is legally described as: Willow Tree Unit 2,
Plat Book 25, page 63, Unit C, Bldg 43, official records of Clark County, Nevada.

The owner(s) of said property as of the date of the recording of said lien is purported to be: Tim McCright
The undersigned agent disclaims any liability for incorrectness of the street address and other common
designations, if any, shown herein. The sale will be made without covenant or warranty, expressed or implied
regarding, but not limited to, title or possession, or encumbrances, or obligations to satisfy any secured or
unsecured liens. The total amount of the unpaid balance of the obligation secured by the property to be sold
and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of
Sale is $2,629.67. Payment must be in cash or a cashier's check drawn on a state or national bank, check
drawn on a state or federal savings and loan association, savings association or savings bank and authorized to
do business in the State of Nevada. The Notice of Default and Election to Sell the described property was
recorded on November 17, 2009 as instrument number 0003349 Book 20091117 in the official records of Clark
County.

Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to
collect a debt. Any information obtained will be used for that purpose.

November 19, 2010                      Nevada Association Services, Inc.
                                       6224 W. Desert Inn Road, Suite A
                                       Las Vegas, NV 89146   (702) 804-8885, (888) 627-5544

When Recorded Mail To:
Nevada Association Services, Inc.      By: Elissa Hollander, Agent for Association and employee of
6224 W. Desert Inn Road, Suite A       Nevada Association Services, Inc.
Las Vegas, NV 89146